(Del. Rev.12/98)

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

Rhonda A. Coleman

_____

(Name of Plaintiff or Plaintiffs)

        0 8 - 5 0

       v.

**CIVIL ACTION No. _____**

Wilmington Trust

_____

(Name of Defendant or Defendants)

## *COMPLAINT UNDER TITLE VII*

## *OF THE CIVIL RIGHTS ACT OF 1964*

1.    This action is brought pursuant to *Title VII of the Civil Rights Act of 1964*, as amended, for

**employment discrimination.** Jurisdiction exists by virtue of 42 U.S.C. $2000e$-5. Equitable and other relief are also

sought under 42 U.S.C. $2000e$-5(g).

2.    Plaintiff resides at   16 Meghaws Way

                (Street Address)

Pennsville    Salem    NJ    08070

(City)     (County)     (State)     (Zip Code)

856-935-1161

(Area Code) (Phone Number)

3.    Defendant resides at, or its business is located at   1100 North Market St

                                             (Street Address)

Wilmington    New Castle County    DE    19890

(City)     (County)     (State)     (Zip Code)

4.    The discriminatory conduct occurred in connection with plaintiff's employment at, or application to

be employed at, defendant's   Wilmington Trust    place of bussiness

                         (Defendant's Name)

located at   1100 North Market St

        (Street Address)

Wilmington    New Castle County, DE    19890

(City)     (County)     (State)     (Zip Code)

5.    The alleged discriminatory acts occurred on ___ ∂∂ ___, ___ Dec. ___, ___ ∂004 ___ thru
                                                    (Day)        (Month)        (Year)
                                                    ∂4           July           ∂006

6.    The alleged discriminatory practice    ◯ is    ✗ is not continuing.

7.    Plaintiff filed charges with the Department of Labor of the State of Delaware,

| (Agency) | (Street Address) | (City) | | |
|---|---|---|---|---|
| | | | | , regarding |
| (County) | (State) | (Zip Code) | | |

defendant's alleged discriminatory conduct on _____, _____, _____ .
                                              (Day)      (Month)      (Year)

8.    Plaintiff filed charges with the Equal Employment opportunity Commission of the United States
regarding defendant's alleged discriminatory conduct on: ___ ∂∂ ___, ___ Dec ___, ___ ∂004 ___ thru
                                                          (Day)        (Month)        (Year)
                                                          ∂4           July           ∂006

9.    The Equal Employment Opportunity Commission issued the attached Notice-of-Right-to-Sue letter
which was received by plaintiff on: ___ 31 ___, ___ Oct ___, ___ 2007 ___ .
                                     (Day)        (Month)       (Year)

## *(NOTE:    ATTACH NOTICE-OF-RIGHT-TO-SUE LETTER TO THIS COMPLAINT.)*

10.    The alleged discriminatory acts, in this suit, concern:

A.    ◯    Failure to employ plaintiff.

B.    ✗    Termination of plaintiff's employment.

C.    ◯    Failure to promote plaintiff.

D.    ✗    Other acts (please specify below)

Retaliation

11.    Defendant's conduct is discriminatory with respect to the following:

    A.    **O**  Plaintiff's race

    B.    **O**  Plaintiff's color

    C.    **X**  Plaintiff's sex

    D.    **O**  Plaintiff's religion

    E.    **O**  Plaintiff's national origin

12.    A copy of the charges filed with the Equal Employment Opportunity Commission is attached to this complaint and is submitted as a brief statement of the facts of plaintiff's claim.

13.    If relief is not granted, plaintiffs will be irreparably denied rights secured by Title VII of the 1964 CivilRights Act, as amended.

14.    Plaintiff's has no adequate remedy at law to redress the wrongs described above.

### *THEREFORE*, Plaintiff prays as follows: (Check appropriate letter(s))

    A.  **X**  That all fees, cost or security attendant to this litigation be hereby waived.

    B.  **X**  That the Court appoint legal counsel.

    C.  **X**  That the Court grant such relief as may be appropriate, including injunctive orders, damages, cost and attorney's fees.

**I declare under penalty of perjury that the foregoing is true and correct.**

Dated: ____11/22/2008____

_____
(Signature of Plaintiff)

_____
(Signature of additional Plaintiff)

EEOC Form 161 (10/96)

**S. EQUAL EMPLOYMENT OPPORTUNITY MMISSION**

0 8 - 5 0

## DISMISSAL AND NOTICE OF RIGHTS

To: Rhonda Coleman
16 Meghan's Way
Pennsville, NJ 08070

From: Equal Employment Opportunity Commission
Philadelphia District Office
801 Market Street, Suite 1300
Philadelphia, PA 19107-3127

*On behalf of person(s) aggrieved whose identity is*
[  ]  *CONFIDENTIAL (29 CFR § 1601.7(a))*

| Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| 530-2007-02898 | Legal unit | (215) 440-2828 |

### THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:

[  ]  The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC.

[  ]  Your allegations did not involve a disability that is covered by the Americans with Disabilities Act.

[  ]  The Respondent employs less than the required number of employees or is not otherwise covered by the statues.

[  ]  We cannot investigate your charge because it was not filed within the time limit required by law.

[  ]  Having been given 30 days in which to respond, you failed to provide information, failed to appear or be available for interviews/conferences, or otherwise failed to cooperate to the extent that it was not possible to resolve your charge.

[  ]  While reasonable efforts were made to locate you, we were not able to do so.

[  ]  You had 30 days to accept a reasonable settlement offer that afford full relief for the harm you alleged.

[ X ]  The EEOC issues the following determination: Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes. This does not certify that the respondent is in compliance with the statutes. No finding is made as to any other issues that might be construed as having been raised by this charge.

[  ]  The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge.

[  ]  Other *(briefly state)*

### - NOTICE OF SUIT RIGHTS -

*(See the additional information attached to this form.)*

**Title VII, the Americans with Disabilities Act, and/or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court. Your lawsuit **must be filed WITHIN 90 DAYS from your receipt of this Notice**; otherwise, your right to sue based on this charge will be lost. (The time limit for filing suit based on a state claim may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that **backpay due for any violations that occurred more than 2 years (3 years) before you file suit may not be collectible.**

On behalf of the Commission

Marie M. Tomasso, District Director

*October 26, 2007*
*(Date Mailed)*

Enclosure(s)

Information Sheet

cc:  Wilmington Trust Comapny
Racann Warner, Esquire ( For Charging Party)
Michael DiGregorio, Sr. VP General counsel (For Respondent)

0 8 - 5 0

EEOC Form 5 (5/01)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other Information before completing this form. | ☐ FEPA<br>☒ EEOC | |

| Delaware Department of Labor | | and EEOC |
|---|---|---|
| State or local Agency, if any | | |

| Name (Indicate Mr., Ms., Mrs.)<br>Mrs. Rhonda Coleman | Home Phone No. (Incl Area Code)<br>(856) 935- 1161 | Date of Birth |
|---|---|---|
| Street Address<br>16 Meghan's Way | City, State and ZIP Code<br>Pennsville, NJ 08070 | |

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. (If more than two, list under PARTICULARS below.)

| Name<br>Wilmington Trust Company | No. Employees, Members<br>2500 plus | Phone No. (include Area Code)<br>302-651-1463 |
|---|---|---|
| Street Address<br>1100 North market Street | City, State and ZIP Code<br>Wilmington, DE 19890 | |

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|

| Street Address | City, State and ZIP Code | |
|---|---|---|

DISCRIMINATION BASED ON (Check appropriate box(es).)

☐ RACE    ☐ COLOR    ☒ SEX    ☐ RELIGION    ☐ NATIONAL ORIGIN

☒ RETALIATION    ☐ AGE    ☐ DISABILITY    ☐ OTHER (Specify below.)

DATE(S) DISCRIMINATION TOOK PLACE

Earliest    Latest

July 24, 2006

☐ CONTINUING ACTION

THE PARTICULARS ARE (If additional paper is needed, attach extra sheet(s)):
This is a claim of discrimination based on sex and retaliation for complaints of sexual discrimination resulting in my termination from Wilmington Trust Company on July 24, 2006 in violation of Title VII of 1964 Civil Rights Act. I have been employed by Wilmington Trust since August 25, 1996. My most recent position was as a General Services Asset Coordinator. On August 20, 2004, James Tancredi, a male General Services Asset Coordinator, was promoted to section manager, although I was more qualified and had less disciplinary history. On December 22, 2004, Mr. Tancredi made offensive remarks to women in my presence and the presence of John Evans, our division manager. He made comments that I could not handle large projects and was not experienced. He made the comment that another female staff member was not qualified to judge workstation standards. He said that the construction plans drawn by a design firm owned by two females were the kind "he could do in his basement".

I complained to Human Resources, specifically Ed Emmi, on December 22, 2004,

December 23, 2004, and January 10, 2005 that Mr. Tancredi's remarks were offensive to me because they demeaned women. I also complained that the failure to promote me to section manager and the failure to pay me equally to James Tancredi prior to his promotion was sexual discrimination in violation of VII of the 1964 Civil Right Act. Although Respondent's policy is to appoint an Affirmative Action Officer to investigate claims of sexual discrimination, one was never appointed.

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – When necessary for State and Local Agency Requirements |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.<br>SIGNATURE OF COMPLAINANT |
| 5/16/07<br>Date          Charging Party Signature | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE<br>(month, day, year) |

EEOC Form 5 (5/01)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | ☐ FEPA<br>☒ EEOC | |

_____ and EEOC

*State or local Agency, if any*

THE PARTICULARS ARE *(Continued from previous page):*

Subsequently, on January 5, 2005, I was informed travel would now be a job requirement by John Evans, which constituted retaliation for going to Human Resources in violation of the 1964 Civil Rights Act. On September 23, 2005, James Tancredi disciplined me with a Level II warning. On May 22,2006, James Tancredi disciplined me with a Level III warning. Both warnings contained manufactured allegations and constituted retaliation. The warnings were based on alleged performance issues. However, males within the company, such as Mark Andress, a manager, routinely failed to comply with management or perform well and were not disciplined nor terminated. On March 31, 2005 I was denied requests for a company car by Dave Gibson, a manager, to meet my travel requirements although males, such as James Tancredi, were given company cars in order to travel. My workload increased dramatically after I went to Human Resources. In June 2006 I both James Tancredi and John Evans manufactured reasons to criticize my performance. Finally, on July 24, 2006, I was notified orally by Andrea Johnson and Jim O'Neill from Human Resources that I was being terminated.

I complained to Andrea Johnson in Human Resources in October 2005, May 2006, June 2006, and July 2006 that I was experiencing retaliation for complaining about sexual discrimination. The workload increase, warnings issued, and termination were clearly based on sexual discrimination and retaliation for complaining of sexual discrimination. I believe this because Mark Andress, a male manager whose superior was John Evans, was never disciplined nor terminated due to performance, although he failed to perform on several occasions including failure to complete work orders on August 18, 2005 and June 13, 2006. Although I complained of sexual discrimination and retaliation, no Affirmative Action Officer was appointed to investigate as mandated by Respondent's policy. The harassment, discipline, and termination were based on sexual discrimination and/or retaliation. Statements made by both of my superiors, James Tancredi and John Evans, indicate a bias toward women. James Tancredi made disparaging remarks about women in my presence on December 22, 2004. When I complained to John Evans about this, he made the remark that my "back was all up at this meeting".

As a direct and proximate result of the actions of Respondent and its agents, I am suffering lost wages, earnings and benefits including lost pension, cost of looking for a new job, humiliation, embarrassment, injury to reputation, emotional distress and other pecuniary and non-pecuniary losses.

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – *When necessary for State and Local Agency Requirements* |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.<br>SIGNATURE OF COMPLAINANT |
| S 16 07            *Charging Party Signature*<br>*Date* | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE<br>*(month, day, year)* |

NAME:    **Rhonda Coleman**                          **DATE: May 16, 2007**

## DISCIPLINE QUESTIONNAIRE
### (DEMOTION, SUSPENSION, DISCHARGE, ETC.)

1.    Provide your employment history with the Respondent employer as follows:

a)    date of hire:

**August 25, 1996**

b)    position title at time of hire:

**Building Management Accounting Specialist**

c)    position title at time of most recent discipline:

**General Services Asset Coordinator**

d)    date you were selected for the job you held at the time of the most recent
discipline:

**1998**

e)    name of section/department at time of most recent discipline:

**Real Estate Planning & Development/ General Services Division**

f)    name and title of your immediate supervisor at time of most recent discipline:

**James Tancredi, Real Estate Planning & Division Section Manager**

2.    Describe the most recent discipline (discharge, suspension, demotion, etc.) given you:

**I was terminated on July 24, 2006.**

3.    What explanation was given to you as to the reason(s) for your receiving this most recent
discipline?

   **I was informed by the Human Resources manager, Jim O'Neil, and a Human
Resources representative, Andrea Johnson, that I was being terminated for performance
reasons, although no specific reasons were given to me at the time or subsequently.**

4.    On what date were you told of the discipline to be given you?

**July 24, 2006**

5.    Were you informed orally or in writing of this discipline?

    **Orally**

6.    What are the name and title of the person who informed you of the discipline to be given you?

    **Jim O'Neil, Human Resources manager.**
    **Andrea Johnson, Human Resources Representative.**

7.    If known, is the person identified in Q.#6 the person who recommended your discipline?

    **Unknown.**

    If not, identify by name and title the person who recommended that you be disciplined.

    **Unknown.**

*If you were disciplined for performance deficiencies, please answer questions 8-13 and provide copies of all documents in your possession which describe each answer.*

8.    What is the employer's discipline policy related to alleged performance deficiencies?

    **I am not aware of the employer's discipline policy related to alleged performance deficiencies.**

9.    How do you know what this discipline policy is?

10.   Did you have performance problems to the extent claimed by your employer? If not, what is your version of your performance record and how can this be documented?

    **I did not have performance problems to the extent claimed by my employer. I believe the Level II and Level III written warning Memos contained allegations made by John Evans and James Tancredi in retaliation for my complaining to Human Resources about sexual discrimination by my employer.**

    **Problems regarding absenteeism were due to medical issues. I notified both Human Resources and Management that I was having health problems in October 2004. John Evans, the division manager, gave me a verbal warning regarding excessive absenteeism on October 29, 2004, which I explained was due to medical issues. He never advised me to go**

2

to Human Resources or of the existence of FMLA.

The second warning was a Level II warning Memo from James Tancredi, a section manager. It was given on September 23, 2005. The reasons for the warnings were "Inappropriate and Unprofessional Behavior and Excessive Absenteeism". I responded to this Memo in an Intra-Company Memorandum on September 30, 2005 which explained the absenteeism was due to health issues related to work place stress.

Further, I apologized for using offensive language in her communications with James Tancredi, Section Manager, dated September 2, 2005 and explained the reasons I was upset with John Evans and my understanding of the need to act more professionally in such situations.

The third warning was a Level III warning Memo from James Tancredi, Section Manager, dated May 22, 2006 regarding unacceptable performance and continued attendance issues.

I took issue with the allegation that I was unwilling to comply with the requests of my supervisors, as claimed in the Level III warning Memo. I was willing to perform any duty that was assigned to me.

I drafted a rebuttal to this Level III warning Memo. I then emailed Andrea Johnson, explaining that I was experiencing retaliation. I requested that we set up a meeting on July 17, 2006 to discuss this and review my draft rebuttal to the Level III warning Memo. I explained that I had written proof that the allegations in this warning were untrue. The meeting was rescheduled for July 24, 2006. I was informed that I was terminated at that meeting by Andrea Johnson and Jim O'Neil of Human Resources. Further, Human Resources refused to accept my written rebuttal.

The Level II and III warning Memos and other supporting documentation are attached hereto as Exhibit "A".

11.    Is performance documented by means such as manual or computer-generated sales records, productivity reports, etc.? If yes, describe the type(s) of reports generated. If there are no such reports or listings, explain to the best of your knowledge how the employer keeps track of performance-related matters.

No.

12.    Describe your last 2 performance reviews, to include the overall rating, any specific area(s) of negative comments, the approximate date of each review, and the name and title of the person who gave you each review.

3

On the Performance Review received on 10/22/04, for the review period of 6/1/03 through 5/31/04, I received an overall rating of above average and was not given any rating below "competent" in any category of the review. The Performance Review was given by John Evans, Division Manager.

On the Performance Review received 1/18/06, for the review period 6/1/04 through 6/1/05, I received the rating of "Meets Objectives". I was not given any rating below "Meets Objectives". The Performance Review was given by James Tancredi, Section Manager.

A copy of the referenced Performance Reviews are attached as Exhibit "B".

13.    Have you received any oral or written counseling or notices of deficiency related to performance (e.g., written warnings, suspensions, placement on probation, etc.)? If yes, describe all such actions to include nature of action taken by the employer, stated reason for action taken, date, and name/title of supervisor or manager who caused the action to be taken.

I received a Level III warning Memo from James Tancredi, Section Manager, dated May 22, 2006 regarding unacceptable performance and continued attendance issues, to which I drafted a rebuttal which I requested Andrea Johnson from Human Resources review prior to formal submission. Human Resources refused to accept my rebuttal.

*If you were disciplined for conduct violations, please answer questions 14-17 and provide copies of all documents in your possession which describe each answer.*

14.    What is the discipline policy related to the rules, policies or practices which you were charged with violating?

I am unaware of the discipline policy related to the rules, policies or practices which she was charged with violating.

15.    How do you know what the discipline policy is?

16.    Did you commit the offense(s) or violate the rule(s) for which you were disciplined?

If not, what is your version of what happened and how can you demonstrate that you did not commit this offense?

4

I received discipline warnings for excessive absenteeism. I was absent for medical reasons. I was being treated for a medical condition that resulted in a hysterectomy and also for work related stress issues. I was never informed by management or Human Resources that FMLA was an option, although I had informed both management and Human Resources of my medical conditions.

17.    What disciplines have you previously received?

Describe each discipline including the date, reason, type of discipline, and name and title of your immediate supervisor at the time of each discipline.

**On 10/29/04, I received a verbal warning for attendance from John Evans, division manager.**

**On 9/23/05, I received a written Level II warning Memo from James Tancredi, my immediate supervisor and section manager, for inappropriate and unprofessional behavior and excessive absenteeism.**

**On 5/22/06, I received a written Level III warning Memo for attendance issues and unacceptable performance from Supervisor James Tancredi.**

*Continue here whether discipline was for performance or conduct reasons.*

18.    Identify all persons in comparable positions who have had similar performance or conduct problems within the last 2 years but who received a lesser discipline than you received. For each person named, provide the following information (adding extra pages, if needed, to complete your answer):

a)    name: **Mark Andress**

b)    race: **white**

sex: **male**

national origin: **unknown**

, and approximate age: **47**

c)    job title: **Maintenance and Operations Manager**

d)    name/job title of immediate supervisor: **John Evans**

5

e)     description of performance or conduct problems: **lack of management to ensure maintenance requests were complete and poor performance.**

f)     type of discipline, if any, given to this person: **none.**

g)     when did this occur?

**7/27/05 through 6/13/06; also 8/3/05 though 8/18/05.**

h)     how do you know about the performance or conduct deficiencies and discipline given to this employee?

**I was copied on an email regarding an internal work order regarding additional lighting on the first floor plaza on June 28, 2005. I was given the instruction to follow up on the work order by Catherine McNamara on July 18, 2005. On August 3, 2005, I asked Mark Andress, who was the manager of Maintenance and Operations, to follow up on the outstanding work order. Fifteen days later, I received and email from Robert Christine informing me that no one had contacted him regarding this order. I then informed John Evans, division manager, of the failure of service on that issue on August 18, 2005.**

**I was instructed by James Tancredi to give a sign project on the eleventh floor to Mark Andress, who was the Maintenance and Operations manager, on July 27, 2005. Although I repeatedly reminded him that the sign project was not completed, the sign project was not completed as of June 13, 2006, and no one addressed the problem nor disciplined Mark Andress, to the best of my knowledge.**

**Supporting documentation is attached as Exhibit "C".**

19. Identify all persons in comparable positions who have had performance or conduct problems in the last 2 years and who have been disciplined in the same manner as you were. For each person listed, provide the following (adding extra pages, if needed, to complete this answer):

a)     name:

b)     race
       sex
       national origin
       , and approximate age

c)     job title:

d)     name/job title of immediate supervisor:

6

e)    description of performance or conduct problems:

f)    discipline given to this person:

g)    when did this occur?

h)    how do you know about the above circumstances?

20.    Why do you believe that you and the persons cited in #19 above were disciplined more
severely than those persons cited in #18 above?

**I had complained to Human Resources about sexual discrimination.**

21.    For what reason(s) do you believe that you were discriminated against because of your
race, sex, color, religion, national origin, age, disability, or in retaliation in a manner
made unlawful by the statutes administered by EEOC?

**On August 20, 2004, James Tancredi was promoted to a newly created section
manager position, although I was more qualified because I had twenty years of superior
performance and fewer disciplinary issues than James Tancredi, who had been disciplined
for abusing the company car privileges, and for abusing computer policies in his former
department.**

**On December 22, 2004, in a meeting I had with James Tancredi, John Evans, and
two fellow staff members, Linda Russell and Mary Devine, James Tancredi made offensive
remarks which were derogatory to women. First, James Tancredi made comments that
insinuated I have only been handling smaller projects and am less experienced than I really
am. I felt he was diminishing my abilities because I am a female. He made the comment
that Linda Russell was not qualified to handle a request if a user came to her and asked her
to reconfigure a workstation, although she is one of the most knowledgeable people on the
staff of what the standards are. The next comment that offended me was about Bradberry
and Kerhadi, a design firm owned by two women. Referring to their construction plans, he
said "what they can do I can do in my basement".**

**After this meeting I went to my division manager, John Evans, to explain why I was
offended and to tell him I felt as though James Tancredi did not have respect for women.
Approximately one hour later, I overheard John Evans talking to Linda Russell. He said
my "back was all up at this meeting".**

**As this was the second time I had addressed the issue of lack of respect for women in
the workplace, I complained to Human Resources on December 22, 2004, December 23,
2004 and January 10, 2005 about the offensive comments made by James Tancredi at the
December 22nd meeting. In addition, I complained that my salary was not equal to James**

7

Tancredi although we performed essentially the same job duties. I further complained that James Tancredi had been promoted over me, the more qualified employee, because of my gender.

Although according to the Wilmington Trust Corporate Policy Manual, there is an assigned Affirmative Action Officer in the Human Resources Department, I was never informed such nor introduced to an Affirmative Action Officer. (see Exhibit "D")

On January 5, 2005 I was told by John Evans that if I did not agree to mandated travel in my current position I would be demoted.

At a meeting on February 1, 2005 which included Ed Emmi and Andrea Johnson of Human Resources, John Evans, and myself, John Evans said the reason James Tancredi had been promoted over me was that I had not completed an Institute for Real Estate Management degree, which I had been pursuing. James Tancredi did not have, and had never pursued, an Institute for Real Estate Management Degree. Further, he said the reason James Tancredi was making a higher salary was that he traveled. However, our job descriptions never mandated travel (supporting documentation from the initial complaint to Human Resources through this meeting is attached as Exhibit "E").

In March 2005 John Evans told me I had to change from the flexible schedule I had been working for the past five years, which enabled me to get my daughter on to the bus in the morning. I told John his insistence on me changing my schedule was retaliation because I complained to Human Resources.

On March 31, 2005 I requested the tools I would need to fulfill my new traveling requirements, including a company car, which is given to males such as James Tancredi who are responsible for jobs on the road, and to be relocated closer to my supervisor, James Tancredi, to improve office communications. I was told Dave Gibson, a manager, denied my request for a company car and John Evans denied my relocation request.

On June 29, 2005 I complained to John Evans in an e-mail that James Tancredi was defensive and made accusations toward me, apparently waiting for me to make some kind of mistake (see Exhibit F").

Only July 22, 2005, John Evans explained in an e-mail that my flexible work schedule did not conform to the General Services guidelines, which he had changed since our conversation in March. The new General Services guidelines decreased the flexibility of my hours.

On September 20, 2005, I received a Level II warning Memo from James Tancredi.

In October 2005 I met with Andrea Johnson in Human Resources to explain that I

8

felt an extreme amount of work related stress and I felt as though the warning was another effort at retaliation. I was not feeling well mentally or physically. She suggested I contact my physician.

Due to work related stress, I went out on disability and returned on December 19, 2005.

On May 30, 2006, I received a Level III warning Memo. I requested weekly meetings with James Tancredi to discuss the allegations and my performance. I met weekly with him thereafter and there were no complaints made of any problems or concerns with my performance. I sent notes from these meetings to Human Resources on a weekly basis.

On May 31, 2006, I complained to Andrea Johnson in Human Resources that this warning was another retaliatory action by James Tancredi and John Evans.

On June 6, 2006, I sent an email to James Tancredi asking him what my workload priorities were, as my workload far exceeded any other individuals in my position (see Exhibit "G").

On June 14, 2006 I contacted Andrea Johnson because an email was deleted from by inbox (and I had never seen it). I felt management was working against me, in retaliation for my complaining to Human Resources (see Exhibit "H").

On June 15, 2006 I sent Andrea an email showing how I was treated differently at staff meetings. My projects status were being updated in highlighted and bold print (see Exhibit "I").

On June 15, 2006, I sent an email to Andrea Johnson at which brought up the concern that I was being placed under a microscope and the management was looking for one false move so they could terminate me. Andrea confirmed she was getting called almost daily with issues John Evans and James Tancredi were trying to raise against me (see Exhibit "J").

On June 20, 2006 James Tancredi reprimanded me for not adding delegates to my calendar, when in fact I had added him as a delegate. I notified Andrea Johnson about this (see Exhibit "K").

On June 20, 2006 John Evans called a meeting with Human Resources regarding my performance. He interrogated me at this meeting for issues that were not material or important. John Evans later apologized to me for his behavior at the request of Andrea Johnson (see Exhibit "L").

9

On June 21, 2006 James Tancredi mentioned that Tom Yborra was complaining about me in my review. I disagreed with him on the subject matter and he told me I was right and he would remove the information from my review. I notified Andrea Johnson about this (see Exhibit "M").

I drafted a rebuttal and called Andrea Johnson on July 5, 2006, explaining that I was experiencing retaliation. I requested that we set up a meeting on July 17, 2006 to discuss this and my response to the Level III warning Memo, which was not completed. I explained that I had written proof that the allegations in this warning were untrue. The meeting was rescheduled for July 24, 2006. At that meeting I was terminated and Human Resources refused to accept my written rebuttal (supporting documentation is attached as Exhibit "N").

Then, on July 24, 2006, I was orally notified of my termination by Andrea Johnson and Jim O'Neil of Human Resources.

I declare under penalty of perjury that I have read the above statements and that they are true and correct.

_____          _____
Signature                                 Date    5/16/07

Coleman, Rhonda \ EEOC Docs \ Coleman - Discipline Questioanairre.Final

10

**NAME:**    **Rhonda Coleman**          **DATE:    May 16, 2007**

## WITNESS QUESTIONNAIRE

Identify all witnesses who you believe have information which would support your allegations. For each witness identified, provide his/her name, address (if known), phone number (if known) or other means to contact the witness. In addition, indicate what type(s) of information you believe the witness can provide:

### WITNESS

Name and Job Title:  **Mary Devine, quasi project manager.**

Home Address:
(*if known*)

Home Telephone: **302-684-0459.**

This witness can provide the following information in support of my charge:

- **Mary Devine can attest to the lack of respect and opportunities given to female staff members by James Tancredi and John Evans.**

- **She will attest to the decreased compensation given to females compared to males.**

- **She will confirm that James Tancredi's performance and experience was inferior to mine when he was promoted to Section Manager over me.**

- **Further, Mrs. Devine can confirm that Linda Russell, an administrator, was given an alternative position in the Division, special hours, and parking, which I believe was part of an effort by Management to thwart the investigation by Human Resources into my allegations of sexual discrimination by James Tancredi.**

### WITNESS

Name and Job Title: **Sandy Kheradi, outside contractor for Wilmington Trust**.

Home Address:
(*if known*)

Home Telephone: **610-293-1999.**

This witness can provide the following information in support of my charge:

- **Sandy Kheradi can attest to my superior job performance as compared to my Wilmington Trust counterparts and that my projects were run on time and on budget.**

- **Specifically, Ms. Kheradi can rebut the allegations made in the Level III warning Memorandum from James Tancredi dated May 22, 2006 regarding my failure to update the capex with additional information as received and alleged poor performance on the Baltimore Expansion Project.**

## WITNESS

Name and Job Title: **Nancy Bradberry, outside contractor for Wilmington Trust.**

Home Address:
(*if known*)

Home Telephone:610-293-1999

This witness can provide the following information in support of my charge:

- **Nancy Bradberry can attest to my superior job performance as compared to my Wilmington Trust counterparts and that my projects were run on time and on budget.**

- **Specifically, Ms. Bradberry can rebut the allegations made in the Level III warning Memorandum from James Tancredi regarding my failure to update the capex with additional information as received and alleged poor performance on the Baltimore Expansion Project.**

## WITNESS

Name and Job Title: **Kay Adams, Former Wilmington Trust Accountant.**

Home Address:
(*if known*)

Home Telephone:302-354-4332

This witness can provide the following information in support of my charge:

- **Ms. Adams can attest to my superior performance and overall excellence at my job.**

## WITNESS

Name and Job Title: **Jerry Reed, Former Maintenance Supervisor.**

Home Address:
(*if known*)

Home Telephone:302-376-6616

This witness can provide the following information in support of my charge:

- **Mr. Reed was also retaliated against by Management at Wilmington Trust Company.**

Coleman, Rhonda \ EEOC Does \ Coleman - Witness Questionnaire-final..wpd

**NAME:**     **Rhonda Coleman**                    **DATE: May 16, 2007**

### REMEDY INFORMATION

1.    If your charge alleges failure to hire or failure to promote, what was the salary or salary range of the job you applied for?

    What was the salary of the position you held at the time you applied for the position in question?

2.    If your charge alleges discharge or suspension without pay, what was the salary of the position you held at the time of discharge or suspension?

    **$60,000 per year.**

3.    If your charge alleges demotion, what was the salary of the position you held before you were demoted?

    After you were demoted?

5.    Other than loss of salary, what money have you lost as a result of the alleged discrimination (e.g., cost of looking for new job, cost of health insurance you had to buy, etc.)?

    **1. Cost for searching for new job:**
        **a. Mileage: (150 miles @.485) = $73**
        **b. Postal Expenses: (10 letters @. .39) = $45**
        **c. Newspaper Subscriptions@ 9 months= $58**
        **d. Internet Subscriptions($33/month)= $297**

    **2. Health:**
        **a. Insurance ($650/month)= $5850.00**
        **b. Medical Flex Savings: ($87.60 x 18 pays x .33% tax savings)= $520**
        **c. Medicine (Ambien, Lexaopro)= $160**
        **d. Doctors = $60**

    **3. Lawyer Expenses:**
        **a. Parking= $16**
        **b. Fees= $2,725**
        **c. Mileage (120 miles@ .485)= $58**

    **4. 401k:**
        **a. $300/month = $2,700**
        **b. Penalties for early withdrawal= $24,502**
        **c. Interest on 401k**

    **5. Stock Options**

**6. Mortgage Discount (1%)**

**7. Liberty Mutual: (5%)**

**8. Accrual of pension benefits.**

6. <u>Other than monetary losses</u>, what losses have you incurred as a result of the alleged discrimination (e.g. loss of seniority, no longer being part of a pension plan, loss of company car, had to seek psychiatric services)?

> **Loss of seniority, damage to reputation, humiliation, embarrassment, emotional distress, loss of life insurance benefit, loss of accrued vacation and sick benefits, no longer part of pension plan, loss of company cell phone, was forced to cash out of 401k to cover loss of wages.**

7. What relief or remedy are you seeking in response to filing a charge with EEOC?

> **I am seeking to be compensated for monies lost in wages, benefits, and retirement funds, expenses associated with obtaining a new position, mental duress and reimbursement for lawyer fees.**

8. If your charge alleges discharge or failure to hire, have you obtained other employment since the date of the alleged discrimination? If yes, please indicate the date of employment and the salary you earn with this new employer. (If there has been more than one employer, please indicate all dates of employment and salary with each employer since your date of discharge or the date you were denied hire by the employer named in your charge.)

> **I have not obtained other employment since the date of the discrimination and retaliation.**

**I declare under penalty of perjury that I have read the above statements and that they are true and correct.**

Rhonda A Coleman                              5-17-07

**Signature**                                        **Date**

Coleman, Rhonda \ EEOC Docs \ Coleman - Remedy Information

2

# EXHIBIT
# A

# Intra-Company
# Memorandum

**WILMINGTON TRUST**

Date: 9/23/05

| To: | Rhonda Coleman | | | Subject: Level II Warning |

| From: | James Tancredi | | | Inappropriate and Unprofessional Behavior a Excessive Absenteeism |
| | | Tel. Extension: | X-1313 | |

On 7/22/05 you were presented with a memo from John Evans regarding Staff Responsibilities. That memo stated "Respectful communications is a must. Even when you disagree, you must communicate in a respectful, non-threatening manner."

On Friday, September 2, 2005 there was an incident where you did not agree with how your division manager, John Evans, handled a business call with bank consultant/contractor Nancy Bradberry. You entered my office and proceeded to be insubordinate in nature, questioning our manager John Evans' authority to inquire as to the status of the Villanova project. Your concern regarded John Evans' inquiry into the status of the Villanova office project. Your communication included content stating that John Evans "is an ass", "everyone knows he's an ass", and "Senior Management knows he's an ass". Additionally you noted that because of the way John is perceived, he's "skating on thin ice". As our Division Manager, John Evans is entitled to inquire as to the status of any of our jobs, whether we agree with the query or not.

Your method of communication and the level of your voice were such that your dialogue was captured by someone outside of my office. Your actions and methods of communication were inappropriate and unprofessional. Your conduct was in direct conflict with the above referenced memo indicating when you disagree with someone or something, the disagreement needs to be presented in a respectful manner. In an effort to be consistent with John Evans' request on 7/22/05, it is advisable to schedule a meeting with me in a private area where we can discuss your displeasures regarding any issue in a respectful manner.

Another topic that also needs to be addressed is your attendance. In October of 2004 your attendance was discussed with you and to date has not improved. In the past 12 month period you have been absent for a total of eight (8) separate sick-day occurrences, totaling 16 sick days between September 10, 2004 and September 7, 2005. These eight occurrences exclude five (5) additional excused paid absences.

This type of inappropriate and unprofessional behavior and absenteeism is unacceptable and will not be tolerated here at Wilmington Trust. The desired response to the issuance of this Level II warning is the expectation that you will adhere to the established Wilmington Trust attendance policy. Additionally, you will address all staff members, vendors, outside contractors, and Wilmington Trust Clientele in a non-threatening, respectful, and courteous manner. Additional inappropriate and unprofessional behavior towards staff members, vendors, outside contractors, and Wilmington Trust Clientele, will result in a Level III warning up to and including the possibility of termination.

I HAVE SEEN THIS LEVEL II WARNING AND
UNDERSTAND ITS CONTENTS.

_See memodated 9/30/05_

_Rhonda A Col_

Staff Member Signature

Manager Signature

# 2005 Attendance Sheet

**Name:** Coleman, R

**Status:** S    (Status MUST be included for calculations)

**Yrs Svc:** 19    (Optional)    **Attendance Area:** 340    **Employee Number:** 9573    **Employment Date:**

| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 | 31 | Sick | G-Vac | H-Vac | Total-Vac | Y-Day | J-Bus | K-Bus |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| JAN | | | | | | | | | | | | | | G | | | | | | G | | | | | | | | | | | | 0.0 | 2.0 | 0.5 | 2.5 | 0 | 0.0 | 0.0 |
| FEB | | | | | | | | | | | | | | | | | | | L | G | G | | G | | | | | | | | | 2.5 | 1.0 | 0.0 | 1.0 | 0 | 0.0 | 0.0 |
| MAR | | | | | | | | | L | | J | L | | | | L | | | | | G | | | | | | | | | | | 0.0 | 1.0 | 0.0 | 1.0 | 1 | 1.0 | 0.0 |
| APR | | | | | | | | | L | | | | | | | | | J | | | | | G | | | | | | | | | 0.0 | 0.0 | 0.0 | 0.0 | 1 | 0.0 | 0.0 |
| MAY | | | G | | | | | | | | | | | | | G | | | | | | G | G | G | G | | | | | | | 3.0 | 1.0 | 0.0 | 1.0 | 0 | 0.0 | 0.0 |
| JUN | | | | | | | | G | | | | | | | G | G | | | G | G | G | G | | | | | | | | | | 4.0 | 4.0 | 0.0 | 4.0 | 0 | 0.0 | 0.0 |
| JUL | | | | | | | | | | | | | | | | | | | G | | | G | | | | | | | G | | | 1.0 | 5.0 | 0.0 | 5.0 | 0 | 0.0 | 0.0 |
| AUG | | | | | | G | G | G | | | | | | | | | | | | | | | | | | | | | | | | 0.0 | 2.0 | 0.0 | 2.0 | 0 | 0.0 | 0.0 |
| SEP | | | | | | G | G | | | | | | | | | | | | | | | | | | L | | | | | | | 0.0 | 2.0 | 0.0 | 2.0 | 0 | 0.0 | 0.0 |
| OCT | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | 0.0 | 0.0 | 0.0 | 0.0 | 0 | 0.0 | 0.0 |
| NOV | | | | | | | | | | | | | | | | | | | | | | | | | | R | | | | | | 0.0 | 0.0 | 0.0 | 0.0 | 0 | 0.0 | 0.0 |
| DEC | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | 0.0 | 0.0 | 0.0 | 0.0 | 0 | 0.0 | 0.0 |
| **Totals:** | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | 10.5 | 18.0 | 0.5 | 18.5 | 1 | 2.0 | 0.0 |

| | |
|---|---|
| Carryover from 2004: | 0.5 |
| Vacation due - 2005: | 25.0 |
| Total Vacation Due: | 25.5 |
| "Y" Days - 2005: | 1 |

| | |
|---|---|
| Total Excused Full Days: | 5.0 |
| Total Excused Half Days: | 0.0 |
| Total Excused Days: | 5.0 |

**Eligible Days:** 25.5    **Days Remaining:** 7.0

## STATUS - IN HOURS

| | Vac |
|---|---|
| Eligible | 204.0 |
| CARRY OVER | 42.0 |

### Attendance Codes:

Blank – Present
A – Sick, Full Day
B – Business, Full Day
L – Leave, Full Day
- – Leave, No Pay

S – Vacation, Full Day
T – Vacation, Half Day
U – Business, Half Day
V – Business, No Pay
X – Excused Full Day

M – Unexcused
N – Funeral
I – Jury Duty
P – Salary Continuation
Q – Excused Half Day

R – Military Leave
– Excused, No Pay, Full Day
– Unexcused Partial Day
– Salary Continuation, Half Day
– Weekend, Holiday, N/A

**NOTES:**

# 2004 Attendance Sheet

**Name:** Coleman , R.

**Status:** [S]  (Status <u>MUST</u> be included for calculations)

**Yrs Svc:** [18]  (Optional)

| Month | Sick | G-Vac | H-Vac | Total-Vac | Y-Day | J-Bus | K-Bus |
|---|---|---|---|---|---|---|---|
| JAN | 3.0 | 0.0 | 1.0 | 1.0 | 1 | 1.0 | 0.0 |
| FEB | 3.0 | 1.0 | 0.0 | 1.0 | 0 | 1.0 | 0.0 |
| MAR | 0.0 | 0.0 | 0.5 | 0.5 | 0 | 0.0 | 0.0 |
| APR | 1.0 | 0.0 | 0.0 | 0.0 | 0 | 1.0 | 0.0 |
| MAY | 1.0 | 1.0 | 0.0 | 1.0 | 1 | 2.0 | 0.5 |
| JUN | 14.0 | 0.0 | 0.0 | 0.0 | 0 | 2.0 | 0.0 |
| JUL | 17.0 | 1.0 | 0.0 | 1.0 | 0 | 1.0 | 0.0 |
| AUG | 0.5 | 0.0 | 0.0 | 0.0 | 0 | 0.0 | 0.0 |
| SEP | 2.5 | 6.0 | 0.0 | 6.0 | 0 | 0.0 | 0.0 |
| OCT | 3.0 | 1.0 | 0.0 | 1.0 | 0 | 1.0 | 0.0 |
| NOV | 0.0 | 11.0 | 0.0 | 11.0 | 0 | 0.0 | 0.0 |
| DEC | 0.0 | 2.0 | 0.0 | 2.0 | 0 | 0.0 | 0.0 |
| **Totals:** | 45.0 | 23.0 | 1.5 | 24.5 | 2 | 7.0 | 0.5 |

**Eligible Days:** 2

**Days Remaining:** 0

Carryover from 2003: 0.0
Vacation due - 2004: 25.0
Total Vacation Due: 25.0
"Y" Days - 2004: 2

Total Excused Full Days: 3.0
Total Excused Half Days: 2.0
Total Excused Days: 5.0

2004 Eligible = 6.0

| STATUS IN HOURS | Vac |
|---|---|
| Eligible | 200.0 |
| CARRY OVER | 4.0 |



Attendance Codes

**NOTES:**

# Intra-Company
# Memorandum

**WILMINGTON TRUST**

Date: 5/22/2006

| To: | Rhonda Coleman | | | Subject: Level IIII Warning |
|---|---|---|---|---|
| From: | James Tancredi | | | Unacceptable performance and continue attendance issues |
| | | Tel. Extension: | X-1313 | |

In September 2005 you were presented with a Level 2 warning related to excessive absenteeism and unprofessional/disrespectful communication. Today, that Level 2 warning advances to a Level 3 warning due to the items outlined below.

Over the past several months, it has become evident that you are unwilling to comply with the requests of your supervisors. Though this behavior has worsened in the recent past, a trend displaying this behavior commenced in June, 2005, when you were instructed on 3 different occasions to arrange a bid meeting for the construction of the new Millville branch building. Additionally, you were notified of a soils test that needed to be completed within a 30 day due diligence period on the Millville project, but you took no action on either request. I was forced to carry out the entire project myself.

Most recently there are three other issues where your supervisors have requested you to perform everyday actions within the scope of your job description, and you did not act in a timely fashion, or at all, on these requests. On April 6, 2006, John Evans asked for you to develop a cost range for the Atlanta project using the plan showing WTC taking the entire floor. On April 12th I was reminded verbally by John Evans that he needed the budget numbers no later than Friday, April 14th. As such, I forwarded a note to you apprising you of this deadline and asked if you had made any progress putting the figures together. A response to my note was not received that afternoon at which time I elected to complete the budget myself to assure that Senior Management had the information it needed to make an informed decision. I made the necessary telephone calls to the appropriate parties, reviewed the preliminary lease terms associated with TI allowance, and constructed the budget within a one hour time frame. I then forwarded the budget on to John Evans for review.

The next instance surrounds the Baltimore expansion project. On April 13th, John Evans requested that you "update the capex with additional information as you get it". On April 26th a discussion commenced surrounding the substantial reduction, or overall removal, of the contingency associated with the project. There was a difference in opinions as to whether or not this should take place. My position was that I was comfortable with BCI's original construction budget figures, but based on our weekly Monday morning staff meetings held on April 17th and 24th, I was under the impression that the CDs were far enough along (50% and 70% respectively) per your own update, that BCI's numbers were revised based on the updated drawings. Your response to the request was "this is the first project in 15 years that I have been asked to get a budget from the contractors after the budget was prepared from the general space plan and before cd's were issued." However, such updated pricing is practiced by this area on a regular basis in an effort to maintain control over our expenses so that we may be able to use residual funds from one project to complete an additional need in another area. On the Baltimore assignment the total contingency for the project approached 20% which is entirely too high. Application of that type of a contingency is irresponsible from the standpoint that we are not budgeting construction funds appropriately, and that misstatement of projected expenses prohibits our area from being optimally efficient in terms of how we spend our proceeds. Absent an updated construction cost budget, John Evans and I both elected on May 8th to leave the exorbitant contingency in place simply because there were too many unknowns associated with the original budget. A discussion with Ken Coldiron (BCI Estimator) yielded information indicating that an updated budget could have been completed within a 2-day

time frame from the request further indicating that more reliable pricing could have been provided by BCI in early May, long after the April 24th date when you noted the cd's were 70% complete. Cd's at 70% completion should provide a much more defined budget number than the general space plan drawings issued to BCI for a budget estimate.

The latest instance of a request that you opted not to act on was my request for all of my staff members to complete and execute a flexible work schedule that fits your personal needs within the parameters set forth in the flexible work schedule options. I asked that document be completed, executed, and returned to me no later than Thursday, May 11th. On Friday, May 12th I forwarded a note to you asking if you had yet completed and executed the flexible work schedule document and you never replied. As of May 19th, the completed and executed document still has not yet been delivered to me.

Along this subject line it is worthy to note that you are regularly tardy on your arrivals to the office and have departed the workplace earlier than the permitted timeframes specified on the flexible schedule document. Depending upon which flexible schedule a staff member elects to work by, the latest we are permitted to arrive in the Real Estate Planning and Development Section is 8:30 AM and the earliest time that we are permitted to leave is 4:30 PM. It has been noted that when working in your Wilmington Trust Center office, you typically arrive between 8:45 AM and 8:55 AM, consistently. Additionally, there have numerous recent occasions where you have left the office in the afternoon without notice as to your whereabouts. And, when several of the staff members have tried to reach you by cell phone, the calls have gone unanswered. We are fortunate enough to be provided with varying alternatives in terms of flexible scheduling to assist us in meeting our personal needs outside the office. You should be mindful in the future to adhere to the specified and agreed upon flex schedule.

These types of deficient performance and attendance related issues are unacceptable and will not be tolerated here at Wilmington Trust. The desired response to the issuance of this Level III warning is that you will have immediate and sustained improvement as it relates to the above items. Any additional violations of Wilmington Trust corporate policy and procedures of any kind, will result in your immediate termination.

I HAVE SEEN THIS LEVEL III WARNING AND
UNDERSTAND ITS CONTENTS.


_____          _____
Staff Member Signature                   Manager Signature


_____
Witness Signature

## Coleman, Rhonda A.

**From:** Coleman, Rhonda A.

**Sent:** Friday, July 07, 2006 8:22 PM

**To:** Coleman, Rhonda A.

**Subject:** RE: Level 3 Warning

-----Original Message-----
**From:** Coleman, Rhonda A.
**Sent:** Thursday, July 06, 2006 5:33 PM
**To:** Coleman, Rhonda A.
**Subject:** Level 3 Warning

I totally disagree with the allegations of performance issues addressed in the memo dated 5/22/06. I strongly feel I am being set up to fail as part of a retaliation agenda being carried out by my management. I am asking that the facts below be considered and the warning be removed from my personnel records.

I have never been "unwilling to comply with the requests of your supervisors". I perform any duty that is assigned to me whether it falls under my job description duties or the job description duties of other staff in our area. The trend is not with my performance, however it is partly because of the major communication issues we have in our Division and also due to the the lack of management structure in our Division and the improper allocation of resources in our area.

### 1. MILLVILLE

The Millville Project was originally assigned to Jim Tancredi. It was reassigned to me at a time that I was already overloaded with projects and I expressed my concerns with the project load to my management. When my concerns were expressed, I received an email back from my supervisor on June 21, 2005 saying "No problem. I'll do what I can to help. Once we get underway, we'll be ok". Correct me if I'm wrong, this is not the type of communication you send if you are going to write the person up for not performing. When I asked my Supervisor on June 21st who I should contact down state to do the soil test, he said Mark Rogers has a contact down in the area and has taken it upon himself to take care of this. John followed up on June 24th with an email documenting that Mark Rogers took care of this. on On June 21, 2005 I sent an email notifying my Supervisor that I cancelled another job meeting I had scheduled for 6/25 to attend the pre-bid meeting for Millville. On Friday June 24th, I was sent an email by Jim telling me he will conduct the bid meeting. On Monday June 25th, I called Jim on his cell phone to let him know I was headed down and he said "not to worry about it, he would take care of it". The statement in my warning that "I was forced to carry out the entire project myself" is totally untrue as documented in many emails and phone calls on the issue.

### 2. ATLANTA

On April 6th I was sent an email from John Evans to develop the Atlanta budget. On April 7th I communicated via email to both Jim and John that " I am up to my eyeballs and sinking fast!!!!! The two new offices that we had two weeks to open are sucking my time dry!!! I am barely keeping up with Villanova and Baltimore and the 10 phases of the 2nd floor Plaza Project are putting me over the edge!!!! I talked to John and said I will do the best to get to this the end of next week. We need more staff!!!!!!!!!!!! In the Level III warning it noted that an email was sent on April 12 asking the status of the number and "a response to my note was not received that afternoon at which time I elected to complete the budget myself". The email was sent on 4/12 @ 3:09 asking the status and Jim sent the budget he prepared on 4/12 @ 5:01. I was in a meeting for the 2nd floor project that afternoon so I did not respond in the 2 hours window that he allowed. Note also that the budget was due to John on 4/14 so I did not miss my required deadline.

## 3. BALTIMORE

The space plan was signed off on and the design development phase of the project started on March 20th. Depending on the size of the project, it takes 8-16 weeks to complete both the design development and the construction drawing phase of a project. Since this project was on a fast track, I asked Bradberry and Kheradi to combine these two phases. We received the Architectural plans on May 12th which was an 8 week turn around. The engineering plans were behind due to not being able to secure the building engineer until John was finished the lease negotiations. I was given approval on A;ril 7th to hire the engineer and Sandy was on vacation. When she got back she requested the proposal which we received on April 20. After they received the contract, they changed their story and said they could not start the project until May 8th. We then had to go back and reselect another engineer. On April 27th , the date I was asked to submit pricing for the cap ex), the Engineering plans were on 10% complete. The engineering work (plumbing, electric, hvac, fire detection/protection ...) accounts for approximately 40% of the total construction costs. In the email Jim sent on April 27th he stated that "...the budget listed on your Baltimore project is most likely very tight indicating that the removal of the contingency should not be a problem." Based on on your statement, the fact that BCI could only reprice 40% of the job understood this statement to mean that you were fine with the figures.(architectural were 70% complete and they account for 60% of the costs - engineering was 10% complete which accounts for 40% of the costs) and the project so I updated every line item on the budget that I could with the information that I had for the 4/27 due date.

I did request BCI to update the pricing when they received the 100% complete architectural (60% of the project cost) and the price came in just over 5% higher then the original budget. The budget per the cap ex less then

Space plan approved, cap ex approved 5/5, lease executed 5/26,–Architecturals received 5/12, Engineering received 6/5, Anticipated August completion

# EXHIBIT
# B


**WILMINGTON**
TRUST

## Exempt/Non-Manager
## Performance Evaluation

NAME  **Rhonda Coleman**                 EMPLOYEE ID NO.   9573        CENTER NO.   7270

POSITION TITLE   **General Services Asset Coordination**           TIME IN POSITION    6Yr.    Mth.

PERIOD COVERED BY REVIEW    06/01/2003            TO    05/31/2004

SALARY LEVEL    16            SALARY RANGE    $ 49,572       $ 74,358
                                                    (Minimum)        (Maximum)

PREPARED BY     John Evans

### PURPOSE

The purposes of this performance evaluation include:

- serving as a basis for discussion between manager and staff member regarding the staff member's success in carrying out his or her job responsibilities and meeting performance goals consistent with the company's vision, mission, driving force, working principles, and corporate strategic plan;
- providing a formal opportunity on an annual basis to set attainable goals for the coming year;
- providing a documented history of performance.

### NOTES FOR PREPARER

1. Review the staff member's job description in preparation for completing the evaluation form. Use the essential functions and job requirements as a basis for oral and written comments. Provide a copy of the job description to the staff member if he or she does not have one.

2. Complete Sections I, II, III, IV, the first part of Section V ("OVERALL PERFORMANCE EVALUATION") and the "Salary Recommendation" portion (Section VI). Review these completed sections with your manager prior to the performance discussion.

3. Remove the page containing proposed increase information. Review the remaining completed sections with the staff member, discussing performance in each area evaluated.

4. At the end of the discussion, give the staff member an opportunity to review the evaluation form and complete Section V ("TO BE COMPLETED BY STAFF MEMBER" portion).

5. After the staff member has returned the evaluation form to you, reattach the "Salary Recommendation" portion (Section VI).

6. Forward the completed form directly to your Manager.

7. The Division Manager will present the evaluation form directly to the Department Manager for any necessary authorizations before sending it to the Human Resources Division.

# SECTION I

## Current Position

This staff member's job description has been reviewed and is accurate.

☒   YES          ☐   NO

If "No", prepare a revised job description and forward it to the Human Resources Division for review.

# SECTION II

## Evaluation Year Projects and Noteworthy Assignments

List and briefly describe specific goals, projects and timetables assigned for the period covered by the review. Evaluate and comment on performance relative to each.  In the same manner, list, describe and evaluate any other noteworthy assignments or strategic plan objectives undertaken by the staff member.

Construct new Baltimore office.

Move Audit to the 2nd floor of the Ceter.

Relocate Retail at the Plaza.

Create XP Storage room.

Additional space for TBC.

Build out space for  research and adjustments at the Plaza.

Direct move coordinator on 104 moves, 500+/- work orders for contractors and 200+/- furniture requisitions.

# SECTION III

The definitions of performance ratings which follow apply to both specific performance goals and to overall performance.  As such, use these ratings categories to complete this Section and the "OVERALL PERFORMANCE EVALUATION" portion of Section V.  The manager's comments should explain and support that rating. Please note, under each principle heading there is a space provided ("Other") for the manager to add a job-specific goal he or she would like to include under Section III.

**Unable to Evaluate**  Staff member does not have the performance goal as a responsibility OR staff member/manager has had insufficient opportunity to demonstrate/evaluate performance.  (Indicate which under "**Supporting Comments**".)

**Excellent**  Staff member consistently performs at a level above expectations in most performance aspects  and/or areas, often assuming additional responsibilities beyond the position's job scope.  Demonstrates qualities which ①reflect extraordinary commitment to organization's goals and objectives and ②indicate the highest potential for assuming new challenges and contributing to the organization's continued success.  Achieved superior results in those tasks undertaken.

**Above Average**  Staff member consistently meets expectations, while exceeding them in some key aspects, areas and/or projects.  Actions reflect a strong commitment to the organization's goals and objectives.  Staff member viewed as a reliable and valuable asset to the organization.

**Competent**  Staff member demonstrates commitment, skill and aptitude to effectively meet expectations.  Completes tasks and demonstrates understanding of how these tasks support the area's and/or the organization's goals and objectives.  Staff member viewed as a dependable member of the organization.

**Marginal**  Staff member's performance is below expectations in a number of key aspects.  Quality and/or quantity of work indicates lack of ability and/or insufficient commitment to goals and objectives.  If staff member does not demonstrate sufficient progress (as outlined in Section IV of this document or in another document), further disciplinary action may result.

Check one rating for each category under Performance Goals and comment in the space provided.

| Performance Goals | Unable to Evaluate | Excellent | Above Average | Competent | Marginal |
|---|---|---|---|---|---|
| **Working Principles and Practices:** | | | | | |
| • Demonstrates commitment to the company's vision and mission through participation in enrollment activities and the application of working principles and practices. | ☐ | ☒ | ☐ | ☐ | ☐ |
| • Applies the working principle of teamwork in the accomplishment of goals, both within the work area and with other areas of the company. | ☐ | ☐ | ☐ | ☒ | ☐ |
| • Uses the working principles of honesty, integrity, respect and courage in interactions with others. | ☐ | ☐ | ☐ | ☒ | ☐ |
| • Assumes accountability for responsibilities as stated in job description. | ☐ | ☐ | ☒ | ☐ | ☐ |
| • Applies working principles when faced with differences of opinion and other conflicts. | ☐ | ☐ | ☐ | ☒ | ☐ |
| • Other | ☐ | ☐ | ☐ | ☐ | ☐ |
| **Supporting Comments** | | | | | |
| **Company Mission:** | | | | | |
| • Supports and works to achieve the company's strategic plan as it applies to the work area. | ☐ | ☒ | ☐ | ☐ | ☐ |
| • Is knowledgeable in products and services which apply to area of responsibility; takes advantage of opportunities to enhance this knowledge and to strengthen service delivery skills. | ☐ | ☐ | ☒ | ☐ | ☐ |
| • Anticipates changing needs; is creative in seeking ways to improve procedures, services and functions. | ☐ | ☐ | ☒ | ☐ | ☐ |
| • Forms strong customer relationships in order to provide what best suits their needs. | ☐ | ☒ | ☐ | ☐ | ☐ |
| • Makes maximum effort to help customers succeed by meeting high performance standards. | ☐ | ☐ | ☒ | ☐ | ☐ |
| • Demonstrates cooperation and courtesy in all customer, staff member and other dealings. | ☐ | ☐ | ☐ | ☒ | ☐ |
| • Applies company telephone standards, including prompt response. | ☐ | ☐ | ☐ | ☒ | ☐ |
| • Participates in corporate programs which may relate to strategic objectives. (For example, Strong Points) | ☐ | ☐ | ☐ | ☒ | ☐ |

Check one rating for each category under Performance Goals and comment in the space provided.

| Performance Goals | Unable to Evaluate | Excellent | Above Average | Competent | Marginal |
|---|---|---|---|---|---|
| **Company Mission (continued):** | | | | | |
| • Other | ☐ | ☐ | ☐ | ☐ | ☐ |
| **Supporting Comments** Rhonda continues to work with vendors to deliver projects to a high standard. | | | | | |
| **Professional Discipline:** | | | | | |
| • Adheres to policies and procedures of the company including the protection of confidential information. | ☐ | ☐ | ☒ | ☐ | ☐ |
| • Conducts self in a professional manner, making the company and its customers a priority during working hours. | ☐ | ☐ | ☐ | ☒ | ☐ |
| • Sets goals, organizes work, focuses on priorities and maintains high standards. | ☐ | ☐ | ☒ | ☐ | ☐ |
| • Maintains a good attendance record; commits to working additional hours as needed to complete projects/tasks in a timely fashion. | ☐ | ☐ | ☐ | ☒ | ☐ |
| • Is punctual and prompt in regard to responsibilities, including meetings, deadlines and work hours. | ☐ | ☐ | ☐ | ☒ | ☐ |
| • Analyzes and evaluates situations accurately; reaches appropriate decisions in timely fashion; uses sound judgment. | ☐ | ☐ | ☒ | ☐ | ☐ |
| • Demonstrates good judgment in the recommendation of expenditures. | ☐ | ☐ | ☐ | ☒ | ☐ |
| • Accepts assignments readily. | ☐ | ☐ | ☐ | ☒ | ☐ |
| • Works proficiently with necessary software application, taking advantage of available training materials/classes as necessary. | ☐ | ☐ | ☐ | ☒ | ☐ |
| • Other: | ☐ | ☐ | ☐ | ☐ | ☐ |
| **Supporting Comments** | | | | | |

Check one rating for each category under Per( 	tance Goals and comment in the space provided.

| Performance Goals | Unable to Evaluate | Excellent | Above Average | Competent | Marginal |
|---|---|---|---|---|---|
| **Written and Oral Communication Skills:** | | | | | |
| • Presents material in clear, concise way. | ☐ | ☐ | ☐ | ☒ | ☐ |
| • Expresses self logically and demonstrates command of language. | ☐ | ☐ | ☐ | ☒ | ☐ |
| • Communicates effectively before groups as well as with individuals. | ☐ | ☐ | ☐ | ☒ | ☐ |
| • Other | ☐ | ☐ | ☐ | ☐ | ☐ |
| **Supporting Comments** | | | | | |
| **Affirmative Action:** | | | | | |
| • Is aware of and demonstrates support of company's efforts to meet affirmative action goals. | ☒ | ☐ | ☐ | ☐ | ☐ |
| • Promotes, through words and actions, a working environment conducive to a work force of diverse backgrounds and ethnic origins. | ☒ | ☐ | ☐ | ☐ | ☐ |
| • Other | ☐ | ☐ | ☐ | ☐ | ☐ |
| **Supporting Comments** | | | | | |

## SECTION V

OVERALL PERFORMANCE EVALUATION

Taking into account comments in all areas of this evaluation, but specifically those performance areas that are **most** critical to the achievement of goals, check appropriate box and give reasons for your choice.

| Excellent | Above Average | Competent | Marginal |
|:---:|:---:|:---:|:---:|
| ☐ | ☒ | ☐ | ☐ |

Comments:

TO BE COMPLETED BY STAFF MEMBER

◆As stated in *The Handbook* under **Civic Activities**, Wilmington Trust encourages staff members to participate in civic, charitable or trade association/affiliation activities. Membership in service clubs is also encouraged, as well as appointments as trustees, directors, or employees of non-profit organizations such as educational, religious, health and welfare institutions. If you have participated in any such activities and would like to make the company aware of them, please list them here.

◆Please list any education or training you have successfully completed since the last performance evaluation.

◆I have reviewed my job description and believe it to be a reasonable representation of my job responsibilities.

☒ YES     ☐ NO

If "No", please comment.

◆Comments regarding performance evaluation. (Staff members are encouraged to submit written commentary on the evaluation. Such comments provide valuable feedback to the manager and thereby help to ensure a successful working relationship.)

◆I acknowledge receipt of this performance evaluation and have read its contents.

_____
Staff Member's Signature

10-22-04
Date

The staff member has the right to appeal to the Division Manager, Department Manager, and the Human Resources Division, in that order, if there is a question or disagreement regarding the Performance Evaluatio

## SECTION IV

**Action Plan:**

Taking into account year-to-date progress on the current business plan, anticipated projects, and career development, list specific goals, projects and timetables for the next twelve month period.

Continue to work on projects that support the 2005 business plan

We have jointly reviewed and discussed the goals, projects and timetables listed above and agree to carry them out as stated.

_____
Staff Member

_____
Manager

*Final*

## *Wilmington Trust Company*
# PERFORMANCE PARTNERSHIP FORM

| | |
|---|---|
| Staff Member Name: Rhonda Coleman<br>w#: 9573 | Evaluator's Name: James D. Tancredi |
| Job Title: Facilities Project Manager | Job Code: 2591-17 |
| Department: Finance | Division: General Services |
| Date of Review: 1/12/2006 | Period Covered:<br>*From:* 6/01/04          *To:* 6/01/05 |

**Job Description Update:** Manager and Staff Member should review it for changes, updates, etc. annually. Please check one of the following to confirm review:

☒ The job description is current (i.e., no more than 2 years old and/or reflects no major changes in responsibility) and is in the correct format.

☐ The job description has been updated and is attached.

---

## EVALUATION GUIDE

When completing Sections I and II, the following rating guidelines should be used. Please refer to the procedures manual for more detailed definitions:

1 – **Does Not Meet Objectives**: Staff Member's accomplishments do not fully meet expectations.

2 – **Meets Objectives**: Staff Member's accomplishments fully meet expectations in all key job areas. No major errors in execution or strategy. This year's contributions are clearly identifiable.

3 – **Consistently Exceeds Objectives**: Staff Member's accomplishments far surpass the expectations for the job. This year's contributions clearly moved the business forward.

## SECTION I: OBJECTIVES-BASED PERFORMANCE RATING

At the beginning of the evaluation period, this worksheet allows you to formulate objectives for Staff Members for the specified performance period, typically one year. Objective-based performance involves defining "what is to be accomplished by when."

You are encouraged to set quantitative and/or qualitative objectives by identifying agreed upon measurement criteria (cost savings, timing, sales volume in terms of dollars, quality measures, etc.). Assign a percentage weight based on the objective's importance to the job, our organization and/or line of business and in relation to other objectives. Total weighting should equal 100%. **Please list a minimum of 3 objectives and no more than 7.**

At the time of the performance review, the manager should assign a rating for each objective based on the definitions on the previous page. Multiply the weight by the rating to find the tally (e.g., 20% x 2 would be .20 x 2 = .40). Sum tallies to calculate this Section's total score. Supporting comments should be made for each objective in the space provided.

| **OBJECTIVES**<br>List each objective to be rated in quantitative, measurable terms. | **PERCENTAGE WEIGHT**<br>(%) | **RATING**<br>Indicate rating for each objective:<br>1, 2, or 3 | **TALLY**<br>(Weight x Rating) |
|---|---|---|---|
| Example: Implement a new LAN System by 12/1/04 at <$100,000<br><br>*This is the "prospective" setting of a quantitative/qualitative objective* | 25%<br><br>*The anticipated importance of this objective is weighted at the beginning of the performance year* | 2<br><br>*Rating is applied after performance year is complete to determine performance levels: ratings are defined on the previous page* | .50<br><br>*Tally represents the total score for each objective calculated by multiplying the weight by the rating* |

**STAFF MEMBER COMMENTS TO SUPPORT SELF-EVALUATION: Provide supporting documentation that objective has/has not been met.**
*Add comments on your accomplishments, note unplanned work that occurred during this performance period, and special contributions you have made to your Section/Division/Department.*

**MANAGER COMMENTS TO SUPPORT EVALUATION: Provide supporting documentation that objective has/has not been met.**
Example: Deadline was met early (end of November) at a cost just over target ($105,000)
*Manager comments can be given in the form of quantitative results, measures and/or behavioral summaries.*

| OBJECTIVES<br>List each objective to be rated in quantitative, measurable terms. | PERCENTAGE WEIGHT<br>(%) | RATING<br>Indicate rating for each objective:<br>1, 2, or 3 | TALLY<br>(Weight x Rating) |
|---|---|---|---|
| 1. Administer the development of and negotiate contracts for the design and renovation of offices and facilities. | 65% | 2 | 1.3 |

**Staff Member Comments (Self-evaluation): I have negotiated contracts for all my projects independently and have ensured that proper documentation was completed to comply with the bank's policies.**

**Manager Comments: Rhonda has done a good job in managing her various construction projects including the Center cafeteria renovations, 1st Floor Plaza Corporate Trusts, Joan Siegle's area on the 6th Floor of the Center, Commercial Lending's 11th Floor project, the large majority of the construction associated with the new Doylestown, PA project, the relocation of the Plaza Mail Center, the reconfiguration of Fran Krohmer's area on the 8th Floor of the Plaza, and numerous other construction and reconfiguration assignments.**

| | | | |
|---|---|---|---|
| 2. Communicate project schedule to customers, management, and other Wilmington Trust Company staff members working on the project. | 10% | 2 | 0.20 |

**Staff Member Comments (Self-evaluation):** I have weekly project meetings for each of my projects and include all the Wilington Trust staff involved. I consistently prepare and distribute meeting minutes for each job. I send out numerous comminucations and set up recurring meetings to keep the users informed of the progress as well as copy them on the meeting minutes. I have set a goal for myself to ensure that the users that I am communicating with are also communicating with thier the appropriate fellow staff members.

**Manager Comments:** Rhonda has done a servicable job in communicating the project schedules to customers, management, and other Wilmington Trust Staff members. There is room for the improvement of communication between Rhonda and customers as evidenced by two specific complaints documented over the past 12 months. Overall, Rhonda's scheduling communication is acceptable.

| | | | |
|---|---|---|---|
| 3. Tour each facility, assess the needs of customers, and prepare a program of scope and pricing for the following year capital budget. | 10% | 3 | 0.30 |

**Staff Member Comments (Self-evaluation):** I prepare budgets that include scope for all the requests I receive at budget time.

**Manager Comments:** Rhonda has done an excellent job managing the programming process, defining project scope, and preparing relatively accurate budgets for future projects.

| | | | |
|---|---|---|---|
| 4. Maintain construction files to include at minimum the following folders: capital expenditure request, design, vendor invoicing, meeting minutes, contracts, and project communication. | 5% | 3 | 0.15 |

**Staff Member Comments (Self-evaluation):** My construction files are superior. I have all the items mentioned above plus other extremely important items such as certificates of occupancy, space plans, furniture plans, site plans, furniture quotes, signage plans. security plans, punchlist, leases, schedules, submittals, RFI's and change orders. I always have all the items needed for meetings and for following up on outstanding issues.

**Manager Comments:** Rhonda has done an outstanding job in maintaining her project files and folders.

*4*

| OBJECTIVES<br>List each objective to be rated in quantitative, measurable terms. | PERCENTAGE WEIGHT<br>(%) | RATING<br>Indicate rating for each objective:<br>1, 2, or 3 | TALLY<br>(Weight x Rating) |
|---|---|---|---|
| 5. Maintain controls on project expenditures and approve payments for goods and services according to authority provided by purchasing policy. Make recommendations to supervisor in matters exceeding that authority. | 5% | 2 | 0.10 |

**Staff Member Comments (Self-evaluation): I keep up to date with the bank's current policies and ensure that the proper authority is involved when necessary.**

**Manager Comments: Rhonda reasonably maintains control where project expenditures are concerned and her effort is acceptable**

| | | | |
|---|---|---|---|
| 6. Assist in the preparation of budgets for Wilmington Trust Company subsidiaries; 100 West 10th street Corp. and Compton Realty, and the General Services Division | 5% | 3 | 0.15 |

**Staff Member Comments (Self-evaluation): I always assist any fellow staff member when a request is made.**

Manager Comments: Rhonda has done an excellent job preparing budgets for the Wilmington Trust subsidiaries.

| | | | |
|---|---|---|---|
| 7. | % | | |

**Staff Member Comments (Self-evaluation):**

**Manager Comments:**

| | | | |
|---|---|---|---|
| **Total:** | **100%** | **Section I Total (Add Tallies):** 2.20 | |

## SECTION II: PERFORMANCE FACTORS

Performance factors represent Company-wide standards that are reflected in our Corporate Strategic Plan (CSP) and are expected of all Staff Members. This section measures "how results are to be accomplished" but does not require the setting of prospective objectives at the beginning of the performance period. Ratings should be given for all Staff on a **minimum of two** performance factors and a **maximum of five**. Note: Leadership Excellence should be completed for Staff Members who have formal supervisory/ management accountabilities.

At the time of the performance review, the manager should assign a rating (1, 2 or 3) for each performance factor based on the definitions on page 1. Average the ratings to find the Performance Factors Section total score. Supporting comments should be made for each performance factor in the space provided.

| PERFORMANCE FACTORS | RATING Indicate rating for each factor: 1, 2 or 3 |
|---|---|
| **EMBRACING DIVERSITY:** Promotes environment conducive to a workforce of diverse backgrounds with respect to age, culture, disability, educational level or background, employee status, family status, function, gender, national origin, organizational level, physical appearance, race, regional origin, religion, sexual orientation, thinking style, etc. | 2 |
| **Staff Member Comments (Self-evaluation):** I embrace every member of the human race. My personal belief is that we are all God's children and a equal in his eyes. For those who do not have the same religious background as myself, I respect their beliefs and enjoy learning about the diverse world that we live in! I go out of my way to help others both professionally and personnaly. | |
| **Manager Comments:** Rhonda appears unbiased in her approach to diversity within the workplace and promotes a diverse ork environment. | |
| **CLIENT FOCUS & SERVICE EXCELLENCE:** Develops positive internal and external relationships by actively listening, anticipating needs, and giving high priority to client satisfaction and flawless execution of client transactions. | 2 |
| **Staff Member Comments (Self-evaluation):** The relationships I have with all vendors/contractors is excellent. I am respected amongst those that I work with. Because of the diverse nature of the world, there will always be a small percentage of folks who you can not please, however I would estimate that 98% of the people that I work with (which is exceeds 100 people a year) both internally and externally would rate my services as excellent. The projects I execute have far exceded the clients expectations. When I close a project out, there are no outstanding issues that need to be addressed and the client is always satisfied. | |
| **Manager Comments:** Rhonda generally strives to satisfy each client's needs, but in the future needs to exercise a more understanding attitude to all client requests. In the future, Rhonda should be mindful to extend her goals to satisfy all customers equally, not just certain clientele. | |
| **COMMUNICATION:** Effectively uses verbal and written communication; demonstrates good judgement in disseminating information up, down and across the organization; demonstrates skills in active listening. | 2 |

**Staff Member Comments (Self-evaluation):** My job as a project manager is basically to communicate and to resolve issues. Because I am good at my job, it demonstrates that I effectively communicate. I actively listen to my clients which is 'emonstrated by having 100% customer satisfaction at the end of each job. I average 100 emails a day which demonstrates ...iat I work hard to ensure that communications are prompt and that everyone up, down and across the organization is kept informed. Again, because the world is diverse and there are numerous communication styles, I will never keep 100% of the people I work with happy.

**Manager Comments:** In most cases, Rhonda is responsive and communicates relatively efficiently to all Wilmington Trust business line clients. There is, however, room for improvement as evidenced by two specific complaints (previously referenced in Objective 3 above) regarding lack of communication and preparedness to communicate. In the future, Rhonda should assure that she is communicating in the most efficient manner possible as to keep all parties informed to the status, scope, and schedule of her projects.

| PERFORMANCE FACTORS | RATING<br>Indicate rating for<br>each factor: 1, 2 or 3 |
|---|---|
| **TEAMWORK:**<br>Collaborates effectively with others; demonstrates dependability and respect for others; delivers on commitments in a timely manner; takes personal responsibility for group objectives. | 2 |

**Staff Member Comments (Self-evaluation):** I always include the enire team in job meetings and effectively communicate with all working on projects. I consistently take meeting minutes and distribute to the entire team to ensure everyone has all the information they need to complete their job. I take responsibility when any part of the project hits a road bump and work with the entire team to resolve issues effectively.

**Manager Comments:** Overall, Rhonda demonstrates collaboration with vendors and Wilmington Trust Staff members that 'he works with during the course of a project. In the future Rhonda needs to remain mindful to include all pertinent team ...members to assure the optimum level of teamwork required to efficiently complete a project from both a timing and financial standpoint.

| | |
|---|---|
| **LEADERSHIP EXCELLENCE:**<br>Conceives and articulates a common vision; exemplifies integrity by fulfilling commitments and taking responsibility for own actions; provides successful leadership by building effective relationships and managing individuals resourcefully; models effective interactions with others; drives Organization success by capitalizing on business opportunities and adapting to customer/marketplace trends. | 2 |

**Staff Member Comments (Self-evaluation):** When running a project I articulate the vision by communication with all parties involved, forseeing what is down the road and effectively being pro-active on a consistent basis. I manage my resourses with respect, communication and by sincerely caring for the success of all those I work with. I go above and beyond to assist others by providing them additional information in a timely manner and I even take the time sit side by side with my co-workers helping them when they fall behind.

**Manager Comments:** Overall, Rhonda exhibits effective leadership through the management of her vendors and other ·ontractors associated with her assignment. As a senior level project manager, Rhonda needs to implement her knowledge nd expertise into the decision-making processes she encounters on a daily basis, and assume responsibilities associated /ith those decisions. Under the "Working Principles" of Wilmington Trust, Rhonda should be encouraged to embrace Empowerment with Accountability". Assuming responsibility in this way will bolster Rhonda's leadership abilities and ·sult in optimum growth as a project manager.

| Section II Total (average ratings): | 2.0 |
|---|---|

**SECTION III:  OVERALL RATING**

This section allows you to calculate the overall performance score by adding the total scores from Sections I and II, rounding to the nearest tenth.  **Note:**  Section I (Objectives) will be given 70% weight as part of the total score and Section II (Performance Factors) will be given 30% weight.

| ( <u>2.20</u>   x .70) | + | ( <u>2.0</u> x .30) | = | <u>2.14</u> |
|---|---|---|---|---|
| **Section I (Objectives)**<br>**Total Score** | + | **Section II (Performance Factors) =**<br>**Total Score** | | **Overall Performance Score** |

*Check the appropriate box below to indicate the overall performance rating which corresponds to the overall performance score above.*

| | IF OVERALL PERFORMANCE RATING (4) EQUALS (minimum rating will equal 1.00): | | INCREASE PERCENTAGES |
|---|---|---|---|
| ☐ | 1.00 to 1.50 | **(1) Does Not Meet Objectives** | 0.0% |
| ☒ | 1.51 to 2.50 | **(2) Meets Objectives** | Up to 4.5% |
| ☐ | 2.51 to 3.00 | **(3) Consistently Exceeds Objectives** | Up to 6.0% |

## EVALUATOR COMMENTS

*Comment specifically on this Staff Member's overall performance. Include in your comments how well the objectives were met; areas in which the individual's performance is best and/or needs further development; what the Staff Member is doing to improve his/her performance; additional training and responsibilities needed for further performance development; and any additional assignments and/or relevant comments.*

Rhonda is a valued employee within the Real Estate Acquisition and Development Section. Her professional knowledge and experience, coupled with her familiarity of Wilmington Trust Culture and staff, results in a rare chemistry capable of incredibly efficient project management production. In an effort to reach those incredibly efficient levels Rhonda should strive to treat all of her clients, vendors, sub contractors and fellow staff members with the utmost respect and professionalism. Further, Rhonda should be conscious that timely and efficient communication between, and inclusion of, all "Team Members" in job meetings during the course of the project will assist in her efforts to be as efficiently productive as possible. Lastly, under the "Working Principles" of Wilmington Trust, Rhonda should be encouraged to embrace "Empowerment with Accountability". Assumption of these types of responsibilities will allow Rhonda to grow as a project manager and will result in increased leadership characteristics.

## STAFF MEMBER COMMENTS

*Comment specifically on your overall performance. Include any areas of disagreement as well as any performance areas you wish to target for improvement.*

I enjoy my job and working with people. I have been fortunate to have the opportunity to work at a company that excels in its performance. I attribute the good fortune of the company to the excellent management and hard working staff. members. I will aspire to meet the objectives set forth in this review. I do however disagree with the comments regarding communication. I showed the history of 20 emails that I sent regarding the one complaint a staff member made about not being kept up to date. This particular staff member complains about everything and everyboday and I do not feel as though the complaint was warranted or validated

The workload of our Section has grown to where it is impossible not to effect job performance and the level of communication is increasingly getting diffucult to sustain. This has been brought to managament's attention and they are working on a resolution of this issue.

## SECTION IV: APPROVALS

Following the discussion and signing of the Performance Partnership Form, it should be forwarded to the appropriate representative for review and filing.

*The Staff Member's signature indicates that this Performance Partnership Form has been jointly reviewed and discussed. It is not an indication of agreement or disagreement with the evaluation.*

| Staff Member: | Title | Date |
|---|---|---|
| Evaluator: | Title | Date |
| Evaluator's Supervisor: | Title | Date |

*10*

## SECTION V: DEVELOPMENT PLAN

The Staff Member and supervisor should discuss and make plans for performance/career enhancement and development. Training needs should be identified and an action plan agreed upon. Attach additional sheets if necessary.

| DEVELOPMENTAL GOALS | DEVELOPMENTAL ACTION STEPS | PERSON(S) RESPONSIBLE | COMPLETION DATE |
|---|---|---|---|
| *List each skill or developmental area that will be the focus of activities for the upcoming performance year. Set the developmental goal in terms of the level of proficiency expected.* | *Action Steps may include any one or more of the following: on-the-job experience, coaching, training or coursework and special projects.* | *Person(s) Responsible may include self or others (e.g., trainers, mentors, or supervisors)* | *Set a target date for completion of action steps related to developmental action steps. Target date should fall within the annual performance period.* |
| Complete Villanova Project | Special Project | Self | June, 2006 |
| Complete Baltimore expansion project | Special Project | Self | 2nd Quarter, 2006 |
| Complete stacking plans for both Wilmington Trust Center and Plaza buildings | Special Project | Self | 1st Quarter, 2006 |
| Other projects as assigned | Special Project | Self | 1st Quarter, 2006 |

## Performance Review Salary Action Form

Name: _____     Employee Number: w _____

Last Increase                    Type of          **Adjustment Increase**              Date
                                 Increase                                              Received
             _____                                                          _____

Staff Member's Current Annual Base Salary/Rate of Pay:    $ _____

Incentive Compensation Earned During Review Period:    $ _____

Total:                                         $ _____

## INCREASE RECOMMENDATION

| | | |
|---|---|---|
| Staff Member's Current Annual Base/Rate of Pay | $ | % of Band |
| Level Adjustment (to minimum of existing salary band) | $ | % Increase |
| Merit Increase (correlated to performance rating) | $ | % Increase |
| Promotional Level Adjustment (to minimum of new salary band) | $ | % Increase |
| Promotional Increase (amount above minimum of salary band) | $ | % Increase |
| Total Recommended Increase Amount | $ | % Increase |
| New Annual Base Salary/Rate of Pay | $ | % of Band |

No Salary Increase    ☐

If Promotion:  New Job Title          Job #          Level          Effective Date

Please complete and attach a Human Resources Assignment Change form to this evaluation for any job title/level change.

If Lump Sum Increase:  Amount $          Effective Date          Earnings Code

Date Last Lump Sum Increase Rec'd          Amount Rec'd $

| | | |
|---|---|---|
| **Manager's Name (please print)** | | Date _____ |
| **Manager's Signature** | | Date _____ |
| **Division Manager** (for all increases) | | Date _____ |
| **Department Manager** (current base salaries of $60,000-$100,000) | | Date _____ |
| **Human Resources Division** (for all increases) | | Date _____ |
| **Chief Executive** (current base salaries over $100,000/Div Mgrs/over max increases/exceptions ) | | Date _____ |

**\* Due to SOX requirements, form must contain all appropriate signatures.**

# EXHIBIT
# C

Question #18 - mark Andress

## Coleman, Rhonda A.

From:           Coleman, Rhonda A.
Sent:           Tuesday, June 13, 2006 11:52 PM
To:             Andress, Mark G.
Cc:             Tancredi, James D.; Evans, John
Subject:        RE: 11th floor signs

Do we have an eta on the signs?

-----Original Message-----
From: Coleman, Rhonda A.
Sent: Thursday, June 01, 2006 5:28 PM
To: Andress, Mark G.
Cc: Tancredi, James D.; Evans, John
Subject: RE: 11th floor signs

I have been waiting for signs on the 11th floor for quite some time.  Can someone please
address this issue?

Thanks

-----Original Message-----
From: Coleman, Rhonda A.
Sent: Monday, April 17, 2006 8:31 AM
To: Andress, Mark G.
Subject: RE: 11th floor signs

???????????
-----Original Message-----
From: Coleman, Rhonda A.
Sent: Tuesday, March 21, 2006 9:46 AM
To: Andress, Mark G.
Subject: RE: 11th floor signs

??

-----Original Message-----
From: Coleman, Rhonda A.
Sent: Monday, March 06, 2006 2:00 PM
To: Andress, Mark G.
Subject: RE: 11th floor signs

Any news?

-----Original Message-----
From: Coleman, Rhonda A.
Sent: Monday, February 20, 2006 12:02 PM
To: Andress, Mark G.
Subject: RE: 11th floor signs

??

-----Original Message-----
rom: Coleman, Rhonda A.
Sent: Monday, February 13, 2006 9:46 AM
To: Andress, Mark G.
Subject: RE: 11th floor signs

1

Question # 18 Mark Andress

-----Original Message-----
From: Coleman, Rhonda A.
Sent: Thursday, February 02, 2006 12:39 PM
To: Andress, Mark G.
Subject: RE: 11th floor signs

How are you making out?

-----Original Message-----
From: Coleman, Rhonda A.
Sent: Thursday, January 19, 2006 4:28 PM
To: Andress, Mark G.
Subject: RE: 11th floor signs

Any luck in getting the signs for the 11th floor?

-----Original Message-----
From: Coleman, Rhonda A.
Sent: Wednesday, January 11, 2006 11:13 AM
To: Andress, Mark G.
Subject: RE: 11th floor signs

It appears that the file was lost!

-----Original Message-----
From: Andress, Mark G.
Sent: Tuesday, January 10, 2006 1:17 PM
To: Coleman, Rhonda A.
Subject: RE: 11th floor signs

Did you find that info. from the sign company?

-----Original Message-----
From: Coleman, Rhonda A.
Sent: Monday, January 09, 2006 7:50 PM
To: Andress, Mark G.
Subject: RE: 11th floor signs

?

-----Original Message-----
From:      Coleman, Rhonda A.
Sent: Wed Dec 28 15:35:11 2005
To:   Andress, Mark G.
Subject:    RE: 11th floor signs

Is there a ship date?

    -----Original Message-----
    From:      Coleman, Rhonda A.
    Sent: Monday, December 19, 2005 12:54 PM
    To:   Andress, Mark G.
    Subject:    RE: 11th floor signs

Did these get ordered?

        -----Original Message-----
        From:      Coleman, Rhonda A.
        Sent: Monday, October 10, 2005 9:12 AM

2

Question #18  Mark Andress

To:      Andress, Mark G.
Subject:     RE: 11th floor signs

Any progress?

          -----Original Message-----
          From:    Coleman, Rhonda A.
          Sent: Wednesday, September 14, 2005 4:41 PM
          To:   Andress, Mark G.
          Subject:    RE: 11th floor signs

          ???

               -----Original Message-----
               From:    Coleman, Rhonda A.
               Sent: Friday, September 02, 2005 4:45 PM
               To:   Andress, Mark G.
               Subject:    RE: 11th floor signs

               Any progress?

                    -----Original Message-----
                    From:      Andress, Mark G.
                    Sent: Monday, August 15, 2005 2:05 PM
                    To:   Coleman, Rhonda A.
                    Subject:    RE: 11th floor signs

                    Not at the moment. Hopefully we'll have a plan for who does
signs in the next couple of weeks.

                    Mark

                    -----Original Message-----
                    From: Coleman, Rhonda A.
                    Sent: Monday, August 15, 2005 2:00 PM
                    To: Andress, Mark G.
                    Subject: RE: 11th floor signs

                    Can Derek do signs?

                    -----Original Message-----
                    From:      Andress, Mark G.
                    Sent: Thursday, August 11, 2005 10:39 AM
                    To:   Coleman, Rhonda A.
                    Subject:    RE: 11th floor signs

                    Not by me.

                    -----Original Message-----
                    From: Coleman, Rhonda A.
                    Sent: Thursday, August 11, 2005 10:11 AM
                    To: Andress, Mark G.
                    Subject: RE: 11th floor signs

                     Have these been ordered?

                    -----Original Message-----
                    From:      Coleman, Rhonda A.
                    Sent: Thursday, August 04, 2005 3:10 PM
                    To:   Andress, Mark G.
                    Subject:    11th floor signs

                    I am also still waiting for signs for the conf rooms in
the lobby (1101 & 1102).

3

Question # 18  Mark Andress

## eman, Rhonda A.

**rom:**        Tancredi, James D.
**Sent:**       Wednesday, July 27, 2005 7:36 AM
**To:**         Coleman, Rhonda A.
**Subject:**    RE: Nameplate

Was Linda. Give this to Caryn. Give it to Mark Andress and I'm sure he'll be in to see me. I'll ask him if Caryn can now handle it.

Jim

-----Original Message-----
**From:**       Coleman, Rhonda A.
**Sent:**       Monday, July 25, 2005 4:23 PM
**To:**         Tancredi, James D.
**Subject:**    RE: Nameplate

Who is doing signage?

-----Original Message-----
**From:**       Culley, Pam
**Sent:**       Friday, July 22, 2005 4:54 PM
**To:**         Coleman, Rhonda A.
**Subject:** Nameplate

Rhonda:
        do we have any of the velcro ones on order?  I need 6....thanks, pjc

### Pamela J. Culley
Wilmington Trust Co.
Corporate Real Estate
Drop Code 0850
Ph: (302) 651-1424
Fax: (302) 427-4529

1

Message

Question # 18 - Jim
                    TAncredi

Page 1 of 1

## Coleman, Rhonda A.

**From:**      Devine, Mary T.

**Sent:**      Thursday, August 18, 2005 1:47 PM

**To:**        Coleman, Rhonda A.

**Subject:** FW:

Newark - State
Job Complete
2004

-----Original Message-----
**From:** Miller, Sally
**Sent:** Thursday, August 04, 2005 11:11 AM
**To:** Devine, Mary T.
**Cc:** Cunningham, Guy
**Subject:** RE:

Hi Mary

Sorry for the short email below.  Here is what I have on my punch list:

TV's to be installed.  (outlets were put in on 7/26)

Corporate Interiors to finish installing furniture that have to been ordered/reordered.  Doug said the furniture is in at Corporate interiors.)

Walk Off mats for front and back doors.

Carpet cleaned  (new carpeting laid if cleaning does not do the job of eliminating the color difference in the tiles)

Check writing desk lights.

Replace shades in Safe Deposit room with correct shades

Cabinet for Mtg area supply room

Lobby clock

Thank you for your help.

Sally

Sally J Miller
Branch Manager
Newark Main Street Office
Drop Code 5033
651-1627

8/18/2005

# EXHIBIT
# D

**Wilmington Trust
Corporate Policy Manual**

## EQUAL EMPLOYMENT OPPORTUNITY

### I.    POLICY STATEMENT

It has been a long-standing policy of Wilmington Trust and all of its wholly-owned subsidiaries to provide equal employment opportunity for all persons without regard to race, religion, color, sex, national origin, ancestry or sexual orientation. Moreover, the company is committed to non-discrimination based on age, the rights of physically and mentally disabled person, qualified disabled veterans, veterans of the Vietnam era, or other covered veterans to equal employment opportunity. Their rights include protection from coercion, intimidation, interference, or discrimination regarding the filing of a complaint.

In support of this policy, the company has an Affirmative Action Program that ensures that positive action will be taken concerning equal employment opportunities with regard to each of the following matters:

A.    Recruitment, advertising, or solicitation for employment

B.    Hiring, placement, promotion, transfer or demotion

C.    Treatment during employment

D.    Rates of pay or other forms of compensation

E.    Benefit plans

F.    Selection for company-sponsored training, education and tuition assistance

G.    Social and recreational programs

H.    Layoff or termination

### II.    PROCEDURES

The Affirmative Action Officer, a member of the Human Resources Department, is responsible for ensuring that the company fulfills the goals of its Affirmative Action Program and follows Federal and State Equal Employment Opportunity regulations.

Managers are responsible for implementing this policy within their own areas.

### III.    WILMINGTON TRUST AFFIRMATIVE ACTION PLAN – Statement of Policy

## Wilmington Trust
## Corporate Policy Manual

**3.1.1**

It has been a long-standing policy of Wilmington Trust and all of its wholly-owned subsidiaries to provide equal employment opportunity for all persons without regard to race, religion, color, sex, national origin, ancestry or sexual orientation. Moreover, the company is committed to non-discrimination based on age, the rights of physically and mentally disabled person, qualified disabled veterans, veterans of the Vietnam era, or other covered veterans to equal employment opportunity. Their rights include protection from coercion, intimidation, interference, or discrimination regarding the filing of a complaint.

In addition, it is the policy of the company to take affirmative action with respect to equal employment opportunity in all areas of employment, including:

A.    Recruitment, advertising or solicitation for employment

B.    Hiring, placement, promotion, transfer or demotion

C.    Treatment during employment

D.    Rates of pay or other forms of compensation

E.    Benefit plans

F.    Selection for company-sponsored training, education and tuition assistance

G.    Social and recreational programs

H.    Layoff or termination

To ensure the fulfillment of this policy and to meet all federal, state and local requirements , I have assigned responsibility for implementation of the policy to the Affirmative Action Officer of the company's Human Resources Department. This person shall disseminate the company's equal employment policy, both internally and externally, assist management in identifying and remedying problem areas, design monitoring systems to measure the effectiveness of the company's program, and serve as liaison between the company and community organizations concerned with employment needs of the protected classes. In addition, managers and supervisors, with the aid of the Affirmative Action Officer, will be responsible for determining and meeting realistic goals in their units and for communicating the Affirmative Action Policy to their staffs.

The essential part of the company's program is that all staff members support the company's Affirmative Action Policy, cooperate fully in its implementation, and

**Wilmington Trust**                                      **3.1.1**
**Corporate Policy Manual**

continue to promote the concept of equal employment opportunity at Wilmington
Trust.

Ted T. Ceçala, Jr.
Chairman and Chief Executive Officer

# EXHIBIT
# E

## Coleman, Rhonda A.

| | |
|---|---|
| **From:** | Emmi, Edward |
| **Sent:** | Friday, December 24, 2004 11:49 AM |
| **To:** | Coleman, Rhonda A. |
| **Subject:** | RE: Meeting on 12/22 & 12/23 |

Thanks, Rhonda. I'll be in touch soon.
Ed

-----Original Message-----
| | |
|---|---|
| **From:** | Coleman, Rhonda A. |
| **Sent:** | Friday, December 24, 2004 11:16 AM |
| **To:** | Emmi, Edward |
| **Subject:** | Meeting on 12/22 & 12/23 |

This is a follow up to our meeting that summarizes my concerns. I attended a meeting on December 22, 2004 with my Supervisor (Jim Tancredi), his manager (John Evans), and my fellow staff members (Mary Devine and Linda Russell). I scheduled the meeting because everyone in our Section was confused about their roles and responsibilities since the arrival of a contractor that was brought on board on November 2, 2004 to assist our section with the ordering, receiving, installing of office furniture. Both my Supervisor and the Division Manager acknowledged that we have a shortage of staff to fulfill our job responsibilities and agreed that bringing in an employee (Leon Cunningham) from one of our furniture vendors (Brennan's Office Interiors) was a solution to fulfill the staffing need. Since the contract was executed by management to bring in the contract staff member, management (John & Jim) has decided to look at alternative solutions to fulfill our staff shortfall. In the meeting on December 22 alternatives were being discussed. The primary alternative was to contract the handling of the office furniture need with the Design firm of Bradberry and Kheradi vs contracting with our furniture vendor Brennan's Office Interiors. I expressed my opinion during this meeting that it did not make a difference to me who we contracted with for the service. My only concern is that whoever would be filling this position have furniture experience with both furniture systems that we currently utilize. This is a summary of who, what where and why the meeting occurred.

During this meeting I was personally offended on several occasions. My supervisor (Jim) made me feel as though I were not experienced and capable of handling the construction part of my current job responsibilities to manage Corporate Real Estate Projects. He made a comment that insinuated I have only been handling office furniture projects in the two downtown facilities and that I have not done construction of a "new" branch or had an architect do a site plan. I have managed all the construction that has occurred in the 600,000 square feet of the two downtown facilities for the past 10 years. My experience handling construction projects include the $15 million renovation of the Wilmington Trust Center, 1.5 million renovation of the 2nd floor WTC, $500,000 construction of the new Baltimore office, $500,000 renovation of the 5th floor of the Plaza, $200,000 renovation of the 6th floor Center, managing tenant renovations on both the 10th and 12th floors, plus dozens of jobs costing under $200,000. As you can see by the number and dollar value of the construction projects, I have more then ample experience and that is why his comments were so offensive. I feel as though he diminishes my abilities because I am a female. During this same meeting Jim also repeatedly said to Linda she was not qualified to handle a request if a user came to her and asked her to reconfigure a workstation. He stated that we needed to hire someone who knew our standard sizes, colors and furniture systems. I have worked with Linda for the past two years and besides myself, she has the most knowledge of our standards in the two downtown office buildings. If Jim does not feel she is qualified that is his opinion and it should not have been brought up in a meeting numerous times in front of her fellow co-workers. The next comment that offended me was a comment made about Bradberry and Kheradi. He stated that the construction plans that Bradberry and Kheradi did he could do in his basement. Nancy Bradberry and Sandy Kheradi have over 30 years of experience including building such buildings as One Liberty (50 + story building in downtown Philly), Carnival Cruise Lines headquarters, many of the top law firms in Philadelphia and many, many more projects over their 30 year careers.

After this meeting I went to John Evans and told him that I was offended and that I felt as though Jim did not have any respect for women. He suggested that I talk to Jim but since I knew I was too upset to handle this I asked that he talk to Jim. Approximately an hour after this conversation, I overheard John talking to Linda saying my back was all up at this meeting. Yes I was upset and offended at the comments made at this meeting and was even more offended that management (John) did not respect me and my concerns enough to handle the situation properly, instead he demeaned my feelings to other staff members. This is not the first time I have felt as though there was a lack of respect for women's capabilities in this Division, however this is the second time I addressed this with my management (John) and have not gotten any results. I enjoy my job and enjoy working with my fellow co-workers and do not want

1

hard feelings in the area. I also do not want to lose my job because I have expressed my concerns to the Human Resources Area. I appreciate any and all help you can provide.

I hope that you have a great Holiday Season.

Rhonda

# January 10, 2005
Monday

January 2005
S M T W T F S
1
2 3 4 5 6 7 8
9 10 11 12 13 14 15
16 17 18 19 20 21 22
23 24 25 26 27 28 29
30 31

February 2005
S M T W T F S
1 2 3 4 5
6 7 8 9 10 11 12
13 14 15 16 17 18 19
20 21 22 23 24 25 26
27 28

| Time | |
|---|---|
| **7** am | |
| **8** 00 | Plan/Communicate |
| **9** 00 | |
| **10** 00 | |
| **11** 00 | |
| **12** pm | |
| **1** 00 | |
| **2** 00 | |
| **3** 00 | Follow up from Friday's meeting (Your Office)    ED EMMi |
| **4** 00 | Wrap up and Schedule |
| **5** 00 | |
| **6** 00 | |

### TaskPad

| | | TaskPad |
|---|---|---|
| ☑ | | TaskPad |
| ☑ | ☐ | Carpet 7th floor |
| ☑ | ☐ | Ceiling Paint |
| ☑ | ☐ | Daytona |
| ☑ | ☐ | Don't forget to check www.palm.net for .. |
| ☑ | ☐ | Get the most out of Outlook 98 |
| ☑ | ☐ | Get the most out of Outlook 98 |
| ☑ | ☐ | Get the most out of Outlook 98 |
| ☑ | ☐ | Outside light |
| ☑ | ☐ | Pa system |
| ☑ | ☐ | Sandy –   security desk |
| ☑ | ☐ | Steve Hyde 856 488-9494 ext 206 |
| ☑ | ☐ | Tina – file cabinet 6703/6611 |
| ☑ | ☐ | Typewriter stand & countertop basement |
| ☑ | ☐ | Who moved my cheese |
| ☑ | ☐ | Will |

### Notes

Notes from mtg 1/10/05

Who complained and did John give you contact names. Most interaction amongst everyone here and not everyone was going to like me and as management – that is not always the goal. Ask Linda she is with me most of the time. Ie  Mike Chandler

Largest work load.   Stuck in the ditches because I cared enough about our reputation to step up and follow up.   300 +/- work orders 200 +/- purchase requests    5 million +/-

Current Job Description – no Furniture, did because our bad reputation trying to get us to have a better one because nobody was following up and I was never asked to, I just did it.  No one asked me not to do it.

Confrontation – memo   email

Loose Cannon – both John and Ed.  Leave him alone, he is about to get fired. Check his record vs mine.

Division Manager's Job – John, Ray and Me  2001
                              Ed called us three in office

Offered Mark's job – didn't want to see him fired.

John did not get it – hired an outsider,

Qualified to run projects  -  5 jobs Sarbain Oxly reviewed that didn't have construction contracts.  Contractor told me I was the only one who looked at proposals and asked any questions.  Doesn't know the design process, doesn't have job meetings    # change orders & over budget CAPEX

Never responded why I was lower level then Jim.

Didn't need to

## Coleman, Rhonda A.

| | |
|---|---|
| **Subject:** | Canceled: Meeting to address Rhonda's Concerns |
| **Location:** | Ed's Office |
| **Start:** | Thu 1/20/2005 11:00 AM |
| **End:** | Thu 1/20/2005 12:00 PM |
| **Show Time As:** | Free |
| **Recurrence:** | (none) |
| **Meeting Status:** | Not yet responded |
| **Required Attendees:** | Emmi, Edward; Coleman, Rhonda A.; Evans, John |
| **Importance:** | High |

Just let me know when you'd like to reschedule this meeting.

Ed

Rhonda,
I have some information for you on two issues that you asked me to look into (unrelated to our job evaluation meeting last week). I am asking John to join us, as he has some relevant information to share as well. Unfortunately though, this is the earliest that all three of us are available, so we'll have to meet then. In the meantime, have a great holiday.

Ed

1

## Coleman, Rhonda A.

| | |
|---|---|
| **From:** | Coleman, Rhonda A. |
| **Sent:** | Friday, January 21, 2005 4:43 PM |
| **To:** | Emmi, Edward |
| **Subject:** | RE: |

Thanks for all the help. I do appreciate it. In the 19 years I have worked for the bank, I have never felt as though I have not been treated fair and with respect so I am a little uncomfortable with the whole process. When I am being told that my expertise and work ethic and job skills are outstanding, then in the next breath not even being considered for the open position that would afford me the opportunity to further my career and increase my salary, I get very confused. I was once considered for the job of Division Manager and received stock options annually for my superior performance and now I get minimal raises, no stock options and no consideration for advancement. I feel fortunate to work for a company that has a place to go to help with these matters and truly appreciate all that you have done. Please set up a meeting for next week and I will be happy to discuss this further with whomever you feel is appropriate.

Have a great weekend.

-----Original Message-----
| | |
|---|---|
| **From:** | Emmi, Edward |
| **Sent:** | Friday, January 21, 2005 4:19 PM |
| **To:** | Coleman, Rhonda A. |
| **Subject:** | RE: |

Rhonda,
Based on the nature of your questions, I needed my manager's input into how much information that could be released to you based on HR protocol. Your questions involved your salary vs. Jim Tancredi's when he started in your area, as well as providing you with the reasoning behind why you were not considered for Jim Tancredi's current position. Though unorthodox, both my manager and I felt that you were entitled to have answers to your questions to put your mind at ease. In regards to the last part of your concerns, there is no way that I would know why you were not chosen without speaking with John. I don't remember telling you I would not speak with John (though I do remember saying that in our earlier meetings regarding your concerns over your current responsibilities), but obviously you received that impression, and I'm sorry. However, there's no way that I could get the information that you needed without speaking to the person who made the decision. I'd be happy to discuss this further with you in person, so just let me know. Also, if you'd like to still meet with myself and John to receive the answers to the questions you had asked me, just let me know. I understand that you were out for our scheduled meeting this week.

Ed

-----Original Message-----
| | |
|---|---|
| **From:** | Coleman, Rhonda A. |
| **Sent:** | Friday, January 21, 2005 3:53 PM |
| **To:** | Emmi, Edward |
| **Subject:** | |

When we spoke on Monday, January 10th you said you would not discuss this issue with John without my permission. I understood that after you had a chance to talk to your manager, you would get back to me so I understood what my options were. Did I misunderstand our "next steps"?

## Coleman, Rhonda A.

**From:**   Coleman, Rhonda A.

**Sent:**   Monday, January 31, 2005 10:29 AM

**To:**   Emmi, Edward

**Subject:** Update

UPDATE!

Below is correspondence providing backup on where we are on updating the Job Description. Also we have changed the way we are handling the furniture in our area. Last week Management terminated the contract with the furniture vendor and Leon (from Brennan's) is no longer on site. Mgt has hired an independent outside contractor (Kathy) to take care of "furniture" and I think she is starting today.   It has not yet been communicated the roles and responsibilities of the folks in our area nor the roles and responsibilities of the new contractor.

I am anxious to get these issues resolved. It is very stressful working in an area where no one is sure who is suppose to be doing what. This will also be the 3rd person we have trained in the last 7 months to handle the bank's furniture and it is a very time consuming and stressful to train staff while handling an already oversized project load.

I will see you tomorrow!

PLEASE KEEP THIS EMAIL CONFIDENTIAL.


-----Original Message-----
**From:** Coleman, Rhonda A.
**Sent:** Monday, January 31, 2005 10:09 AM
**To:** Evans, John
**Cc:** Tancredi, James D.
**Subject:** RE: Job description

I apologize - you have interpreted the email incorrectly. I am not "demanding" a response - I was asking for the opportunity to sit down as a team and work on this together. I thought we would have open dialog regarding my career path vs getting an email to make a changes without discussion. As far as being late - I thought I communicated with you explaining that after my 2 1/5 days scheduled vacation I had to take an additional 2 days because my child was ill. I did ask my manager if I could work from home at that time so I would not get behind and Jim stated that you denied the request.

Per your email below, I think it is wise that we sit down and meet before I change my draft of the job description. I would like to know and understand the specifics of how much overnight travel is required. I also would like input from both you and Jim on the draft description that I prepared and also see where Jim's was going with his draft. I would also like feedback on my career path.

What is the status of the meeting we were asked to have regarding going over the process flow of the project mgt area defining roles and responsibilities?

Thanks for the speedy response.

        -----Original Message-----
        **From:** Evans, John
        **Sent:** Monday, January 31, 2005 8:24 AM
        **To:** Coleman, Rhonda A.
        **Cc:** Tancredi, James D.
        **Subject:** RE: Job description

        I have had time to read the description you prepared. One material change you must make concerns travel. Your definition

of "Manages projects within driving distance that requires no more than a normal business day of travel" is not in keeping with the reason for reviewing the job description.

1) Please make a change to include overnight travel

2) e-mail a copy to me as an attachment

3) We will discuss next steps

It's ironic that you can be two weeks late with a project and demand a response so quickly

-----Original Message-----
**From:** Coleman, Rhonda A.
**Sent:** Saturday, January 29, 2005 4:02 PM
**To:** Evans, John
**Cc:** Tancredi, James D.
**Subject:** RE: Job description

You have had time to review the job descriptions that both Jim and I prepared. I was under the impression that we were suppose to be working on the preperation of the job descripton as a team and since you have the drafts I think it is appropriate to sit down all together and discuss where this is going.

**From:** Evans, John
**Sent:** Fri 1/28/2005 1:34 PM
**To:** Coleman, Rhonda A.
**Cc:**
**Subject:** RE: Job description

Please e-mail a copy to me.

-----Original Message-----
**From:** Coleman, Rhonda A.
**Sent:** Friday, January 28, 2005 1:10 PM
**To:** Evans, John
**Subject:** RE: Job description

On your desk!

-----Original Message-----
**From:** Evans, John
**Sent:** Friday, January 28, 2005 10:18 AM
**To:** Coleman, Rhonda A.
**Cc:** Tancredi, James D.
**Subject:** RE: Job description

Rhonda,

I highly desire your ideas on this. That is why I want your draft before any collaboration takes place between you and Jim. Please send me your draft for review.

-----Original Message-----
**From:** Coleman, Rhonda A.
**Sent:** Wednesday, January 26, 2005 4:27 PM

**To:**   Evans, John
**Cc:**   Tancredi, James D.
**Subject: ?;**   RE: Job description

I have completed the draft of my job description.  I disagree with your approach to not include Jim and I on the initial review of the drafts we prepared.  I feel strongly that Jim and I should be working together on this to open the lines for better communication and it would help us bond with the recent changes in our organization.  If there are issues that Jim and I are at odds with, then I think it be appropriate to then include you for direction.  I thought it was a good idea for both Jim and I to prepare a draft, however I am concerned that by taking the approach that you are, it will solidify the silo's and lack of communication in our department and I also have concerns that you and Jim will team together and my input will be diminished.  Please let me know if you will change your mind and let Jim and I work together to prepare a combined draft for your review.

-----Original Message-----

> **From:**  Tancredi, James D.
> **Sent:**  Wednesday, January 26, 2005 8:00 AM
> **To:**  Coleman, Rhonda A.
> **Subject:**   RE: Job description

> John wants to see them both before that happens.  I mailed my version to him 2 weeks back.

> > -----Original Message-----
> > **From:**  Coleman, Rhonda A.
> > **Sent:**  Tuesday, January 25, 2005 4:00 PM
> > **To:**  Tancredi, James D.
> > **Subject:**   Job description

> > I will have my draft done tomorrow.  When would you like to sit down and compare the two?

## Coleman, Rhonda A.

| From: | Emmi, Edward |
|---|---|
| Sent: | Monday, January 31, 2005 12:11 PM |
| To: | Evans, John; Coleman, Rhonda A.; Tancredi, James D. |
| Cc: | O'Neill, James F.; Johnson, Andrea M. |
| Subject: | General Services Issues at Hand |

Importance:       High

John, Jim, and Rhonda,

Per the memo that was circulated company-wide last week, the Staff Member Relations team has had a reorganization of responsibilities and as the result, some members of our team will be serving different client groups as of February 1, 2005. In light of this, I will no longer be the primary person in Staff Member Relations who will be serving the areas within Finance. That person will now be Andrea Johnson. We have been asked by our manager, Jim O'Neill, to start the process of transitioning our areas. In that regard, I have begun apprising Andrea of the situation within your area. As I see it, there are two distinct issues here:

### 1.) Rhonda's questions regarding historical salary issues and the current structure

Tomorrow, John, Rhonda, and I will be meeting to discuss the information that I compiled. I have asked Andrea to join us in the meeting. My purpose of this meeting will be to present the information so that everyone has the same understanding of it. Our purpose is not to agree or disagree, but merely to get the facts, and then put this issue to rest. I would not expect these questions to re-surface after tomorrow's meeting.

### 2.) Project Manager Job Description going forward

As per the meeting we held a few weeks ago, we agreed that Rhonda and Jim would work together on a job description for a project manager that would reflect the needs of the Bank as we go forward. This would mean that overnight travel would be required, as most of the company's upcoming growth would be outside of the local area. Once this description was completed, it would be presented to John. He would either approve it, decline it, or ask for changes. Once all three parties were on board, the finished job description would be presented to Linda Desmond of HR for her to indicate a level and salary assignment. As that is not what seems to be happening, I would like to make two suggestions so that this can move forward:

a.) We should all be clear that for purposes of the Project Manager's job description (with a possible level and salary upgrade from what is currently in            place), travel means "overnight travel". The extent of this will need to be agreed upon and clearly documented in the new job description. Travel involving            the local tri-state area which only involves a day out of the office is already part of the job, and poses no necessitated changes to the current job                description.

b.) I would suggest sticking to the original plan of having Rhonda and Jim work together to produce one finished product (job description), which can then                be forwarded to John for his review. Since Rhonda is the person doing the job, and Jim is the person responsible for the job, as wall as any incarnations of it going forward, I am very comfortable that they can come up with a quality finished product that is reflective of the needs of the company as it moves forward. I also think it would be a great team-building opportunity for them. Of course, John would have the ultimate authority over the the job description before submitting it to HR, but I think it is far more beneficial to stick with our initial plan.

I'd like to take the opportunity to summarize my understanding of what the entire exercise of the job description revision is for. It is anticipated that with the overnight travel component installed into the job description, it is likely that the level and salary of the position will increase (though this can not be guaranteed without having the description reviewed by Linda). If that indeed ends up being the case, it will then be incumbent upon Rhonda to determine whether or not her personal circumstances will allow her to travel, and if the new proposed salary is attractive enough for her to accept the revised position. It is my understanding that if the answer to either of those questions is "no", then the newly-revised Project Manager position will be filled externally, and Rhonda will be responsible for "Furniture", which is currently being handled by an outside consultant. Though this position would pay less, it would involve no overnight travel.

Andrea should now be consulted going forward regarding the job description revision project. Please let me know if anything is unclear, or if I am misunderstanding anything we discussed.

                    Thanks,
                    Ed

## Coleman, Rhonda A.

| | |
|---|---|
| **From:** | Coleman, Rhonda A. |
| **Sent:** | Tuesday, February 01, 2005 10:05 AM |
| **To:** | Coleman, Rhonda A. |
| **Subject:** | FW: General Services Issues at Hand |

-----Original Message-----
| | |
|---|---|
| **From:** | Coleman, Rhonda A. |
| **Sent:** | Tuesday, February 01, 2005 10:05 AM |
| **To:** | Emmi, Edward; Evans, John; Tancredi, James D. |
| **Cc:** | O'Neill, James F.; Johnson, Andrea M. |
| **Subject:** | RE: General Services Issues at Hand |

I would like to take the opportunity to summarize the issues to date as I see them.

1) I am merely asking that I receive equal pay, equal benefits and equal consideration for advancement in my current position. In the past both John and Jim have performed the same job with the same functions and responsibilities which is managing renovations and new construction for Wilmington Trust throughout the Tri-State area. Job titles may have varied but the *primary* functions and responsibilities were the same. The jobs were all within one business day of travel and were both at higher levels and higher pay then I currently receive.   Since the departure of Ed Huppi (Division Mgt) who was the staff member responsible for all the jobs outside the local area, John assumed the responsibilities for the jobs outside the local area and was promoted accordingly. In the last two years John has assumed the responsibilities of Division Manager and Jim has handled the jobs outside of the local area.  This appears to be the primitive form of a career path for our area.  I am currently below the level and pay that both John and Jim received before they assumed the responsibilities of traveling and I am only asking why before I make any commitments to take on additional responsibilities.

2) In light of the questions I have asked, we (John, Jim and I) were asked to review my current job description and to work together to revise it, I thought to provide me opportunity to grow and advance.  It appears from this email that if I chose not to do the traveling that I will be demoted and my pay decreased.  After looking into this a little further I discovered that a current staff members job description states that they are responsible for overseeing the furniture for WT.  I am hoping that this is a non-issue and that we can all work together for a mutually agreeable resolution to the issues at hand.

I hope this helps clarify what my concerns are and welcome any feedback.

-----Original Message-----
| | |
|---|---|
| **From:** | Emmi, Edward |
| **Sent:** | Monday, January 31, 2005 12:11 PM |
| **To:** | Evans, John; Coleman, Rhonda A.; Tancredi, James D. |
| **Cc:** | O'Neill, James F.; Johnson, Andrea M. |
| **Subject:** | General Services Issues at Hand |
| **Importance:** | High |

John, Jim, and Rhonda,
Per the memo that was circulated company-wide last week, the Staff Member Relations team has had a reorganization of responsibilities and as the result, some members of our team will be serving different client groups as of February 1, 2005.  In light of this, I will no longer be the primary person in Staff Member Relations who will be serving the areas within Finance.  That person will now be Andrea Johnson.  We have been asked by our manager, Jim O'Neill, to start the process of transitioning our areas.  In that regard, I have begun apprising Andrea of the situation within your area.  As I see it, there are two distinct issues here:

### 1.) Rhonda's questions regarding historical salary issues and the current structure
Tomorrow, John, Rhonda, and I will be meeting to discuss the information that I compiled.  I have asked Andrea to join us in the meeting.  My purpose of this meeting will be to present the information so that everyone has the same understanding of it.  Our purpose is not to agree or disagree, but merely to get the facts, and then put this issue to rest.  I would not expect these questions to re-surface after tomorrow's meeting.

### 2.) Project Manager Job Description going forward
As per the meeting we held a few weeks ago, we agreed that Rhonda and Jim would work together on a job description for a project manager that would reflect the needs of the Bank as we go forward.  This would mean that overnight travel would be required, as most of the company's upcoming growth would be outside of the local area.

1

Once this description was completed, it would be presented to John. He would either approve it, decline it, or ask for changes. Once all three parties were on board, the finished job description would be presented to Linda Desmond of HR for her to indicate a level and salary assignment. As that is not what seems to be happening, I would like to make two suggestions so that this can move forward:

a.) We should all be clear that for purposes of the Project Manager's job description (with a possible level and salary upgrade from what is currently in place), travel means "overnight travel". The extent of this will need to be agreed upon and clearly documented in the new job description. Travel involving the local tri-state area which only involves a day out of the office is already part of the job, and poses no necessitated changes to the current job description.

b.) I would suggest sticking to the original plan of having Rhonda and Jim work together to produce one finished product (job description), which can then be forwarded to John for his review. Since Rhonda is the person doing the job, and Jim is the person responsible for the job, as wall as any incarnations of it going forward, I am very comfortable that they can come up with a quality finished product that is reflective of the needs of the company as it moves forward. I also think it would be a great team-building opportunity for them. Of course, John would have the ultimate authority over the job description before submitting it to HR, but I think it is far more beneficial to stick with our initial plan.

I'd like to take the opportunity to summarize my understanding of what the entire exercise of the job description revision is for. It is anticipated that with the overnight travel component installed into the job description, it is likely that the level and salary of the position will increase (though this can not be guaranteed without having the description reviewed by Linda). If that indeed ends up being the case, it will then be incumbent upon Rhonda to determine whether or not her personal circumstances will allow her to travel, and if the new proposed salary is attractive enough for her to accept the revised position. It is my understanding that if the answer to either of those questions is "no", then the newly-revised Project Manager position will be filled externally, and Rhonda will be responsible for "Furniture", which is currently being handled by an outside consultant. Though this position would pay less, it would involve no overnight travel.

Andrea should now be consulted going forward regarding the job description revision project. Please let me know if anything is unclear, or if I am misunderstanding anything we discussed.

Thanks,
Ed

2

# EXHIBIT
# F

## Coleman, Rhonda A.

**From:**  Coleman, Rhonda A.

**Sent:**  Wednesday, June 29, 2005 1:22 PM

**To:**  Coleman, Rhonda A.

**Subject:** FW: Work Authorization For the Century Office


-----Original Message-----
**From:** Coleman, Rhonda A.
**Sent:** Wednesday, June 29, 2005 1:18 PM
**To:** Evans, John
**Subject:** RE: Work Authorization For the Century Office

agree about more talking, hence the request 6 months ago to have us sitting in closer proximity. The issue is not if *you* were offended. I brought this to your attention and if you feel as though it is a non-issue - then so noted.

-----Original Message-----
**From:** Evans, John
**Sent:** Wednesday, June 29, 2005 11:58 AM
**To:** Coleman, Rhonda A.
**Subject:** RE: Work Authorization For the Century Office

I read the series again and don't sense a defensive or accusatorial tone. Perhaps it would serve you both to do more talking and less writhing.

-----Original Message-----
**From:** Coleman, Rhonda A.
**Sent:** Wednesday, June 29, 2005 11:48 AM
**To:** Evans, John
**Subject:** FW: Work Authorization For the Century Office

Thanks for the feedback. I sent Jim the CA because he asked me to sign it and I am not authorized. I am not sure where he was going with the emails - but it came off as defensive and accusational.   PA was not the issue at hand - the discussion was about CA.  Since this is not the first time, I want to make sure you were aware of the situation. I learned in the diversity training that people should not be offended at the workplace. I don't need a meeting set up to tell me that he didn't mean it that way or that I took it wrong - we did this the first time. I would just like Jim to be more mindful when he communicates.

-----Original Message-----
**From:** Evans, John
**Sent:** Wednesday, June 29, 2005 11:14 AM
**To:** Coleman, Rhonda A.
**Subject:** RE: Work Authorization For the Century Office

CA folks are averse to signing the authorization until we meet with the architect and they get comfortable with scope and pricing. That is the reason for our trip next week. I think he is trying to find out why you sent him the CA contract and not PA.

-----Original Message-----

**From:** Coleman, Rhonda A.
**Sent:** Wednesday, June 29, 2005 9:48 AM
**To:** Evans, John
**Subject:** FW: Work Authorization For the Century Office

I am not sure what the big issue is with this. Jim seems to be taking things a bit personal. It appears that he searching for things to find me doing wrong. I just wanted him to execute the work authorization in case they needed it next week when we go out and meet with them.

-----Original Message-----
**From:** Tancredi, James D.
**Sent:** Tuesday, June 28, 2005 10:56 AM
**To:** Coleman, Rhonda A.
**Subject:** RE: Work Authorization For the Century Office

Wilmington Trust of PA is not 100 West 10th Street either. So, a representative from Wilmington Trust should have signed the contracts. That's what it has to do with CA.

-----Original Message-----
**From:** Coleman, Rhonda A.
**Sent:** Tuesday, June 28, 2005 10:47 AM
**To:** Tancredi, James D.
**Subject:** RE: Work Authorization For the Century Office

Provco signed the one for Doylestown and Villanova hasn't been bid yet. What does that have to do with the Work Authorization for CA? Do you want me to have John sign it?

Original Message-----
**From:** Tancredi, James D.
**Sent:** Tuesday, June 28, 2005 10:30 AM
**To:** Coleman, Rhonda A.
**Subject:** RE: Work Authorization For the Century Office

Well, I guess the question is, who signed the contract for Doylestown and has one been signed for Villanova?

-----Original Message-----
**From:** Coleman, Rhonda A.
**Sent:** Tuesday, June 28, 2005 9:19 AM
**To:** Tancredi, James D.
**Cc:** Evans, John
**Subject:** RE: Work Authorization For the Century Office

I can sign for 100 W. Tenth Street because I am a VP of that sub. CA is an FSB I think ????

-----Original Message-----
**From:** Tancredi, James D.
**Sent:** Tuesday, June 28, 2005 9:14 AM
**To:** Coleman, Rhonda A.
**Cc:** Evans, John
**Subject:** RE: Work Authorization For the Century Office

Who's signing your contractor agreements? For example BCI?

-----Original Message-----
**From:** Coleman, Rhonda A.

Vlessage

**Sent:** Tuesday, June 28, 2005 8:35 AM
**To:** Tancredi, James D.
**Cc:** Evans, John
**Subject:** RE: Work Authorization For the Century Office

  I think that only AVP's can sign contractual obligations for the bank.  Can you please sign it for me and I will fax it to them.

Thanks!

-----Original Message-----
**From:** Tancredi, James D.
**Sent:** Tuesday, June 28, 2005 8:02 AM
**To:** Coleman, Rhonda A.
**Cc:** Evans, John
**Subject:** FW: Work Authorization For the Century Office

Rhonda,

Here's a "work authorization letter" from Wolcott in LA to handle the proposed revisions for the Century City Office. if the folks in LA elect to move forward, you'll need to execute this letter to get the ball rolling from a design standpoint.  Jan Vega is in possession of a Design Request form and balked at the price.  But, it's the cost of doing business and should they wish to proceed with their proposed revisions, they will obviously need to pay for their design costs.

Jim

-----Original Message-----
**From:** José Tabarez [mailto:jtabarez@wolcottai.com]
**Sent:** Monday, June 27, 2005 8:29 PM
**To:** Tancredi, James D.
**Cc:** Evans, John; jstefanucci@wolcottai.com; awilder@wolcottai.com
**Subject:** Work Authorization For the Century Office

*James,*
*Please review our Work Authorization attached. To approve, please print the form, sign at the space provided and fax to my attention. Should you have questions, please do not hesitate to contact me.*
*José Tabarez*

# EXHIBIT
# G

## Coleman, Rhonda A.

| | |
|---|---|
| **From:** | Coleman, Rhonda A. |
| **Sent:** | Tuesday, June 06, 2006 10:50 AM |
| **To:** | Tancredi, James D. |
| **Cc:** | Johnson, Andrea M. |
| **Subject:** | Need Direction |

**Importance:** High

Here is what is on my plate today.   Please let me know what is the priority.

BALTIMORE: Need to follow up to ensure plans were received for permits - RISK: - Job will fall behind schedule
        Need to review plans for accuracy - RISK: - increase job costs
        Furniture order must be placed - RISK: - job will fall behind schedule
        Need to review White sound issues and proposal - RISK: - Job will fall behind schedule

VILLANOVA: Need to address the Security issues presented by Tommy - RISK: potential risk to staff
        Need to address punchlist/quality issues (grand opening party in 1 week) - RISK: reputation of
myself and Division
        Furniture Issues need to be addressed - RISK:  reputation of myelf and Division
        Need to follow up on phone costs -  RISK:  being fired for poor job performance

GERMANY: Need to dig and see what I am suppose to do  - RISK: reputation of myself and Division, office not
opening on time
        Need to apply for passport - RISK: not able to travel when needed

LEHIGH VALLEY:  Need to address sign issue - RISK: - reputation of myself and Division

PRINCETON:   Need to verify Furniture plan, schedule coordinate electric and wiring in new office,
        coordinate the move - RISK - office will not open.

2ND FLOOR PROJECT: Need to address Card Access Control - RISK: - job being completed on time

CONNECTICUT: Need pricing, leasing and sq ft to John today - RISK: being fired for poor job performance

DOYLESTOWN: - Need to schedule and review lighting change in reception area - RISK: reputation of myself and
Division
        Need to schedule repair of wall covering - RISK: - reputation of myself and Division

STACKING PLAN: - Need to review plans, meet with users, mark up plans for CAD input - RISK: being fired for
job performance

These are the hot items TODAY and I am still behind on my emails (over 400) due to extremely heavy work load
last month (opening the two new offices last month with only a weeks notice, opening the Villanova office,
competing the cafeteria, starting Baltimore, working on the 10 phase 2nd floor Plaza project, etc..). By not
responding to my emails, which is extremely important because my job as project manager is 90%
communication, I am costing the bank money by falling behind on projects and incurring additional project costs
due to not being able to make timely decisions. Lets not forget that I have an excellent reputation with both the
user group and the vendors and that is being tarnished as well because I am unable to respond in a timely
fashion.  I also would like to write a response to the level 3 warning I received last week and have not had time to
do so.  I have worked 16 hours overtime in the last 4 business days and I have not even placed a dent into my
workload.   I know we have a meeting tomorrow to discuss this, however I am sinking today and need some
help!!!!!!!!  Please let me know what you want me to complete today and I will do what I physically can to
accomplish this!

6/13/2006

## Coleman, Rhonda A.

| | |
|---|---|
| **From:** | Coleman, Rhonda A. |
| **Sent:** | Tuesday, June 13, 2006 3:05 PM |
| **To:** | Tancredi, James D. |
| **Cc:** | Johnson, Andrea M. |
| **Subject:** | FW: Villanova |

I have been contact with you daily asking what you need from me each day until I feel as though I am caught up from the landslide of work that happened in April/May. This was never mentioned. I will get this done today. Please let me know if there are any other items that are outstanding you need from me. ·I am caught up reading all my emails and am feeling a "little" better about what is out there. however as I stated below. I do not have a copy of this email in my inbox or deleted box so I am very concerned that you may still be waiting for something from me. I am checking with IT to see what is wrong with my email system as to why I did not receive this.

By the way - It was nice for the CEO to send out an email thanking us all for all this work that was done during these last two months.   It feels good that someone recognizes the efforts put forth!!!

-----Original Message-----

| | |
|---|---|
| **From:** | Coleman, Rhonda A. |
| **Sent:** | Tuesday, June 13, 2006 2:56 PM |
| **To:** | Evans, John |
| **Cc:** | Tancredi, James D. |
| **Subject:** | RE: Villanova |

Sorry, this is the first time I have seen this email. I checked my inbox and deleted box and could not even find a copy of this this email. I will get this to you today.

-----Original Message-----

| | |
|---|---|
| **From:** | Evans, John |
| **Sent:** | Tuesday, June 13, 2006 2:23 PM |
| **To:** | Coleman, Rhonda A. |
| **Cc:** | Tancredi, James D. |
| **Subject:** | RE: Villanova |
| **Importance:** | High |

Rhonda, please assemble the list of items and values that were negotiated away from the landlord.

Let me know if you have any questions.

-----Original Message-----

| | |
|---|---|
| **From:** | Evans, John |
| **Sent:** | Friday, May 26, 2006 11:55 AM |
| **To:** | Coleman, Rhonda A. |
| **Cc:** | Tancredi, James D. |
| **Subject:** | Villanova |

I just returned from Villanova. Target still has some work to complete, including the trim under the stairs, the ceiling over the reception and some misc. woodwork. We will also need to work with them on some quality issues.

Now that we have a certificate of occupancy I need to request payment of the tenant improvement allowance from the landlord. Rhonda, during the construction you negotiated with landlord that WTC would complete several items that were the responsibility of the landlord and landlord agreed to compensate WTC for accepting responsibility for this work. Please provide me with an itemized list of work and associated values so that I can include them in my request. Please provide this list by June 5.

# EXHIBIT
# H

message

## Coleman, Rhonda A.

**From:** Coleman, Rhonda A.

**Sent:** Wednesday, June 14, 2006 10:09 AM

**To:** Johnson, Andrea M.

**Subject:** RE: I found it

Thanks for getting back to me. I gave him the info he requested yesterday. I worked until 2:00 am. I am feeling alot of pressure to get things done and the stress level is really affecting my family life. I have gotten feedback from Jim in our Monday meeting that he is happy with my performance and that I am responding to all his needs and that my jobs are all going well. By taking the Baltimore job off my plate, I can *better* keep up with the 4 major projects I am working on with a July 1 completion date. I know I am at a level three warning, however with all the efforts I have put forth, all the overtime I have put in, and all the communication I have had with my manager, I feel as though they are not working with me but against me. John or Jim could have easily popped their head in my door asking if I got that email and what the status was. Am I wrong to think that?

----Original Message-----
**From:** Johnson, Andrea M.
**Sent:** Wednesday, June 14, 2006 9:57 AM
**To:** Coleman, Rhonda A.
**Subject:** RE: I found it

> I think that there is an auto delete set up in the system because I had items deleted on 6/10 as well and I didn't log into my e-mail at all on 6/10 either. I also had items deleted on 6/3 which was the Sat before and I wasn't online then either.
>
> -----Original Message-----
> **From:** Coleman, Rhonda A.
> **Sent:** Tuesday, June 13, 2006 4:35 PM
> **To:** Johnson, Andrea M.
> **Subject:** I found it
>
> I found the item is the deleted/deleted file. I do not remember this in the least bit. I recovered it so I do not know how to find out when it was deleted. I think it said it was deleted on 6/10 (Saturday). If that is the case then I was at a softball tournament all day and did not touch a computer so I could not have deleted it. Is there a way to find out when it was deleted after it was recovered?
>
> I know I would never have deleted an email that had something for me to do when I am in the shoes that I am in. If I did, then the pressure is getting to me and I am starting to lose my mind. Losing my mind is not an option for me at this point. I have three children and a wonderful husband that needs me and I refuse to let this place put me over the edge.

7/6/2006

## Coleman, Rhonda A.

| | |
|---|---|
| From: | Coleman, Rhonda A. |
| Sent: | Wednesday, June 14, 2006 11:23 AM |
| To: | Johnson, Andrea M. |
| Subject: | FW: Villanova |

Here is another example of the communication issues that are occurring in our area. I was not clear on a request and asked to sit down and discuss. Instead of stopping by my office (which is two doors down), he sends me an email that just restated what he said in his original email. I did not understand it the first time, that is why I made the simple request for some clarification. I was told to stop communicating via email and start doing more face to face. I think it would help if that worked both ways.

-----Original Message-----
| | |
|---|---|
| From: | Coleman, Rhonda A. |
| Sent: | Wednesday, June 14, 2006 11:01 AM |
| To: | Evans, John |
| Cc: | Tancredi, James D. |
| Subject: | RE: Villanova |

Should we wait for Jim for this meeting? I saw the original email and was not real clear regarding the request so I asked to sit down and discuss. I was not part of the negotiations with the landlord, only the contractor so that is probably where some the confusion is stemming from. I am available for the next 30 minutes or so then I have to go to Villanova. If you would like me to cancel the trip to Villanova to work on this, please let me know!

-----Original Message-----
| | |
|---|---|
| From: | Evans, John |
| Sent: | Wednesday, June 14, 2006 10:43 AM |
| To: | Coleman, Rhonda A. |
| Cc: | Tancredi, James D. |
| Subject: | RE: Villanova |

I am available today except for a 2:30 meeting at Hagley. So that you can prepare for the meeting the meaning of "negotiated away" is contained in the original text and is "during the construction you negotiated with landlord that WTC would complete several items that were the responsibility of the landlord and landlord agreed to compensate WTC for accepting responsibility for this work"

-----Original Message-----
| | |
|---|---|
| From: | Coleman, Rhonda A. |
| Sent: | Wednesday, June 14, 2006 1:42 AM |
| To: | Evans, John |
| Cc: | Tancredi, James D. |
| Subject: | RE: Villanova |

I am not sure what you mean by negotiated "away" from landlord so I am going to take a shot at what you are looking for:

Insulation at perimeter walls - $11,000 +/-
Ductwork - $40,000 +/- (credit)
Sanitary piping to kitchens - $16,000 +/-
Curved Stair - $103,000 +/-

I am not sure where the line is for what you negotiated as part of the rent deal and what items WTC is due a credit for including in our contract. We should probably sit down and discuss to ensure clarity on both our parts.

-----Original Message-----
| | |
|---|---|
| From: | Evans, John |
| Sent: | Tuesday, June 13, 2006 2:23 PM |
| To: | Coleman, Rhonda A. |
| Cc: | Tancredi, James D. |
| Subject: | RE: Villanova |
| Importance: | High |

1

Rhonda, please assemble the list of items and values that were negotiated away from the landlord.

Let me know if you have any questions.

-----Original Message-----
| | |
|---|---|
| **From:** | Evans, John |
| **Sent:** | Friday, May 26, 2006 11:55 AM |
| **To:** | Coleman, Rhonda A. |
| **Cc:** | Tancredi, James D. |
| **Subject:** | Villanova |

I just returned from Villanova. Target still has some work to complete, including the trim under the stairs, the ceiling over the reception and some misc. woodwork. We will also need to work with them on some quality issues.

Now that we have a certificate of occupancy I need to request payment of the tenant improvement allowance from the landlord. Rhonda, during the construction you negotiated with landlord that WTC would complete several items that were the responsibility of the landlord and landlord agreed to compensate WTC for accepting responsibility for this work. Please provide me with an itemized list of work and associated values so that I can include them in my request. Please provide this list by June 5.

# EXHIBIT
# I

## Coleman, Rhonda A.

**From:** Coleman, Rhonda A.

**Sent:** Thursday, June 15, 2006 3:30 PM

**To:** Johnson, Andrea M.

**Subject:** RE: Update

I am attaching just one example of an item that makes me feel as though I am being placed under a microscope so if I move in the wrong direction I will be fired. The attached meeting minutes from our project meeting June 6th has only my items in caps, color and bold. I made light of this in our meeting and said I feel special because my items are in "big bold print". The next set of meeting minutes came out and it was corrected. Pam does the meeting minutes and I am not sure if she was directed to do this or did this on her own. Pam and I have maintained a very cordial professional relationship since I went to HR last year when she said offensive remarks about my children. I am sure she is aware of my level 3 warning and hope that she would not make any attempts to aggravate the situation.

Meeting Minutes from 6/5/06. thanks, pjc

# Corporate Real Estate
## Minutes       June 5, 2006     8:30 A.M.      General svcs conf room

| Meeting called by | Jim Tancredi |
|---|---|
| Type of meeting | New Project(s) Coordination Meeting |
| Facilitator | Jim Tancredi |
| Note taker | Pam Culley |
| Attendees | Leslie Hitchens, Cathy McNamara, Bill Novertia, Jeff Noznisky, Jim Tancredi |

## Agenda topics

| | WT Plaza atm room move | COLEMAN/MC NAMARA | |
|---|---|---|---|
| **Discussion** | Proposal from Jim Riley to relocate the ATM Room currently located on Plaza 1st fl to either the 2nd fl or completely off site in a more secure setting. Budget figure of $500,000 was submitted to Jim Riley. This figure reflects only the cost to move from 1st fl Plaza to 2nd fl. | | |
| **Conclusions** | Decision pending. 9/26 – n/c; 10/3 – n/c; 10/10 – n/c; 10/31 – on hold; 11/7 – n/c; 11/28 – n/c; 12/5 – n/c; 12/12 – no time frame for move yet. 12/19 – Sandy working on finalizing numbers; number of workstations to be priced; will impact people on firs. 1-6. 1/9 – 1st qtr 06 project; TY to check with Mary re: start date so that equipment can be ordered. Print to follow. 2/6 – meeting scheduled for 2/13 with Rita Turner, Bob Harra & Gen. Svcs. Cap ex has been signed. 2/13 – coordination meeting to be scheduled. 2/20 – Meet 2/20 w/Bob Harra – approved; Phase I (ATM Control 2nd to 6th fl.). Schedule to be determined next week. 3/20 – moving along; first move scheduled for 3/21. 4/10 – second move scheduled (tentatively) 5/5. Estimated 11 phases total. 4/17 – move scheduled for 5/5 – on schedule. Any modifications/changes will be made after the bulk of the moves are complete. 4/24 – weekend move (5/5) still on. Ten phases total – tentative dates have been set; estimate completion in Sept. 5/1 – on schedule. 5/8 – no update. **6/5 – Phase III completed last weekend; on schedule.** | | |
| **Action items** | | Person responsible | Deadline |
| | | | |

WT Center ground fl – post office      r coleman/j tancredi

| Post Office to be out 09/06 (realistic – end of 2006). Mail Center, Printing and Central File |
|---|

| Discussion | tentatively slated to move to ground floor. | | |
|---|---|---|---|
| **Conclusions** | Pending.<br><br>9/26 – working on blocking plan.  10/3 – have blocking plan.  Awaiting decision from Management as to who should occupy space.  10/10 – pending.  10/31 – n/c. 11/7 – n/c; 11/28 – n/c; 12/5 – n/c; 12/12 – n/c.  12/19 – n/c. 1/9 – n/c @ this time; estimated 6 mo. design project should get underway soon. 2/6 – n/c; 2/13 – n/c; 2/20 – n/c; 3/20 – n/c. 4/10 – n/c; 4/17 – n/c; 4/24 – n/c; will need direction sometime in the near future. Once Post Office moves out, rent will be incurred on empty space. 5/1 – space/stacking plans will be to be complete very soon in order to determine who will utilize the vacant space. 5/8 – n/c. **6/5 – n/c** | | |
| **Action items** | | Person responsible | Deadline |
| | . | . | |

| | wt center -- sidewalks | r COLEMAN | |
|---|---|---|---|
| Discussion | Replacement/repair of existing sidewalks around WT Center. | | |
| Conclusions | Need to provide budget figure.<br><br>9/26 -- Sandy Kheradi working on design. 10/3 -- RC to contact Sandy re: status. 10/10 -- n/c. 10/31 -- n/c. 11/7 -- n/c; 11/28 -- n/c; 12/5 -- n/c; 12/12 -- n/c; 12/19 -- n/c 1/9 -- n/c. Sandy Kheradi to address at later date. 2/6 -- n/c; 2/13 -- n/c; 2/20 -- n/c; 3/20 -- n/c; 4/10 -- n/c; 4/17 -- n/c; 4/24 -- n/c; 5/1 -- n/c; 5/8 -- n/c; **6/5 -- no update**. | | |
| Action items | | Person responsible | Deadline |
| Provide budget figures | | R Coleman | |

| | villanova | R coleman |
|---|---|---|
| Discussion | Construction drawings will go out on 9/16. Start mid to late October. | |
| Conclusions | 9/26 -- CD's ready -- engg. dwgs. are not ready. Waiting signed cap ex. Meeting planned for afternoon of 9/26. Bill Novertia gave Rhonda costs for Telecom items. 10/3 -- out to bid -- due 10/14. Engineering drawings were signed off. 10/10 -- bids due 10/14. Studding going up -- construction to begin mid-Nov. Target doing shop drawings. 10/31 -- cap ex postponed for a couple of weeks. Space will not be turned over to WTC until 1Q06. WTC construction to begin late 1Q06 (12-16 wk fit-out). Steel is in place. 11/7 -- fit-out late 4Q05/1Q06. 11/28 -- meeting to be scheduled for 12/6; construction commencement Jan. 06. Estimated 12-16 wk time frame. (Mary Ann Corse is the site contact.) 12/5 -- scheduled for Jan. 06 start. Job meeting 12/6. 12/12 -- turn over to WTC first/second week of January. Est. completion June 06. 12/19 -- John to meet w/landlord in an attempt to postpone initial rent payment; 1/1/06 new space to be turned over to WTC even though WTC won't occupy until June, most likely begin rent payments for both spaces in April; TY has sent out request for security equipment to Purchasing today. 1/9 shell should be complete end of Jan. (tentative). Walls are laid out, stud work completed. Millwork selection in progress (contractor selection an issue). Contractor estimating end of May completion. 2/6 -- started drywall last week. Holding weekly meetings w/contractor & Mary Ann Corse. Building signage & furniture order issues to be addressed. 2/13 -- Met w/Mary Ann last week to go over move & IT order was discussed. Drywall is not up yet. Schedule was revised last week -- May 1 tentative move in. Telecom advised -- equipment to be ordered. Safe will need to be moved per TY (Gilbertson?). 2/20 -- Drywall started. Move details to follow. Mechanical contractor is behind schedule. Stairwell railings still need to be fabricated. 3/20 -- tentative mid-May occupation per Jim; circuits ordered (BN). 4/10 -- completion estimated 2nd or 3rd week in May. 5/19 will be breakdown day, opening 5/22 (tentative). Furniture delivery started 4/10. 4/17 -- furniture started last week. Still on schedule for opening 5/22. 4/24 -- On schedule. Cleaning survey should take place after 5/12. Blacktop should be complete this week; hopefully, landscaping done this week. Signage issue to be addressed with Landlord. 5/1 -- on schedule for 5/19 move in. 5/8 -- still on schedule for 5/19 move & 5/22 opening. Stairwell completion in question. **6/5 -- Many open ended** |

Message

**construction issued remain.  Punchlist will be ongoing (JT)**

| Action items | Person responsible | Deadline |
|---|---|---|
|  |  |  |
|  |  |  |

| Discussion | Relocate ATM to Shoppes of Villanova. |
|---|---|
| Conclusions | 1/9 – proposal package to be worked up by RC. Questions on notification – time line. 2/6 – Information rec'd from Owner's architect. Additional info needed; then package will be forwarded to Jeff Culp/Mark Graham. End of April/first of May est. time frame. 2/13 – Package to be sent soon. Time frame TBD. 2/20 – RC sent our portion of package; Dee Cahill working on her info. 3/20 – n/c ??; 4/10 – n/c; 4/17 – new building location may not be ready for ATM installation before move from existing location to take place; in that case, Security will need to monitor old space until machine is moved. JN to contact Dee Cahill re: dial-up vs. network of ATM. 4/24 – existing ATM to be maintained until details are firmed up on new location. 5/1 – will not be moved until mid-June. 5/8 – request in to Service Desk to install new line. 6/5 – 2-3 months away from lobby being available for WT ATM installation per TY. |

| Action items | | Person responsible | Deadline |
|---|---|---|---|
| | | | |

Doylestown                                        coleman

| Discussion | Grand Opening scheduled for 9/15. Couple of outstanding punch list items. |
|---|---|
| | Rhonda will be on site 9/13 to resolve. |
| Conclusions | 9/26 – Grand Opening went well. Couple of panels on order; couple punchlist items remain. 10/3 – couple of punchlist items. Chairs to be recovered; acoustical issues being worked on, outlet to be installed for monitor on 10/3. 10/10 – white noise representative to adjust levels in reception area; Rhonda to accompany them. Sound panels will be added if necessary. 10/31 – Panels installed in reception area. Minor punchlist items remain. 11/7 – will be adding door phone/intercom system (JN/TY). 11/28 – sliding door problem resolved. Intercom issue needs to be coordinated w/Gen Svcs. & Telecom. 12/5 – Maureen (Telecom) to schedule. 12/12 – MD and CM to go 12/13 for walk-thru to go over punchlist items. 12/19 – most punchlist items complete, including acoustical items. 1/9 – punchlist items – white noise issue to be addressed. 2/6 – white noise issue resolved; couple of small punchlist items outstanding. 2/13 – RC will visit site on 2/17 to check on punchlist completion. Lighting issue to be addressed. 2/20 – Outstanding punchlist item (fabric wallcovering); lighting fixture is in – to be installed. 3/20 – n/c; 4/10 – n/c; 4/17 – n/c; 4/24 – punchlist items ongoing. 5/1 – no update; 5/8 – n/c; 6/5 – **punchlist items ongoing (JT).** |

| Action items | | Person responsible | Deadline |
|---|---|---|---|
| | | | |

aTLANTA                                    TANCREDI

| Discussion | ~~between~~ staying at the current location or moving to a new site. |
|---|---|

| | ~~On the~~ ~~meeting~~ ~~session~~ from Rod. |
|---|---|
| Conclusions | ~~COMPREHENS~~ – looks like they will be picking a new location for 2007.  Negotiating deal.  10/3 – John ~~...~~ Design due mid-2006. 10/10 – pending. 10/31 – '07 project.  Mid '06 for design ~~...~~ 11/28 – n/c; 12/5 – n/c; 12/12 – n/c. 12/19 – n/c. 1/9 – n/c; end of year design project. 2/6 ~~...~~ – design to commence 3rd or 4th qtr. 06. 3/20 – n/c; 4/10 – n/c; 4/17 – n/c; 4/24 – n/c; ~~...~~ signed within a month; preliminary budget done. Third/fourth quarter 06 start anticipated. 5/8 ~~...~~ to Sr. Mgt. for approval.  Lease to be executed soon.  **6/5 – Programming to begin soon.  April** ~~...~~ start anticipated (JT). |

| Action items | | Person responsible | Deadline |
|---|---|---|---|
| | | | |

| Discussion | Working on budget figures to move Residential Mortgage staff to Pike Creek (would basically be paint/carpet/furniture) 17-20 people in 2006. | | |
|---|---|---|---|
| Conclusions | 9/26 - $250,000 budget figure for renovation; they will wait for 2006 renovations. Becky DePorte & Bill Williams discussing. 10/3 – Awaiting decision from Becky Deport. 10/10 – pending. 10/31 – n/c. 11/7 – new circuits, cabling & fire alarm needed for new space. 11/28 – B Williams & B DePorte still discussing. JT to contact B Williams. Basically carpet & paint. Budget discussion to ensure accuracy of original figure. JT & MD will visit site w/B Williams. 12/5 – Site visit sch. 12/6 (JT, JN, MD & Bill Williams). 12/12 - $250,000 accurate budget figure. JT to forward rent figures to Bill Williams. No demo work; TY will need another port on router. Tentatively 1Q06. | | |
| | 12/19 – Bill getting numbers to Becky DePorte, should hear something around 1st of 2006. 1/9 – n/c; waiting to hear from Bill Williams. 2/6 – still waiting on approval from B DePorte. 2/13 – n/c; 2/20 – Bill Williams needs add'l week for confirmation. 3/20 – Bill Williams still waiting on a decision from R. DePorte. 4/10 – Shooting for 6/1-6/30 occupancy. Security & fire system figures are in. Possible video installation in lobby only. BN to order circuit. Carpet, paint, vinyl base & hanging of interior doors to be done by WTC Bldg. Mgt. 4/17 – cap ex to be prepared by JT this week for signature. 4/24 – cap ex ready for signature (shooting for end of June move-in). Basically, paint, carpet & furniture – one wall change; millwork in front area. 5/1 – no response from Bill Williams. 5/8 – Bill Moore to contact carpet reps for sq. footage & quote. **6/5 – construction meetings to begin tomorrow (6/6) @ 2:00 p.m. CM to send floor plans to JN & TY. Approx. 20 staff members moving. Bill Williams advised to name a move coordinator for job; staff needs to begin packing/clean-up. RHONDA: pls make sure all parties involved are included in job meeting notification (JT).** | | |
| Action items | | Person responsible | Deadline |
| Provide budget figures | | R Coleman | |

wt center – 5th fl.                              TANCREDI/moore

| Discussion | Renovation of 5th fl. Has been approved – move of Finance to 5th fl. Construction tentatively scheduled to begin 1Q06. |
|---|---|
| Conclusions | 9/26 – Meeting w/Sandy Kheradi 9/26 to discuss blocking plan. Once approved, furniture space plan will be developed. 10/3 – blocking plan in place. Still tentative (mtg to be held 10/4 w/Garrison). 10/10 – Pending. Meeting w/Sandy Kheradi on 10/10. Floor is approx. 4000 sq ft short of accommodating all of Finance Dept. 10/31 – Meeting scheduled for 1:00 pm 10/31. 11/7 – ongoing – '06 project. 11/28 – 50% of floor plans have been signed off on. 12/5 – 50% signed off on; early 2nd qtr. 06 commencement. 12/12 – no update. 12/19 – n/c. 1/9 – waiting on budget decision – D Gibson to present proposal to CIC (to complete remainder of building – fit-out). 2/6 – meeting 2/6 @ 1:00 to transition project to Tancredi/Moore. Cap ex's due by end of week. 2/13 – Cap ex complete; Jerry Sopp putting together memo for CIC. S Kheradi to provide finished dwgs. Demo slated to start once CID approval is rec'd. Est. construction to begin 1st week of April. 2/20 – Met last week, small revisions to layout. Review meeting to be held next week. 3/20 – Demo has started (in-house). Approved floor plan tentatively this week from S. Kheradi. KPMG approved to stay on 6th fl. Mid-May construction start; mid-August tentative construction completion. Tom needs reflective ceiling & furniture plans before proceeding. 4/10 – CD's are in progress – tracking for 24th. Mid-May construction start date; mid-August tentative completion. Michele Hughes (Controllers) to serve as move coordinator. Project will be added to move team schedule. 4/17 – CD's should be ready next week, then to BCI for bidding. TY to order fire/video equipment. 4/24 – construction commencement May; August completion. 5/1 – draft plans are in from S Kheradi – need bid set. Will need finished |

# EXHIBIT
# J

## Coleman, Rhonda A.

**From:**    Coleman, Rhonda A.

**Sent:**    Thursday, June 15, 2006 7:39 AM

**To:**    Johnson, Andrea M.

**Subject:** Update

Update:

I have been working really hard to address the issues of concern brought to my attention. I have put in many hours overtime to get caught up and to ensure that all aspects of each project are where they should be. I have been communicating on a very regular basis with my manager. We had our weekly meeting on Monday and I asked for feedback and was told that my communication levels are fine and he was comfortable with the progress of each job. There were no issues brought to my attention that needed improvement or to be addressed. I was just told that to continue to keep up on the projects outstanding.

I have some concerns. Because of the increased level of communication, I feel that the information I am providing is being scrutinized so that it can be used against me. I really hope this is not the case. I am not getting the warm fuzzies that my management is working with me. I feel as though I am under a huge microscope. Please let me know how I should address my concerns.

# EXHIBIT
# K

## Coleman, Rhonda A.

**From:**   Coleman, Rhonda A.
**Sent:**   Tuesday, June 20, 2006 12:57 PM
**To:**     Johnson, Andrea M.
**Subject:** RE: Update

I want to bring another situation to your attention on why I feel like I am being placed under a huge microscope. In our meeting on May 30th, when I was given a level 3 warning, Jim mentioned that I did not check the box that notifies the parties that I have added them to my calendar. I was taken back by the importance of this detail. The task off adding the requested staff members to view my calendar was done (not to mention I added a few additional members) and was done on time. I have attached an email from Jim asking me why the task was not done (which it was, I just forgot to check the box). If Jim was trying to view my calendar and did not have access, I could understand a follow up email asking the status. Instead I am continually feeling like I am being placed under this huge microscope and that someone is searching and waiting for me to do something wrong. I have had an outstanding record of performance since being employed almost 20 years ago. I have not changed the way I do my job, my commitment to the company and its mission or who I am. I am very concerned on why I have been the focus of attention over this past year.

-----Original Message-----
**From:** Tancredi, James D.
**Sent:** Thursday, May 11, 2006 9:59 PM
**To:** Coleman, Rhonda A.
**Cc:** Evans, John
**Subject:** FW: Wilmington Trust Calendar Delegates

Rhonda,

I asked for the below referenced delegations to be completed by end of business day on Thursday, March 11th, but when I looked through my mail box this evening, I didn't see yours. Please let me know if you're having any problems completing the delegations.

Thanks,

Jim T.

-----Original Message-----
**From:** Coleman, Rhonda A.
**Sent:** Thursday, June 15, 2006 3:30 PM
**To:** Johnson, Andrea M.
**Subject:** RE: Update

> I am attaching just one example of an item that makes me feel as though I am being placed under a microscope so if I move in the wrong direction I will be fired. The attached meeting minutes from our project meeting June 6th has only my items in caps, color and bold. I made light of this in our meeting and said I feel special because my items are in "big bold print". The next set of meeting minutes came out and it was corrected. Pam does the meeting minutes and I am not sure if she was directed to do this or did this on her own. Pam and I have maintained a very cordial professional relationship since I went to HR last year when she said offensive remarks about my children. I am sure she is aware of my level 3 warning and hope that she would not make any attempts to aggravate the situation.

> Meeting Minutes from 6/5/06. thanks, pjc

# Corporate Real Estate

# EXHIBIT
# L

## Coleman, Rhonda A.

**From:**    Coleman, Rhonda A.

**Sent:**    Wednesday, June 21, 2006 4:17 PM

**To:**    Johnson, Andrea M.

**Subject:** follow up to meeting 6/20

The following is a follow up to our meeting yesterday with John Evans.

ISSUE #1

Mark Graham made a comment that I was pulled off the Villanova Job. John said the comment could have only come from himself, Jim, Andrea or me. John stated he did not make the comment and neither did Jim. Andrea also stated she did not. John was concerned that our reputation as a Division would be in jeopardy if comments like this were made.

I stated I did not make the comment and that I was not on site for the two weeks after the move so he probably made an assumption. I did not tell Mark I was not pulled from the job. Mark is notorious for taking issues out of context. As an example, Mark called a couple of weeks ago and told Mark Andress to fire the contractor. Mark Andress obviously did not proceed with this direction. We all know that the contractor (Target Construction) is a customer and that Mark G. really did not mean this.

I am concerned that Mark Graham called myself, John and Jim and expressed that he was very upset that John told Target Construction, a Wilmington Trust Client, that Mark Graham (the President of Wilmington Trust of PA) was upset at his customer's performance. This not only effects the banks reputation, but also effects the relationship with a valued customer. John did call the Target back as damage control.

ISSUE #2

Respectful communications. John stated he thought that my comment in my communication to Jim Tancredi regarding the cleaning of the Villanova job was disrespectful to Mark Andress. The communication was sent to Jim at Jim's request to update him with the status of Villanova for the opening party. Jim sent the email to Mark. If Jim thought it was disrespectful, why did he not approach me instead of forwarding it to Mark? Mark in turned sent me an offensive email. Was he also called aside and talked to about disrespectful communications?

ISSUE # 3

John brought up my request for clarification in an email regarding the numbers for the Villanova project. He felt as though I was evading his request. I sent him everything I could think of that had to do with the landlord and the Villanova project and stated that I had some concerns on understanding what exactly he was looking for. After we had a face to face meeting, I better understood and provided him the detailed info he was requesting.

ISSUE # 4

Baltimore Project Budget and Plans

John was digging into the detail on the schedule and costs associated with the project. I was concerned that he wanted to dissect the project and said I would be happy to provide the back-up, but did not have it with me. He said he did not want to do that and that the issue was that he could not depend on what I was saying. We then further discussed the timeline and costs of the project with some emphasis on Brennan's and Bradberry & Kheradi. John will follow up with the two vendors on the timing of their performance. I have a real concern on his approach with these two vendors (who are also customers). How can he approach them without my back-up? Is he just looking for more items to come back at me for?

Also a comment was made that the mechanical and electrical costs do not impact the budget. This statement is just another example of the communication issues that occur in our Division. How could these items not impact

budget?

In our meeting where I received the level 3 warning and also in the follow up meeting, I was told that management did not want to terminate me and they wanted to work with me. What I don't understand that if this were the case, why were there no positive feedback at yesterday's meeting?

I am sharing this information with you as a follow up and would like to keep it confidential. I am already being treated differently since going to HR last year.

# EXHIBIT
# M

## Coleman, Rhonda A.

**From:**    Coleman, Rhonda A.

**Sent:**    Wednesday, June 21, 2006 2:11 PM

**To:**    Johnson, Andrea M.

**Subject:** Disturbing information

I just remembered something that happened during my 2004 review which occurred only a few short months ago. During the review process Jim was noting an event that occurred that related to Tom Yborra. During this conversation Jim told me just between him and I, Tom was getting a bad review this year because of issues concerning the system upgrades he was working on that was way behind schedule.   I am not sure how Jim was privy to this information and why he was sharing it.  This is just one more of the disturbing issues that have been occurring in our Division. As we discussed, yes there are bigger issues that are occurring in General Services and I am concerned that the focus is being placed on me in order to divert the attention from the much larger problem in our Division.

# EXHIBIT
# N

## Coleman, Rhonda A.

**From:**    Coleman, Rhonda A.

**Sent:**    Wednesday, July 05, 2006 2:21 PM

**To:**      Johnson, Andrea M.

**Subject:** Concerns

When I went to Human Resources (HR) expressing my concerns regarding gender discrimination, I was promised that I would not be retaliated against. I feel strongly that this is occurring. If you review my personnel file you will see that I have been an exceptional employee for the past 20 years. Since I went to HR, I am under surveillance and being treated different. I have sent you several examples of how I am being treated different and would like to bring another example to your attention. I am in the only section in our Division that has been requested to add delegates to view our calendars. It was communicated that the request to add the delegates was for "...apprising management of your whereabouts in the event an urgent manner needs to be resolved, or you need to be contacted in the event of an emergency" on one of our construction and/or furniture projects. However, I would think that the Security and Maintenance Sections in our Division would be needed on a more frequent basis for emergencies and they have not been asked to add delegates to their calendars. There is at least one staff member in these two areas that does not even have a cell phone, so having access to their calendar would prove to be even more beneficial.

Since I went to HR with my gender discrimination concerns, I have received 3 disciplinary warnings and have been under an extreme amount of stress. Now that I have received the level 3 warning, the stress level has significantly increased and has had a significant impact on my personal life. To add to the pressure of the retaliation that is occurring, the original issues that I brought to HR's attention are still occurring. In the past year, we have had two females give up and transfer from the area and two left the bank. People are very apprehensive to talk because of the fear of retaliation. Everyone is aware of John's calculated efforts of retaliation against Mark Rubenstein (his former employer) and his ex-wife Susan. I was assured by HR that I would be protected if I expressed my concerns and I am now one thread away from termination.

I have worked for Wilmington Trust for twenty years and really do not want to leave. Unfortunately, because of the pressure and stress I am feeling, I feel as though the only alternative I have is to find employment somewhere else. I enjoy working for the bank and am strongly committed to its Mission to "Help Our Customers Succeed". I would appreciate anything Human Resources can do to help me through this so I can spend many more years continuing to contribute to Wilmington Trust's Success.

7/6/2006

## Coleman, Rhonda A.

**From:**  Johnson, Andrea M.

**Sent:**  Friday, July 07, 2006 4:32 PM

**To:**  Coleman, Rhonda A.

**Subject:** RE: Concerns

okay, have a great week off, I know I will!!! See you on the 17th.
Thanks!
A

> -----Original Message-----
> **From:** Coleman, Rhonda A.
> **Sent:** Friday, July 07, 2006 4:29 PM
> **To:** Johnson, Andrea M.
> **Subject:** RE: Concerns
>
> My draft is not to the point where I want to share it with others. As I said, the issue is so upsetting that I am not sure that it reads as professionally as it should, that is why I want to talk to you first. I will see you next week!
>
> RC
>
> > -----Original Message-----
> > **From:** Johnson, Andrea M.
> > **Sent:** Friday, July 07, 2006 3:55 PM
> > **To:** Coleman, Rhonda A.
> > **Subject:** RE: Concerns
> >
> > If we need additional time that's fine with me. Do you have the draft of your response? I would like to take a look at it before our meeting if possible.
> > Have a Great Vacation!!
> > Andrea
> > -----Original Message-----
> > **From:** Coleman, Rhonda A.
> > **Sent:** Friday, July 07, 2006 3:34 PM
> > **To:** Johnson, Andrea M.
> > **Subject:** RE: Concerns
> >
> > > Thanks for getting back to me. I would very much like to sit down with you on the 17th. I have finally had the time to draft an response to the level 3 warning and am so upset regarding the untrue facts that I am having difficulty responding. I have the written documentation that contradicts what was alleged in the warning and would like to discuss how to proceed. I am also on vacation next week, so the 17th works fine with me. We will probably need more then the 1/2 hour you have scheduled due to the fact I want to review my response to the warning. Thanks for all help.
> > >
> > > Have a great vacation!
> > >
> > >
> > >
> > > -----Original Message-----
> > > **From:** Johnson, Andrea M.
> > > **Sent:** Friday, July 07, 2006 2:35 PM
> > > **To:** Coleman, Rhonda A.
> > > **Subject:** RE: Concerns

Rhonda,
I would like to discuss the below e-mail with you, sorry I didn't get in touch with you yesterday or earlier today, I have been in and out. I will on vacation next week but would like to catch up on the 17th if possible. I will send you a meeting request so that we have something scheduled.
Thanks and have a great weekend!
Andrea

-----Original Message-----
**From:** Coleman, Rhonda A.
**Sent:** Wednesday, July 05, 2006 2:21 PM
**To:** Johnson, Andrea M.
**Subject:** Concerns

When I went to Human Resources (HR) expressing my concerns regarding gender discrimination, I was promised that I would not be retaliated against. I feel strongly that this is occurring. If you review my personnel file you will see that I have been an exceptional employee for the past 20 years. Since I went to HR, I am under surveillance and being treated different. I have sent you several examples of how I am being treated different and would like to bring another example to your attention. I am in the only section in our Division that has been requested to add delegates to view our calendars. It was communicated that the request to add the delegates was for "...apprising management of your whereabouts in the event an urgent manner needs to be resolved, or you need to be contacted in the event of an emergency" on one of our construction and/or furniture projects. However, I would think that the Security and Maintenance Sections in our Division would be needed on a more frequent basis for emergencies and they have not been asked to add delegates to their calendars. There is at least one staff member in these two areas that does not even have a cell phone, so having access to their calendar would prove to be even more beneficial.

Since I went to HR with my gender discrimination concerns, I have received 3 disciplinary warnings and have been under an extreme amount of stress. Now that I have received the level 3 warning, the stress level has significantly increased and has had a significant impact on my personal life. To add to the pressure of the retaliation that is occurring, the original issues that I brought to HR's attention are still occurring. In the past year, we have had two females give up and transfer from the area and two left the bank. People are very apprehensive to talk because of the fear of retaliation. Everyone is aware of John's calculated efforts of retaliation against Mark Rubenstein (his former employer) and his ex-wife Susan. I was assured by HR that I would be protected if I expressed my concerns and I am now one thread away from termination.

I have worked for Wilmington Trust for twenty years and really do not want to leave. Unfortunately, because of the pressure and stress I am feeling, I feel as though the only alternative I have is to find employment somewhere else. I enjoy working for the bank and am strongly committed to its Mission to "Help Our Customers Succeed". I would appreciate anything Human Resources can do to help me through this so I can spend many more years continuing to contribute to Wilmington Trust's Success.

# THE NEUBERGER FIRM

ATTORNEYS AND COUNSELLORS AT LAW

_0 8 - 5 0_

TWO EAST SEVENTH STREET
SUITE 302
WILMINGTON, DELAWARE 19801-3707

WWW.NEUBERGERLAW.COM
EMAIL: INFO@NEUBERGERLAW.COM

THOMAS S. NEUBERGER, ESQUIRE
STEPHEN J. NEUBERGER, ESQUIRE
RAEANN WARNER, ESQUIRE
CHERYL A. HERTZOG, ESQUIRE*
*(LICENSED IN PA AND NJ ONLY)

PHONE: (302) 655-0582
Fax: (302) 655-9329

September 21, 2007

## VIA FACSIMILE & US MAIL
**(215) 440-2604**

Ms. Evangeline Draper Hawthorne
Investigator
U.S. Equal Employment Opportunity Commission
Philadelphia District Office
801 Market Street, Suite 1300
Philadelphia, PA 19107-3127

**RE:     Rhonda Coleman (Charging Party) v. Wilmington Trust Company (Respondent);
Charge Number 530-2007-02898
Response to September 12, 2007 Letter**

Dear Ms. Hawthorne:

This letter is in response to your letter of September 12, 2007.

In your letter you cited several incidents of disciplinary action that my client received. There is a notable distinction in the type of disciplinary action that was meted out before and after Rhonda Coleman went to Human Resources to complain about sexually offensive remarks made by James Tancredi in the presence of John Evans. The two disciplinary incidents that occurred after Rhonda Coleman complained to Human Resources on December 22, 2004, December 23, 2004, and January 10, 2005 were based on Rhonda Coleman's performance, for which she had never been criticized or disciplined in the twenty years she worked for Wilmington Trust Company (to clarify, Rhonda Coleman began working for Wilmington Trust Company on August 25, 1986, not August 25, 1996). Only after she went to Human Resources and complained about sexually offensive comments made by her supervisor and in the presence of the division manager did her performance become substandard according to the men she had complained about. Further, Respondent failed to comply with the Wilmington Trust Corporate Policy Manual ("WTC Policy")(attached as Exhibit "A") by failing to follow the discipline

Ms. Evangeline Draper Hawthorne
September 21, 2007
Page 2

procedure outlined in that policy with respect to Rhonda Coleman in retaliation for her complaints about sexual harassment.

The disciplinary action given on 6/13/03 was based on Rhonda Coleman defending herself from George Taylor, who had a history of verbal abuse toward coworkers, direct reports, and also the administrative staff. George Taylor has not been terminated for his actions.

Rhonda Coleman received a memo dated 10/29/04 (attached as Exhibit "B") stating "Please understand that according to our current WTC Policy, if there are 5 non-FMLA occurrences within any 12-month period, a Level 1 warning may be given. At this point, I would like to ensure that this does not happen." Rhonda Coleman explained to her manager, John Evans, that her attendance problems were due to medical problems, problems which eventually led to surgery. Rhonda Coleman also contacted Human Resources regarding her medical condition. At no time was she counseled regarding what her rights were under FMLA.

A Level II warning was given on 9/30/2005, which was improper pursuant to WTC Policy regarding progressive discipline, specifically section 3.1.29(c), as she had never received a Level I Warning. It is Rhonda Coleman's belief that Mr. Evans violated the policy and issued a Level II Warning instead of a Level I Warning in an effort to terminate her because she complained to Human Resources on December 22, 2004.

The WTC Policy on progressive discipline states "Should further need for Corrective Action arises on any issue during the time frame of the Warning, the next step is to give a Level II Warning." (see WTC Policy, section 3.1.29(c). First, Rhonda Coleman was never given a Level 1 Warning. Second, even if her first warning had been a "Level I", Mr. Evans should have conducted periodic reviews pursuant to WTC Policy. (See WTC Policy section 3.1.29(B)(8) which states "A manager must conduct periodic reviews with the staff member to ensure that the staff member is kept apprised of progress as perceived by management. If sufficient progress is not demonstrated within 30-90 days (time frame for improvement having been defined in the Warning), a Level II Warning should be issued.")

Further, the WTC Policy states in section 3.1.29(B)(10) "As referenced above, a Level I Warning remains "active" for a period of 6 months from the origination date. If no further corrective action occurs with that 6-month period, the Warning is considered "satisfied" and a clean slate is given. If the need for corrective action occurs after this time, a Level I Warning will be issued". Hence, if a warning was warranted on 9/30/05, more than six months after the warning of 10/29/04, it should have been only a Level I. James Tancredi's failure to follow WTC Policy was retaliation for Rhonda Coleman's complaining to Human Resources.

The Level III warning that was issued on May 22, 2006 was given in retaliation for

Ms. Evangeline Draper Hawthorne
September 21, 2007
Page 3

Rhonda Coleman's complaints to Human Resources about sexually offensive remarks made by
James Tancredi on December 22, 2004, December 23, 2004, and January 10, 2005. Had
corporate policies been followed this warning would have been merely a Level I Warning as it
occurred more than six months after the warning of 9/30/05. However, in retaliation for Rhonda
Coleman's complaints to Human Resources, James Tancredi ignored the existing corporate
policies regarding progressive discipline in an effort to punish Rhonda Coleman for going to
Human Resources by terminating her.

Rhonda Coleman refutes every charge on the Level III Warning issued on May 22, 2006.
Her performance on the job was based on her twenty years of experience and was not  First, the
Millville project, originally assigned to James Tancredi, was reassigned to her at a time that she
was already overloaded with projects and she expressed her concerns with the project load to her
supervisor, James Tancredi. James Tancredi responded to her email on June 21, 2005 (Exhibit
C1 & C2) saying "No problem. I'll do what I can to help. Once we get underway, we'll be ok".
James Tancredi stepped in and helped and set up the pre-bid meeting. When Rhonda Coleman
asked her supervisor who she should contact to do the soil test, he said Mark Rogers has a
contact down in the area and has taken it upon himself to take care of this. James Tancredi was
being helpful and a team player. John Evans followed up on June 24, 2005 with an email
documenting Mark Rogers took care of this. This was John's attempt to start building false
evidence regarding Rhonda Coleman's performance. On June 21, 2005 she sent an email
notifying James Tancredi that she cancelled the Villanova job meeting in order to attend the June
25 pre-bid meeting for Millville. On Friday, June 24, 2005, James Tancredi sent her an email
telling her he would conduct the bid meeting. On Monday, June 27, 2005 Rhonda Coleman
called Jim on his cell phone to let him know she was headed down to the bid meeting since I had
already cancelled the Villanova job meeting and he said "not to worry about it, he would take
care of it". The statement in the warning said "I was forced to carry out the entire project
myself". This is untrue as evidenced in the emails and phone calls.

Regarding the Atlanta Project, on April 6, 2006 Rhonda Coleman was sent an email from
John Evans directing her to develop the Atlanta budget. On April 7, 2006 at 10:44 she
communicated via email to both James Tancredi and John Evans that "I am up to my eyeballs
and sinking fast!!!!!!  The two new offices that we had two weeks to open are sucking my time
dry!!! I am barely keeping up with Villanova and Baltimore and the 10 phase of the 2nd floor
Plaza Project are putting me over the edge!!! I talked to John and said I will do the best to get
this the end of next week. We need more staff!!!!!!!". Jim Tancredi responded on April 7, 2006
at 11:07 am: "Keep swimming. I'm working on more staff". In the Level III warning it noted
that an email was sent by James Tancredi on April 12 asking the status of the Atlanta budget and
…"a response to my note was not received that afternoon at which time I elected to complete the
budget myself". The email was sent on April 12, 2007 at 3:09 pm asking the status and James
Tancredi sent the budget he prepared on April 12, 2007 at 5:01 pm. Rhonda Coleman was in a
meeting for the 2nd floor Plaza Building that afternoon when James Tancredi sent the email and
could not respond in the 2 hour window before he sent his second email at 5:01 pm. The budget
was not due to John until April 14, 2006 so his complaint to John Evans that a response had not

Ms. Evangeline Draper Hawthorne
September 21, 2007
Page 4

been received was just another attempt to make Rhonda Coleman look incompetent or unresponsive.

Regarding the Baltimore project covered in the Level III Memo, Rhonda Coleman did not "opt" to act on the request made to update a flexible work schedule document. She was more then buried in projects with very tight deadlines, as previously communicated to her supervisor, and did not see the request. She was already working under the previous work schedule document that she had executed and did not have any issues with her current schedule. If the document needed to be executed immediately it should have been brought to Rhonda's attention. It was not an offense worthy of a written warning.

The allegations of tardiness were baseless and manufactured to retaliate against Rhonda Coleman. As a project manager, Rhonda Coleman was required to be on site at the various projects. She would stop in to check on job sites before coming to work, on her way home and on the weekends. She has been on job sites as late as midnight and also flew around the country and spent many evenings away from her family to manage the project workload. The only time she was unavailable was if her cell phone service was not working.

Rhonda Coleman met with Andrea Johnson in Human Resources and told her verbally that the Level III Warning had no merit and that she had evidence which corroborated that. As she was working 12 to 16 hour days, she informed Andrea Johnson a complete response would be forthcoming. This information was also communicated to James Tancredi. When Rhonda Coleman contacted Andrea Johnson letting her know she had the draft of her response, a meeting was set up for July 17, 2006 to review the evidence. The meeting never occurred. She was called that weekend and told not to come in to work until further notice. She was then called on July 23, 2006 and told not to report to work on Monday, July 24, 2006 and was then terminated. At the termination meeting she was told by Jim O'Neil of Human Resources that Respondent did not want to review her response to the level III warning.

The termination memo (not dated) contained in Wilmington Trust's Response to the Charge of Discrimination ("WTC Response") was also full of false allegations. Paragraph 1 alleges that Marketing sent out correspondence to customers that did not contain the correct opening date for the new Villanova Office. During the project, she maintained constant communication with Marketing and Management regarding the opening date of the Villanova Office. The notices were **not** sent out with the incorrect opening date. The office was opened on the date that was documented in the notice to the customers. The CEO & President of Wilmington Trust of Pennsylania was scheduled to give Rhonda an award for her outstanding performance constructing the Villanova Headquarters at the Corporation's Officer's Meeting on July 26, 2006, which the rest of her team attended. She constantly kept all management in the loop regarding the construction schedule. The President of Wilmington Trust of Pennsylvania did not want her to pressure the contractor due to the banking relationship we had with them. This was standard operating procedure as customers were always hired to do construction work for the Respondent (see Exhibit D). The lobby was safe to enter and we received a certificate of occupancy from the government officials.

Ms. Evangeline Draper Hawthorne
September 21, 2007
Page 5

Regarding the lock issue in Villanova mentioned in paragraphs 2, 3 & 4 of the WTC Response, all locks, security systems and safety issues fall under the responsibility of the Security Section of the bank, managed by Security Officer Ray Johnson, who reports directly to John Evans. The Security Section's mission is to protect the assets (both staff and financial) of the bank. Tom Yborra was the person assigned by the Security Section of the bank to manage the Security Systems at this location. Management (including the President of Wilmington Trust of Pennsylvania) and the Security Officer were aware of the interior lock issue. It is Security's standard operating procedure and also their responsibility to assess the situation and hire guards if they feel staff or clients are at risk. Security chose not to hire the guards. It was not the responsibility of the project manager, Rhonda Coleman, to assess the risk to any of the banks assets.

The same breach of security issue arose in Wilmington Trust Company's Dublin office and no one was terminated or given a warning. The proper security systems were not installed on the project and unauthorized persons entered the space (see Exhibit E). James Tancredi was the project manager on the job and he did not receive any disciplinary action because it is the responsibility of the Security Systems Manager and the bank's Security Officer to ensure the building and staff are secure. This was the third security issue that placed staff and clients at risk. No one from Security received a warning or was terminated.

In response to paragraph number six of the WTC Response, Rhonda Coleman was told by the company that installed the carpet that the carpet came from the same dye lot and that the color differentiation was due to cleaning issues. As with all projects, issues arise and it is the project manager's responsibility to resolve the issues. Rhonda Coleman resolved the carpet dye lot issue through a new blending process done by the manufacturer. There was no cost incurred by the bank to resolve the issue.

In response to paragraph number seven of the WTC Response, Rhonda Coleman was asked to re-price the Baltimore job and she did. The comment regarding her "electing not to rebid" the Baltimore Project is untrue. She only questioned the new process to bid the job again in the middle of progress plans because she had never done this in the past. Regarding the 10% variance in the furniture budget, management had demanded the contingency be removed which caused the variance. Rhonda Coleman immediately emailed the designer to forward Cathy McNamara the furniture plan. Cathy McNamara never again asked for the plan so Rhonda Coleman was unaware she did not receive it. If Cathy McNamara would have managed her work effectively, the furniture would not be an issue. Cathy McNamara is responsible for all furniture for the organization and is directly reports to James Tancredi.

Rhonda Coleman was fully aware that BCI did not have a complete set of drawings on June 12th. She developed a plan with BCI to streamline the project to meet the project completion date. The initial delay in the project was due to fact the building's engineers could not be contacted until John Evans was finished negotiating the lease. Rhonda Coleman received the

Ms. Evangeline Draper Hawthorne
September 21, 2007
Page 6

approval to hire the engineer on April 7, 2006 and Sandy (the architect) was on vacation. The
engineer was hired directly by the architect and she did not receive his proposal until April 20,
2006. After the engineering contract was signed, the engineer said they could not get to the
project until May 8, 2006, forcing selection of a new engineer.

On April 27, 2006, the date Rhonda Coleman was asked to submit revised pricing for the
Baltimore job, the engineering plans were only 10% complete. The engineering work (plumbing,
electric, hvac, fire detection/protection) accounts for approximately 40% of the total cost of the
project. This made the statement in John's memo regarding the engineering having significantly
less variance to the project untrue. Rhonda Coleman was told by James Tancredi on April 27,
2006 in an email that the "...budget listed on your Baltimore Project is most likely very tight
indicating that the removal of the contingency should not be a problem". She had BCI re-price
the project with only 70% progress plans for architectural (which accounts for 60% of the project
costs) and 10% engineering plans (which accounts for 40% of the project costs). She updated
every line item on the budget on April 27, 2006 with the information I obtained from Ken
Coldiron (BCI). Removing the contingency on a project with that is an average of 50% progress
plans is unheard of in project management. The architectural firm, Bradberry and Kheradi has
done work for Wilmington Trust for over 5 years. When they said they had 70% drawings,
Rhonda Coleman trusted the plans were 70% complete based on the long term working
relationship. The sliding doors were not in the original scope of the project. It was a new request
from the users to allow flexibility within their space. Since it was such a specialty item, the
architects needed further time to develop the plans for this item.

Regarding paragraph 12 of the WTC Response, Exhibit G shows that Rhonda
communicated with her supervisor about being late on June 14, 2006. Rhonda Coleman was not
told that she would be terminated if she was late for work, only that she had to inform her
supervisor.

In response to paragraph 14 of the WTC Response, John Evans mentioned a meeting with
Andrea Johnson to coach Rhonda Coleman on respectful communications. At this meeting she
was interrogated by John Evans regarding her performance on several projects. Rhonda Coleman
told Andrea Johnson that it felt like an interrogation. Andrea Johnson agreed and spoke to John
Evans about his behavior and he issued an apology. John Evans brought up in the
meeting that Rhonda was not turning invoices around on a timely basis. As evidenced in Exhibit
H, the invoices are received by the administrative staff and stamped then given to the accountant.
After the accountant codes the invoice they are given to Jim to approve for payment and then to
the project manager to take a copy for their files. At no time did Rhonda have responsibility for
turning invoice around.

As noted in the "Bill of Particulars" (Exhibit I) Rhonda Coleman was being treated
different since her meeting with Human Resources and she brought this concern to management's

Ms. Evangeline Draper Hawthorne
September 21, 2007
Page 7

attention. She was given an unrealistic work load, which lead to Rhonda being out of work for 8 weeks at the end of the year in 2005 under the care of a physician. After returning to work, Rhonda Coleman was assigned 14 projects that were in 10 different areas of the world. Five of the projects were new offices that needed to be open. These 5 projects required extensive travel to select the site and then follow up with only a 4 week lead time span to open the office. This was a near impossible task, however she accomplished it. It normally took Wilmington Trust a year to select the site, 6 months to develop plans and 4-12 months to construct the office. No other staff member in her Division had ever been assigned this work load. She was given an excess amount of work to set her up for failure to terminate her employment from Wilmington Trust Company. John Evans was fully aware that it was an unmanageable work load because he asked her to prepare the documentation for the justification to obtain additional staff (Exhibit J).

A fellow staff member, Jerry Reed, went to Human Resources and complained about the management in our Division. When he returned to work from a back injury, he was sent up to the penthouse (a 30,000 square foot attic space full of old office furniture) to sort and clean out the entire penthouse. This is just one more example of management's retaliation efforts. Jerry Reed was ultimately terminated.

Also attached are examples of other staff members' poor performance who were not disciplined or terminated:

Exhibit K is an example of James Tancredi's poor project management which exposed the bank to damages to bank's reputation and potential loss of a client if the client saw their furniture covered in construction debris, losses for damaged to property, hazardous work conditions for staff members and loss of wages due to the inability for staff to be able to perform their functions.

Exhibit L shows it took over a month for Mark Andress to get a soda machine installed on the 11th floor despite the numerous requests.

George Taylor has also had many performance related issues. Exhibit M is just one example of the lack of performance from George Taylor and his staff, who were never disciplined or terminated.

In sum, the record of disciplinary action you cite in your letter was meted out by the very supervisors whom Rhonda Coleman complained about to Human Resources. Regarding Respondent's contention that she failed to improve her performance, Rhonda Coleman has explained in this letter that the allegations of poor performance were not valid or warranted. They were manufactured by those supervisors in an effort to terminate her in retaliation for complaining about them to Human Resources. In addition, those supervisors she complained about were the same who failed to follow corporate policy of progressive discipline, leading to her illegal termination in violation of Title VII of the 1964 Civil Rights Act.

Ms. Evangeline Draper Hawthorne
September 21, 2007
Page 8

      Rhonda Coleman is willing to settle for a sum of $500,000 to compensate her for her lost wages of approximately $60,000 for 2006-2007 and approximately $15,600 per year thereafter, her lost pension, and other costs associated with her unjustified termination from Wilmington Trust Company which are listed on the Remedy Questionnaire filed with the Charge of Discrimination.

Very truly yours,

Raeann Warner

Coleman,Rhonda/Letters/Hawthorne.01.final.wpd

# EXHIBIT A

09/20/2007 08:50   3028318249                     FPA                    PAGE 02
                                                                   EXhibit 13

**Wilmington Trust**                                      3.1.29
**Corporate Policy Manual**

# CORRECTIVE ACTION POLICY

## I.   POLICY STATEMENT

In the event that corrective action must be taken due to poor work performance or
personal conduct, the company's management will address the problem in a fair
and consistent manner and within the limits of the law. Corrective action measures
taken, whether for new or repeating issues, are cumulative within the time limits
defined in the policy.

## II.   PROCEDURES

A.   Managers are responsible for informing their staff members of the company's
standards, policies, procedures and performance expectations. If a staff
member has a job performance problem or is found in violation of any
company policy or procedure, the manager will discuss the problem with the
staff member and explain what is expected to correct the situation.

B.   Should it become necessary to correct the work performance or behavior of
an individual, the first formal step (following discussions with the staff
member) is a **Level I Warning** (Samples on 3.1.29(8-9)). At this stage a
manager should:

1.   Review "Techniques for Holding a Corrective Action Discussion" (3.1.29
(7)).

2.   Confer with a Staff Member Relations Consultant in the Human Resources
Department.

3.   Identify and discuss the problem openly with the staff member.

4.   Suggest ways the staff member might improve. Include expected or
desired results.

5.   After the situation is discussed and the staff member has read the
Warning, the staff member and the manager should sign the original
document. In a case where the staff member refuses to sign the
document, another manager should be called as a witness to observe that
the staff member has been presented with the Warning and refused to
sign. The witness should then sign the warning, with the manager
indicating the refusal to sign. The Staff Member is given a copy of the
Warning, a copy kept for the manager's records, and the original
forwarded to the Staff Member Relations Consultant in Human
Resources with whom the manager has been conferring.

**Wilmington Trust**                                              3.1.29
**Corporate Policy Manual**

6.  Staff members may write a response to the Level I Warning, if they
    desire.

7.  A staff member is eligible to post for jobs while on a Level I Warning.
    (See Section H for further explanation.)

8.  A manager must conduct periodic reviews with the staff member to
    ensure that the staff member is kept apprised of progress as perceived by
    management.  **If sufficient progress is not demonstrated within 30 – 90
    days** (timeframe for improvement having been defined in the Warning), a
    Level II Warning should be issued. (See Section C.)

9.  **If sufficient improvement is demonstrated within the defined time
    period,** the Level I Warning becomes inactive.  **However,** if within 6
    months of the Warning's origination date further corrective action is
    needed, the level of the warning issued will be a Level II.

10. As referenced above, a Level I Warning remains "active" for a period of
    6 months from the origination date.  If no further corrective action occurs
    within that 6-month period, the Warning is considered "satisfied" and a
    clean slate is given.  If the need for corrective action occurs after this
    time, a Level I Warning will be issued (barring circumstances that
    necessitate a higher level warning being issued.)

C.  Should the Level I Warning fail to bring about a desired change, or further
    need for Corrective Action arises on any issue during the timeframe of the
    Warning, the next step is to give a **Level II Warning** (3.1.29 (10-11)).  At
    this stage the manager should:

    1.  Confer with a Staff Member Relations Consultant in the Human Resources
        Department.

    2.  Identify and discuss the problem openly with the staff member.  Explain
        why he/she is receiving a Level II Warning, citing specific examples.

    3.  Clearly state what is expected of the staff member and that if
        improvement is not made within the specified time period, further
        corrective action may be taken.

    4.  After the situation is discussed and the staff member has read the
        Warning, the staff member and the manager should sign the original
        document.  In a case where the staff member refuses to sign the
        document, another manager should be called as a witness to observe that

**Wilmington Trust**                                        **3.1.29**
**Corporate Policy Manual**

the staff member has been presented with the Warning and refused to
sign. The witness should then sign the warning, with the manager
indicating the refusal to sign. The Staff Member is given a copy of the
Warning, a copy kept for the manager's records, and the original
forwarded to the Staff Member Relations Consultant in Human
Resources with whom the manager has been conferring.

5.  Staff members may write a response to the Level II Warning, if they
    desire.

6.  A staff member is eligible to post for jobs while on a Level II Warning.
    (See Section H for further explanation.)

7.  A manager must conduct periodic reviews with the staff member to
    ensure that the staff member is kept apprised of progress as perceived by
    management. **If sufficient progress is not demonstrated within 30 – 90
    days** (timeframe for improvement having been defined in the Warning), a
    Level III Warning should be issued. (See Section D.)

8.  **If sufficient improvement is demonstrated within the defined time
    period,** the Level II Warning becomes inactive. **However,** if within 12
    months of the Warning's origination date further corrective action is
    needed, the level of the warning issued will be a Level III.

9.  As referenced above, a Level II Warning remains "active" for a period of
    12 months from the origination date. If no further corrective action
    occurs within that 12-month period, the Warning is considered "satisfied"
    and a clean slate is given. If the need for corrective action occurs after
    this time, a Level I Warning will be issued (barring circumstances that
    necessitate a higher level warning being issued.)

D.  Should the Level II Warning fail to bring a desired change, or further need for
    Corrective Action arises during the timeframe of the Warning, the next step is
    to give a **Level III - Final Warning.** (3.1.29(12-15)). At this stage the
    manager should:

    1.  Confer with the Division Manager and a Staff Member Relations
        Consultant in the Human Resources Department before issuing the Level
        III - Final Warning.

    2.  Arrange for a witness (another manager or supervisor in the area) to be
        present at the corrective action meeting.

    3.  Meet with the staff member to review the Level III – Final Warning,
        informing him/her that further corrective action may be taken, including

09/20/2007  08:50    3028318249                      FPA                              PAGE  05

**Wilmington Trust**                                    3.1.29
**Corporate Policy Manual**

the possibility of termination, if sufficient improvement is not shown or if
improvement is not maintained.  Inform the staff member that during this
period he or she will not be eligible for transfer or promotion and that
merit increases may be deferred. After the situation is discussed and the
staff member has read the Warning, the staff member, the manager and
the witness should sign the original document.  Send the original
document to the Human Resources Department to be placed in the staff
member's personnel file.  Give a copy to the staff member and send one
to the Division Manager. The document is retained in the staff member's
personnel file for a minimum of 18 months (together with the related
Level I and Level II Warnings.)

4.  Staff members may write a response to the Level III Warning, if they
    desire.

5.  A staff member is not eligible to post for jobs while a Level III Warning
    is on record.

7.  A manager must conduct periodic reviews with the staff member to
    ensure that the staff member is kept apprised of progress as perceived by
    management.  **If sufficient progress is not demonstrated within 30 – 90
    days** (timeframe for improvement having been defined in the Warning),
    termination, among other options, must be considered.  (See Section E.)

8.  **If sufficient improvement is demonstrated within the defined time
    period,** the Level III Warning becomes inactive.  **However,** if within 18
    months of the Warning's origination date further corrective action is
    needed, termination may occur.

9.  As referenced above, a Level III Warning remains "active" for a period of
    18 months from the origination date.  If no further corrective action
    occurs within that 18-month period, the Warning is considered "satisfied"
    and a clean slate is given.  If the need for corrective action occurs after
    this time, a Level I Warning will be issued (barring circumstances that
    necessitate a higher level warning being issued.)

10. **PLEASE NOTE:** Given the seriousness of a Level III – Final Warning, a
    staff member may not post for the entire 18-month period, even if he/she
    has demonstrated enough improvement for the Warning to be removed.
    This restriction allows for a complete year of satisfactory performance to
    be formally evaluated.

E.  If sufficient improvement is not evident within the given time frame, or
    further/additional issues arise, a decision must be made as to whether reduction

09/20/2007  08:50    3028318249                    FPA                              PAGE  06

**Wilmington Trust**                                                    **3.1.29**
**Corporate Policy Manual**

in work load, demotion, suspension or termination is in order. In the case of
**termination**, the manager should:

1.  Review "Checklist for Avoiding Corrective Action Mistakes" (3.1.29 (16)).

2.  Discuss terminating the staff member with the Division Manager and a
    Staff Member Relations Consultant in the Human Resources
    Department. If the Division Manager and the Human Resources
    Department agree the staff member should be discharged, the manager
    will then inform the staff member. (Please follow the guidelines in
    Terminations, 3.1.34)

F.  In the case of severe or extreme violations of policy or standards, corrective
    action which pre-empts normal steps may be necessary. Managers should
    immediately notify their Division Manager and the Human Resources
    Department before deciding what action to take. If this is not possible or
    further investigation is required, the staff member may be suspended until a
    decision is reached. **In no case should a staff member's employment be
    terminated without consulting the next level of management and the
    Human Resources Department.**

G.  Managers should explain to staff members who feel that the corrective action
    is not fairly administered that they may discuss the situation with the next
    level of management and/or a Staff Member Relations Consultant in the
    Human Resources Department.

H.  **SPECIAL NOTE:**

    This Policy is an attempt to protect the interests of both the staff member and
    the Company. A staff member who is currently on a Level I or Level II
    Warning for any issue is eligible to post into a new area, as long as their most
    current annual performance evaluation has an overall rating of "Meets
    Expectations" or "Exceeds Expectations." However, the Warning will be
    disclosed to the hiring manager. Once a staff member is completely removed
    from the Level I or Level II Warning, any prior Warnings will not be
    disclosed when posting. This allows the staff member to make a fresh start
    without fear of any repercussions.

    However, if management finds reason to approach a Staff Member Relations
    Consultant due to issues with the new staff member, HR will review the staff
    member's records. If it is found that a Level I and/or Level II Warning was
    issued to the staff member within the previous 6 months (for a Level I) or 12
    months (for a Level II), HR will advise management of the existing
    Warning(s) and explain that a higher Level of Warning is <u>required.</u>

Case 1:08-cv-00050-GMS    Document 1-5    Filed 01/24/2008    Page 15 of 56

**Wilmington Trust**                                           **3.1.29**
**Corporate Policy Manual**

As stated above, this policy and these procedures are designed to provide
protection to both staff and management, enabling "fresh beginnings" while
at the same time helping the Company avoid recurring problems.

# EXHIBIT  B

Exhibit A



WILMINGTON
TRUST

## Intra-Company Memorandum

| To: | Rhonda Coleman | Date: | 10/29/2004 |
|-----|----------------|-------|------------|
| From: | John Evans | Subject: | Attendance |
| Ext: | 1675 | | Level 1 Warning |

Rhonda,

With the attached spreadsheet, I wanted to bring to your attention that your non-FMLA absences exceed the number outlined in the HR policy.  Specifically, these dates are: Jan 8,9, Jan 23, Feb 18,19,20, Apr 5, May 28, July 28, Aug 9, Sep 8,9,13, Oct 25, 26, 27.

Please understand that according to our current policy, if there are 5 non-FMLA occurrences within any 12-month period, a Level 1 warning may be given.  At this point, I would like to ensure that this does not happen.  If I can help to avoid this in any way, please let me know.  I look forward to your cooperation regarding this matter.

Thanks,
John

EXHIBIT C

09/20/2007  08:55    3028316249                    FPA                              PAGE  01
exhibit C1

## Coleman, Rhonda A.

**From:**       Tancredi, James D.
**Sent:**       Wednesday, June 22, 2005 3:27 PM
**To:**         Coleman, Rhonda A.
**Subject:**    FW: Contractor List

Rhonda.

Any progress on getting an engineer to perform the soils analysis?

Jim

-----Original Message-----
**From:**       Tancredi, James D.
**Sent:**       Tuesday, June 21, 2005 3:17 PM
**To:**         Coleman, Rhonda A.
**Subject:**    RE: Contractor List

No problem. I'll do what I can to help. Once we get underway, we'll be okay. The meeting is the hard part. After that it
will take them two weeks to get the numbers in, we'll pick someone and prepare them to break ground. Have you by
chance contacted an engineer yet to handle a soil compaction analysis? I know the clock's ticking and we have only 30
days to hammer out due diligence. That seems to be the only real item of concern. If you haven't ordered on yet,
apparently there a guy in Sussex by the name of Gary Gredell who's pretty good. He can be reached at 996-9500. I'd call
him ASAP, get him the drawings and in touch with Joe Farina. Have him give you a proposal and then set him lose and
ask him to get it back in two week's time. I don't suppose we'll find anything unusual but you never know.

-----Original Message-----
**From:**       Coleman, Rhonda A.
**Sent:**       Tuesday, June 21, 2005 2:46 PM
**To:**         Tancredi, James D.
**Subject:**    RE: Contractor List

Thanks for doing this. I am trying to get caught up! I cancelled my meeting in Villanova on Monday so I will be there.

-----Original Message-----
**From:**       Tancredi, James D.
**Sent:**       Monday, June 20, 2005 10:23 AM
**To:**         'farina@dca.net'
**Cc:**         Coleman, Rhonda A.; Evans, John
**Subject:**    Contractor List

Joe,

Per our discussion, here is the contractor list for Millville. Please set up a bid meeting for Monday, June 27th, and
inform the contractors that a not to exceed contract will be awarded and that construction is expected to
commence mid to late July.

Thanks,

Jim T.

Tim O'Connell & Sons
2 Meco Circle
Wilmington, DE 19804
302.999.0246
Contact: Phillip O'Connell

DiSabatino Construction Company
1 South Cleveland Avenue
Wilmington, DE 19805
302.652.3838

1

09/20/2007  08:55    3028318249              FPA                    PAGE  02

exhibit  C2

## Coleman, Rhonda A.

| | |
|---|---|
| **From:** | Tancredi, James D. |
| **Sent:** | Friday, June 24, 2005 1:24 PM |
| **To:** | Evans, John; Coleman, Rhonda A. |
| **Subject:** | RE: Two things |

Rhonda.

Initially you were assigned the Millville project, but as we need to proceed forth fairly quickly, I will take over the responsibilities from this point. As I noted several weeks back, we need to get the geotechnical survey completed as part of our due diligence and the clock is ticking. Therefore, I'll conduct the bid meeting on Monday.

Thanks.

.Jim T.

> -----Original Message-----
> **From:** Evans, John
> **Sent:** Friday, June 24, 2005 11:53 AM
> **To:** Coleman, Rhonda A.; Tancredi, James D.
> **Subject:** Two things
>
> Mark Rogers has scheduled a Geotech firm to test soil bearing in Millville.
>
> Rhonda, I still need to have your trip scheduled for California. Please let Pam know if you have already done the scheduling.

EXHIBIT D

09/20/2007  08:55     3028318249          FPA                    CANCUN   PAGE  03

-----Original Message-----
**From:** Coleman, Rhonda A.
**Sent:** Thursday, June 01, 2006 12:41 PM
**To:** Yborra, Thomas J.; Tancredi, James D.
**Subject:** RE: File Rm access control solution

I would check with Maryann to see who has the authority there to sign off on that dollar amount.
My guess it would be Mark.

> -----Original Message-----
> **From:** Yborra, Thomas J.
> **Sent:** Thursday, June 01, 2006 11:13 AM
> **To:** Tancredi, James D.; Coleman, Rhonda A.
> **Subject:** RE: File Rm access control solution
>
> I'm up at Villanova now - who needs to sign this cap exp req if I can get it done now ?

>> -----Original Message-----
>> **From:** Tancredi, James D.
>> **Sent:** Thursday, June 01, 2006 11:11 AM
>> **To:** Coleman, Rhonda A.; Yborra, Thomas J.
>> **Subject:** RE: File Rm access control solution
>>
>> No, that's fine.  Just wanted to make sure that we were over and above what was
>> initially allocated.  Tom, I would go ahead and cut a new expenditure together to
>> cover the add-ons.

>>> -----Original Message-----
>>> **From:** Coleman, Rhonda A.
>>> **Sent:** Thursday, June 01, 2006 8:36 AM
>>> **To:** Tancredi, James D.; Yborra, Thomas J.
>>> **Subject:** RE: File Rm access control solution
>>>
>>> $60,000 - don't forget we are probably going to incur additional costs
>>> because Target wasn't ready.  We can always back charge Target, however
>>> I am not sure how upset you would like to get Target considering the bank's
>>> relationship with them.

>>>> -----Original Message-----
>>>> **From:** Tancredi, James D.
>>>> **Sent:** Wednesday, May 31, 2006 10:22 PM
>>>> **To:** Coleman, Rhonda A.; Yborra, Thomas J.
>>>> **Subject:** RE: File Rm access control solution
>>>>
>>>> Just out of curiosity, how much did we originally have in for Security?

>>>>> **From:** Coleman, Rhonda A.
>>>>> **Sent:** Wed 5/31/2006 1:56 PM
>>>>> **To:** Yborra, Thomas J.
>>>>> **Cc:** Tancredi, James D.
>>>>> **Subject:** RE: File Rm access control solution
>>>>>
>>>>> We have reached our spending point.  You will need to do an

1/2006

# EXHIBIT E

exhibit E

## WT CENTER — CONCIERGE DESK

**R COLEMAN**

| DISCUSSION | Request to add "returns" on each side of front security station. Desk will have to be shifted forward & floor drilled — wiring issues. | | |
|---|---|---|---|
| CONCLUSIONS | Rhonda to obtain pricing.<br>9/26 — Design request sent to Mark Andress. 10/3 – n/c 10/10 – postponed — 2006 budget item. 10/31 – '06 project. 11/7 – n/c; 11/28 – n/c – 2006 Item. 12/5 – n/c; 12/12 – n/c; 12/19 – n/c; 1/9 – n/c; 2/6 – 3rd/4th qtr. Item. 2/13 – n/c; 2/20 – n/c; 3/20 – n/c; 4/10 – n/c; 4/17 – n/c; 4/24 – n/c | | |
| ACTION ITEMS | | PERSON RESPONSIBLE | DEADLINE |
| Pricing needed | | R Coleman | |

## PIKE CREEK

**TANCREDI**

| DISCUSSION | Working on budget figures to move Residential Mortgage staff to Pike Creek (would basically be paint/carpet/furniture) 17-20 people in 2006. | | |
|---|---|---|---|
| CONCLUSIONS | 9/26 - $250,000 budget figure for renovation; they will wait for 2006 renovations. Becky DePorte & Bill Williams discussing. 10/3 – Awaiting decision from Becky Deport. 10/10 – pending. 10/31 – n/c. 11/7 – new circuits, cabling & fire alarm needed for new space. 11/28 – B Williams & B DePorte still discussing. JT to contact B Williams. Basically carpet & paint. Budget discussion to ensure accuracy of original figure. JT & MD will visit site w/B Williams. 12/5 – Site visit sch. 12/6 (JT, JN, MD & Bill Williams). 12/12 - $250,000 accurate budget figure. JT to forward rent figures to Bill Williams. No demo work; TY will need another port on router. Tentatively 1Q05. 12/19 – Bill getting numbers to Becky DePorte, should hear something around 1st of 2006. 1/9 – n/c; waiting to hear from Bill Williams. 2/6 – still waiting on approval from B DePorte. 2/13 – n/c; 2/20 – Bill Williams needs add'l week for confirmation. 3/20 – Bill Williams still waiting on a decision from R. DePorte. 4/10 – Shooting for 6/1-6/30 occupancy. Security & fire system figures are in. Possible video installation in lobby only. BN to order circuit. Carpet, paint, vinyl base & hanging of interior doors to be done by WTC Bldg. Mgt. 4/17 – cap ex to be prepared by JT this week for signature. 4/24 – cap ex ready for signature (shooting for end of June move-in). Basically, paint, carpet & furniture — one wall change; millwork in front area. | | |
| ACTION ITEMS | | PERSON RESPONSIBLE | DEADLINE |
| Provide budget figures | | R Coleman | |

## DUBLIN, IRELAND

**TANCREDI**

| DISCUSSION | Construction meeting to be held 9/13-9/15. Mary & Randy Harbaugh will attend. Chris Watson to handle IT tie-in w/London. IT issues to be addressed by Chris as well (serves as liaison). Jeff Noznisky working on telecom connect. Invoices are to be paid directly out of Ireland offices after review by GS. | | |
|---|---|---|---|
| CONCLUSIONS | 9/26 – Punchlist items to go to architect. 10/3 – MD working w/Ireland contacts. They need video in lobby – generic system @ this time. Also artwork. VAT (value added tax) issue needs to be resolved. 10/10 – no updates from MD. Jim added that VAT may be recovered on work done prior to 9/1. 10/31 – n/c. 11/7 – couple of small open items remain. 11/28 – N/C; awaiting completion. 12/5 – punchlist items still outstanding. 12/12 – n/c; 12/19 – n/c; 1/9 – n/c; 2/6 – outstanding furniture issues. Scheduled completion 2/10. 2/13 – outstanding items should have been completed – JT will check on status. 2/20 – One outstanding item remains on punchlist. 3/20 – still has outstanding Security issues. 4/10 – TY to check w/Ray Johnson re: security issues. 4/17 – n/c; 4/24 – n/c | | |
| ACTION ITEMS | | PERSON RESPONSIBLE | DEADLINE |

# EXHIBIT  F

exhibit F  rage 1 of 3

## Coleman, Rhonda A.

**From:**    Coleman, Rhonda A.
**Sent:**    Tuesday, June 27, 2006 10:43 AM
**To:**      Tancredi, James D.
**Subject:** FW: Germany - Security

fyi

——Original Message——
**From:** Johnson, Raymond (RayJo) J.
**Sent:** Monday, June 26, 2006 8:29 PM
**To:** Coleman, Rhonda A.
**Subject:** RE: Germany - Security

Will do,but have86 projects going on right now.

**From:** Coleman, Rhonda A.
**Sent:** Mon 6/26/2006 5:43 PM
**To:** Johnson, Raymond (RayJo) J.
**Cc:** Tancredi, James D.
**Subject:** RE: Germany - Security

Have you talked to Martin?

——Original Message——
**From:** Coleman, Rhonda A.
**Sent:** Monday, June 19, 2006 1:00 PM
**To:** Johnson, Raymond (RayJo) J.
**Cc:** Tancredi, James D.
**Subject:** RE: Germany - Security

Any luck?

——Original Message——
**From:** Coleman, Rhonda A.
**Sent:** Tuesday, June 13, 2006 10:51 PM
**To:** Johnson, Raymond (RayJo) J.
**Cc:** Tancredi, James D.
**Subject:** RE: Germany - Security

Thanks!

——Original Message——
**From:** Johnson, Raymond (RayJo) J.
**Sent:** Tuesday, June 13, 2006 10:01 PM
**To:** Coleman, Rhonda A.
**Cc:** Tancredi, James D.
**Subject:** RE: Germany - Security

Thanks for trying - I'll see what I can do.

Ray

7/6/2006

**From:** Coleman, Rhonda A.
**Sent:** Tue 6/13/2006 8:45 PM
**To:** Johnson, Raymond (RayJo) J.
**Cc:** Tancredi, James D.
**Subject:** RE: Germany – Security

Jim and I have both attempted to get info on what type of security measures are in the
building that Martin is leasing for the new Germany office. Because we are getting a bit of
resistance, I suggest that you speak with him direct so that you can better explain Wilmington
Trust's Security Standards and Policies. I am scheduled to go out for a site visit sometime
before the office opens and I can do some field surveying at this time if that is any help.

Please let me know how you make out.

Thanks.

-----Original Message-----
**From:** Johnson, Raymond (RayJo) J.
**Sent:** Thursday, June 08, 2006 9:24 AM
**To:** Coleman, Rhonda A.
**Cc:** Tancredi, James D.
**Subject:** Germany – Security

That would be great!

-----Original Message-----
**From:** Coleman, Rhonda A.
**Sent:** Thursday, June 08, 2006 9:20 AM
**To:** Johnson, Raymond (RayJo) J.
**Cc:** Tancredi, James D.
**Subject:** RE: pdfs

Will do. Just let me know if you need any further info. I am going to see if they
have photos of the space, building, etc.

-----Original Message-----
**From:** Johnson, Raymond (RayJo) J.
**Sent:** Thursday, June 08, 2006 9:12 AM
**To:** Coleman, Rhonda A.
**Cc:** Tancredi, James D.
**Subject:** RE: pdfs

Probably better to have one point of contact at this point - if you don't
mind asking him, I would appreciate it.

Thanks - Ray

-----Original Message-----
**From:** Coleman, Rhonda A.
**Sent:** Thursday, June 08, 2006 9:11 AM
**To:** Johnson, Raymond (RayJo) J.
**Cc:** Tancredi, James D.
**Subject:** RE: pdfs

I have not been to the site yet. I have calls into Martin McDermott
to go over some items. I can ask him these questions or you can
call him direct - whichever you prefer!

7/6/2006

-----Original Message-----
**From:** Johnson, Raymond (RayJo) J.
**Sent:** Thursday, June 08, 2006 9:08 AM
**To:** Coleman, Rhonda A.
**Cc:** Tancredi, James D.
**Subject:** RE: pdfs

Has anyone been there yet? Do we know what overall
building security consists of? How long will we be in this
office? Let's get together for a few minutes to discuss.

Ray

      -----Original Message-----
      **From:** Coleman, Rhonda A.
      **Sent:** Thursday, June 08, 2006 9:02 AM
      **To:** Johnson, Raymond (RayJo) J.
      **Cc:** Tancredi, James D.
      **Subject:** FW: pdfs

      Please let me know what you would like for Security
      in this office.

      Thanks!

      -----Original Message-----
      **From:** Tancredi, James D.
      **Sent:** Tuesday, June 06, 2006 9:09 AM
      **To:** Coleman, Rhonda A.
      **Subject:** FW: pdfs

      Rhonda.

      Here is the projected space layout for the Frankford,
      Germany office. I've asked Martin to assemble
      contact information for Stephanie as you would be a
      great source for a number of items including
      translation issues and overall German business
      protocol. As soon as he returns that info I will pass it
      on. If you do not have in the next day or so, please
      contact him and ask for the info again. Martin is
      asking for a 7/1 opening and there's not much time
      to get that done.

      Tom.

      Please review this plan with Ray and let me know if
      you recommend security for this location, and if so,
      to what extent.

      Thanks,

      Jim T
      -----Original Message-----
      **From:** McDermott, Martin
      **Sent:** Thursday, June 01, 2006 5:08 AM

To: Tancredi, James D.
Cc: Watson, Christopher A.
Subject: RE: pdfs

Jim.

Thanks for this and apologies for the delay in responding.

I believe that it was left to me to confirm that the landlord will pick up fit-out costs and I have now confirmed this. To be absolutely clear, we have no work to do in terms of fit out. The space will be delivered to us complete at the beginning of the lease - which we still hope will be 1 July.

As regards furniture, I think we said that we would use Hayworth if they could supply in Germany but I await clarification on this. I am also happy to ask Stephanie Gaubatz - our German consultant - to source suitable product and forward brochures for our consideration. Please advise.

I have attached a diagram of the office arrangement that we are requesting - apologies for the poor quality.

Martin.

> -----Original Message-----
> From: Tancredi, James D.
> Sent: 26 May 2006 13:52
> To: McDermott, Martin
> Cc: Watson, Christopher A.
> Subject: FW: pdfs
>
> Martin.
>
> Please find attached the Frankford, Germany, floor plan in pdf format for your review. Please feel free to mark up the drawing as you see fit to denote how you. and your staff, envision how the space should layout. When you're through marking up the drawing, please scan the document and forward it back to me so that we can commence furniture and fit-out plans. I hope all is well.
>
> Jim Tancredi
> -----Original Message-----
> From: Martin Kaftan
> [mailto:mkaftan@a2ny.com]
> Sent: Friday, May 19, 2006 5:58 PM
> To: Tancredi, James D.
> Subject: pdfs
>
> Pdfs from your file
>
> Martin Kaftan
> A-SQUARED

09/20/2007  08:55    3028318249                FPA                                    PAGE  09
Message

1201 Broadway, NY
tel: 212-696-9062

7/6/2006

# EXHIBIT  G

09/20/2007  09:00    3028318249    FPA    PAGE 01

Page 1 of 1

**Coleman, Rhonda A.**    exhibit G

**From:** Coleman, Rhonda A.
**Sent:** Wednesday, June 14, 2006 9:51 PM
**To:** Tancredi, James D.
**Cc:** Johnson, Andrea M.
**Subject:** RE: Tardy

I hear you loud and clear. I was only 5 minutes late and it was to to bring in the cake for my daughters last day of school party and to pick up her art project that was too big for the bus. They do not allow anyone in the school until 8:00 so I could not leave my home any earlier so that I could get to work any earlier. My husband could not do this task because he took the afternoon shift to pick up my other daughter from school. Today was her finals and because she only had one left to take she was dismissed early without transportation - go figure! Andrea told me in our level 3 meeting that if I was not going to be on time, make sure I call. I was not told that I absolutely could not be late again. Does the level 3 warning mean I can not be late for any reason for one entire year? Today was the last day of school so I should not have any kid/school issues in the near future.

I do apologize for being late. I appreciate you working with me. I really thought that working 17 hours the day before (until 2:00 in the morning) that it would not have been a major problem if I was 5 minutes late to take care of a kid issue as long as I called and let you know.

Original Message-----
**From:** Tancredi, James D.
**Sent:** Wednesday, June 14, 2006 4:30 PM
**To:** Coleman, Rhonda A.
**Subject:** Tardy

Rhonda,

Per our telephone conversation this morning, you noted you were going to be 10 to 15 minutes late to work because you needed to drop something of at one of your children's schools. You recent Level 3 warning referenced regular tardiness as an issue, and noted that additional occurrences could result in termination. We're trying to work around yours, and everyone else's personal schedules by providing a flexible work schedule for everyone's convenience. We absolutely need to be mindful of our arrival and departure times . to assure that we are working within the agreed upon flex work schedule. From this point, any additional occurrences will result in your termination.

Jim T.

6/14/2006

# EXHIBIT H

09/20/2007  09:00    3028318249              FPA                    PAGE  02
                                                                   Page 1 of 1

*exhibit H*

**Coleman, Rhonda A.**

**From:**    Coleman, Rhonda A.
**Sent:**    Friday, June 23, 2006 2:34 PM
**To:**      Tancredi, James D.
**Subject:** Target Invoices

As per your suggestion, I am sending an email to follow up on our previous conversation.

I know I expressed concern in the past regarding timing of checks going out. I did the research and realized that large checks had to go thru too many hands before the went out and that was a SOX regulation and nothing could be done. In my meeting with John and Andrea on Wednesday, this issue briefly came up and it was mentioned that the invoices sat on my desk. I have attached the most recent invoice from Target. As you can see it was stamped as received on June 12th. Last week when I was asking Leslie the status of the $486,000 +/- check that Target was waiting for, she had this invoice on her desk. I told her I was not looking for this application, but for payment but the previous one.  Since we were late sending out the last check to Target, I figured I better check up on the status of the attached invoice.  This invoice was both seen for the first time and approved by both of us today.

6/23/2006

09/20/2007  09:00    3028318249                    FPA                          PAGE  03

                                                                                3

..ON TRUST COMPANY          PROJECT: WILMINGTON TRUST FIT OUT      APPLICATION NO:    . 5    DISTRIBUTION TO:
.SQUARE NORTH                        RADNOR, PA                   PERIOD ENDING:: 05/31/06   ____ OWNER
.NORTH MARKET STREET                                                                        ____ ARCHITECT
.MINGTON DE 19890                                                                           ____ CONTRACTOR
                                                                                            ____ OTHER
.TARGET BUILDING CONSTRUCTION   VIA: WILMINGTON TRUST COMPANY      PROJECT NO: 05-178  R E C E I V E D
400 W. CHESTER PIKE                  RODNEY SQUARE NORTH
RIDLEY PARK, PA  19078               1100 NORTH MARKET STREET
                                     WILMINGTON DE 19890                               JUN 12 2006

NTRACT FOR:  FITOUT OF INTERIOR SPACE                             CONTRACT DATE: 11/18/05

NTRACTOR'S APPLICATION FOR PAYMENT                    Application is made fr payment, as shown below, in connection with the
                                                      contract.  Continuation Sheet, AIA Document G703, is attached.
CHANGE ORDER SUMMARY

                                                      1. ORIGINAL CONTRACT SUM ...........................   1,533,800.00
hange Orders approved | ADDITIONS  | DEDUCTIONS |     2. NET CHANGE BY CHANGE ORDERS ....................     208,018.91
n previous months by  |                         |     3. CONTRACT SUM TO DATE (Line 1 + 2) .............. .  1,741,818.91 06
wner.    TOTAL  | 196,742.96 |  1,962.00 |            4. TOTAL COMPLETED & STORED TO DATE ................  1,741,818.91
                                                         (Column G on 6703)
Approved This Month |                                 5. RETAINAGE
                                                         a.  5.00 % of Completed Work
Number    Date      |                                        (Column D + E on 6703)
                                                         b.  5.00 % of Stored Material
  17   05/10/06 |  4,071.65 |                                 (Column f on G703)
 _18   05/25/06 |  4,167.90 |                             Total Retainage (Line 5a + 5b  OR
  19   05/25/06 |  2,798.40 |                                Total in Column I of G703) .....................     87,090.96
 — 20  05/31/06 |  2,200.00 |                          6. TOTAL EARNED LESS RETAINAGE .....................   1,654,727.95
                                                         (Line 4 less Line 5 total)
                                                      7. LESS PREVIOUS CERTIFICATES FOR PAYMENT ..........   3,474,966.61
    Totals | 209,980.91 |  1,962.00 |                    (Line 6 from prior certificate)
                                                      8. CURRENT PAYMENT DUE .............................     179,761.34
let change by Change Orders    |    208,018.91 |      9. BALANCE TO FINISH, PLUS RETAINAGE ...............     87,090.96

· undersigned contractor certifies that to the best    State of: PENNSYLVANIA      County of: DELAWARE
the contractors knowledge, information and belief
work covered by this Application for Payment has       Subscribed and sworn to before me this  5  day of  Jan, 2006
n completed in accordance with the contract
uments, that all amounts have been paid by the         Notary Public: Kathi Mc Millan
tractor for work for which previous Certificates
Payment were issued and payments received from         My commission expires:
owner and that current payment shown herein is
due.
                                                       COMMONWEALTH OF PENNSYLVANIA
                                                              Notarial Seal
TRACTOR: TARGET BUILDING CONSTRUCTION, INC..          Kathleen MacMillan, Notary Public
                                                      Ridley Park Boro, Delaware County
                             Date: 6/5/06             My Commission Expires June 10, 2010.
                                                      Member, Pennsylvania Association of Notaries.
ITECT'S CERTIFICATE FOR PAYMENT                       AMOUNT CERTIFIED ...................  $_____
ccordance with the contract documents, based on
rite observations and the data comprising the         ARCHITECT:
pplication, the architect certifies to the
nat to the best of the architect's knowledge          By: _____  Date: _____
rmation and belief the work has progressed as         This Certificate in not negotiable.  The AMOUNT CERTIFIED is payable
cated, the quality of the work is in accordance       only to the contractor named herein.  Issuance, payment and
the contract documents, and the contractor is         acceptance of payment are without prejudice to any rights of the
tled to payment of the AMOUNT CERTIFIED.              owner or contractor under this contract.

09/20/2007  09:00    3028318249                    FPA        *More Examples*            PAGE  04

# Optima Cleaning Systems Incorporated

# Invoice

110 Valley Road
The OCS Building
Wilmington, DE 19804
Phone  302-652-3979    Fax  302-652-0312

| DATE | INVOICE # |
|------|-----------|
| 6/19/2006 | 9771 |

| BILL TO | SHIP TO |
|---------|---------|
| 100 West 10th Street Corporation<br>1100 North Market Street<br>Wilmington, DE 19890<br>ATTN:  Mark Andress/accounts payable | 100 West 10th Street Corporation<br>311 West 11th Street<br>Wilmington, DE 19890<br>ATTN:  Mark Andress/accounts payable |

*RECEIVED*

| P.O. NUMBER | TERMS | REP | ORDER DATE | VIA | F.O.B. | PROJECT |
|-------------|-------|-----|-----------|-----|--------|---------|
| G Otto | Net Upon Receipt of ... | TDD | 6/15/2006 | | | |

| ITEM CODE | DESCRIPTION | AMOUNT |
|-----------|-------------|--------|
| Construct-Cln | Post Construction Cleaning Services<br>2nd floor – Construction clean up requested by Glenn Otto - (18) Modular work stations<br>See Attach: | 347.40 |
| Upholstery | Upholstery Cleaning Services<br>(130) Modular panels steam extracted | 455.00 |

LOCATION  2nd FLR PLazz
ACCOUNT #  242013 (5-7777)
APPROVED  JL
DATE

...nk You  for Choosing  Optima Cleaning Systems, Inc.!

| Total | $802.40 |
|-------|---------|

05/22/2007   09:00    3028318249                    FPA

# JAMES A. QUICK, INC.

MECHANICAL CONTRACTORS
21-A Newport Drive
Forest Hill, MD 21050
E-mail: info@jamesquick.com

Phone: (410) 893-4200

Fax: (410) 893-4202

## INVOICE

Wilmington Trust
1100 North Market Street
Wayne, PA 19087

Attention:  Mrs. Rhonda Coleman

RE:   Wilmington Trust Baltimore Office
Mechanical Design Fees for Proposed Expansion
James A. Quick, Inc. Job #206-140
Invoice #206140-1

RECEIVED
JUN   2006

Original Contract Amount

Total Labor and Materials to Date          $4,872.00

Total Amount Due This Invoice              $4,872.00

                                           $4,872.00

RECEIVED
JUN 1 3 2006
ACCOUNTS PAYABLE

Submitted by James A. Quick
May 22, 2006

LOCATION  Villznve
ACCOUNT #  24201 24-7777
APPROVED  JT.
DATE

09/20/2007  09:00    3028318249              FPA                    PAGE  06

# BRADBERRY & KHERADI, INC.

307 South Wayne Avenue
Wayne  Pennsylvania  19087

# Invoice

| Date | Invoice # |
|------|-----------|
| 6/16/2006 | 1164 |

**Bill To**

Ms. Rhonda Coleman
Wilmington trust
1100 North Market St
Wilmington DE 19890



| Contract Amt. | Project # | Project | Terms | Dates of Service |
|---------------|-----------|---------|-------|------------------|
|  |  | 2nd Floor Plaza | net 30 days | 05.17.06-06.16.06 |

| Item | Description | Qty | Rate | Serviced | Amount |
|------|-------------|-----|------|----------|--------|
| FEE-SANDY - ... | FEE-SANDY KHERADI-INTERIOR DESIGN | 3 | 75.00 | | 225.00 |
| | Fee Previously Invoiced: $23,700.00 | | | | |
| | Fee this Invoice:$225.00 | | | | |
| FAXES | REIMBURSIBLE EXPENSES-FAXES | 10 | 2.00 | | 20.00 |
| PHOTOCOPIES | REIMBURSIBLE EXPENSE-PHOTOCOPIES | 15 | 0.30 | | 4.50 |
| Reimb Group | | | | | |
| | Delivery Service | | 9.87 | 5/23/2006 | 9.87 |
| | Total Reimbursable Expenses | | 9.87 | | 9.87 |
| | Markup | | 10.00% | | 0.99 |
| | Total Reimbursable Expenses | | | | 10.86 |
| | | | 6.00% | | 0.00 |

LOCATION _____
ACCOUNT # _____
APPROVED _____
DATE _____

| | Total | $260.36 |

09/20/2007  09:00  3028318249                    FPA                        PAGE  07

# Schindler Elevator Corporation                                    *INVOICE*

| Local Office | Schindler Elevator Corporation<br>840 N LENOLA RD STE 4<br>MOORESTOWN NJ 08057-1055 | Invoice Number | 7150747271 |
|---|---|---|---|
| | | Invoice Date | 05/31/2006 |
| | | Billing ID | 1122845 |
| | | Purchase Order No | |
| | ****** | Sales Contact | Gina Murphy-Connell |
| | | Field Contact | Steven Heintz |
| Bill to | WILMINGTON TRUST<br>LANCASTER PIKE (W. OF RT. 320)<br>VILLANOVA PA 19085 | Telephone | 856 234 2220 |
| | | Fax | 856 234 8003 |
| | | Federal Tax ID | 34 127 0056 |
| | | DUNS Number | 09 480 9993 |
| Service Location | WILMINGTON TRUST<br>LANCASTER PIKE (W. OF RT. 320)<br>VILLANOVA PA 19085 | Order Type | Z1TM |
| | | Order No | 5151005740 |
| | | Contract | 4100050919 |

| Description | Price |
|---|---|
| DATE OF SERVICE 5/20/06 - OVERTIME CALL AUTHORIZED BY JOHN CELLINI<br>THAT THE ELEVATOR DOWN. DOUBLE REBOOT ELEVATOR - TESTED - OKAY<br>NOTIFICATION 18914539 | |

|  | | |
|---|---|---|
| | Labor | 1,115.31 |
| | Expenses | 33.40 |
| | Subtotal | 1,148.71 |
| Applied unless an exemption certificate is on file | Tax | 0.00 |
| Terms: *NET PAYABLE UPON RECEIPT* | *Total Invoice Amount* | **$1,148.71** |

LOCATION Villanova -7777
ACCOUNT # 242014
APPROVED
DATE

## *REMITTANCE*

Please return this portion with your payment

| Payer | WILMINGTON TRUST<br>LANCASTER PIKE (W. OF RT. 320)<br>VILLANOVA PA 19085 | Invoice Number | 7150747271 |
|---|---|---|---|
| | | Invoice Date | 05/31/2006 |
| | | Billing ID | 1122845 |
| | | Order Type | Z1TM |
| Remit to | Schindler Elevator Corporation<br>P.O.Box 93050<br>Chicago, IL 60673-3050 | *Use this address for payments only. Direct calls and correspondence to our Local Office above.* | Order Number | 5151005740 |

| *INVOICE AMOUNT $1,148.71* |
|---|

*Invoices not paid within 30 days are subject to a service charge of 1.5% per month, or the maximum permitted by law.*
*Seller represents that with respect to the production of the articles and/or the performance of the*



09/20/2007  09:00   3828318249           FPA                        PAGE  08

## Schindler Elevator Corporation                    *INVOICE*

| Local Office | Schindler Elevator Corporation<br>840 N LENOLA RD STE 4<br>MOORESTOWN NJ 08057-1055 | Invoice Number<br>Invoice Date<br>Billing ID<br>Purchase Order No | 7150747271<br>05/31/2006<br>1122845 |
|---|---|---|---|

RECEIVED  JUN 12 2006

| Bill to | WILMINGTON TRUST<br>LANCASTER PIKE (W. OF RT. 320)<br>VILLANOVA PA 19085 | Sales Contact<br>Field Contact<br>Telephone<br>Fax<br>Federal Tax ID<br>DUNS Number | Gina Murphy-Connell<br>Steven Heintz<br>856 234 2220<br>856 234 8003<br>34 127 0056<br>09 480 9993 |
|---|---|---|---|
| Service Location | WILMINGTON TRUST<br>LANCASTER PIKE (W. OF RT. 320)<br>VILLANOVA PA 19085 | Order Type<br>Order No<br>Contract | Z1TM<br>5151006740<br>4100060919 |

**Description**                                                                  **Price**

DATE OF SERVICE 5/20/06 - OVERTIME CALL AUTHORIZED BY JOHN CELLINI
THAT THE ELEVATOR DOWN. DOUBLE REBOOT ELEVATOR - TESTED - OKAY
NOTIFICATION 18914539

| | |
|---|---|
| Labor | 1,115.31 |
| Expenses | 33.40 |
| Subtotal | 1,148.71 |
| Applied unless an exemption certificate is on file    Tax | 0.00 |

Terms: *NET PAYABLE UPON RECEIPT*        **Total Invoice Amount**    **$1,148.71**

LOCATION Villanova -7777
ACCOUNT # 242024
APPROVED JI
DATE 6/26/06

QC 6/26

### *REMITTANCE*

Please return this portion with your payment

| Payer | WILMINGTON TRUST<br>LANCASTER PIKE (W. OF RT. 320)<br>VILLANOVA PA 19085 | Invoice Number<br>Invoice Date<br>Billing ID<br>Order Type<br>Order Number | 7150747271<br>05/31/2006<br>1122845<br>Z1TM<br>5151006740 |
|---|---|---|---|
| Remit to | Schindler Elevator Corporation<br>P.O.Box 93050<br>Chicago, IL 60673-3050 | *Use this address for payments only.<br>Direct calls and correspondence<br>to our Local Office above.* | |

**INVOICE AMOUNT $1,148.71**

*Invoices not paid within 30 days are subject to a service charge of 1.5% per month, or the maximum permitted by law.<br>Seller represents that with respect to the production of the articles and/or the performance of the<br>services covered by this invoice, it has fully complied with the Fair Labor Standards Act of 1938, as amended.*



# EXHIBIT I

## "Bill of Particulars"

Exhibit I

| | |
|---|---|
| 6/11/04 | I went out on leave for surgery (Hysterectomy) |
| 7/23/04 | I returned to work from surgery. |
| 8/03/04 | John Evans was promoted to Division Manager |
| 8/20/04 | A meeting was held for our entire Division and we were told that there was reorganization. A new position was created as section manager of the project managers and Jim was now my immediate supervisor. |
| 10/22/04 | I received a performance review and was rated "above average". |
| 10/29/04 | I received a level 1 warning for attendance. |
| 12/17/04 | John Evans purchased alcohol for staff during work hours at Division x-mas luncheon at Mrs. Rubinos. I have enclosed copy of company policy regarding Alcohol. I did not report to HR because I did not want to create any issues in the work environment. |
| 12/22/04 | Team meeting. Jim Tancredi made offensive remarks |
| 12/22/04 | I went to Hr and met with Ed Emmi. I was very upset and HR sent me home and rescheduled meeting for 12/23 |
| 12/23/04 | Met with HR and discussed concerns regarding remarks made in meeting. I also discussed my concerns regarding why my pay was always below a fellow employees (Jim Tancredi) and why I was not overlooked for the promotion of Section Manager. |
| 12/24/04 | I sent HR my notes from the meeting and expressed concerns regarding losing my job if HR contacted my manager to research this matter. He assured me that it was against the law to retaliate. Because I had grave concerns regarding retaliation (John had history of retaliating against his former employer) so I asked that HR not contact John Evans regarding my concerns, and also asked how else HR could help me. |
| 1/10/05 | Another meeting with Ed Emmi in HR regarding my concerns and I provided additional info to HR regarding my concerns that I was being discriminated against for not receiving the promotion, for being paid less then other equal male counterparts and also that women were not treated with the same respect. I again asked what the company protocol was for my concerns. Ed stated he had to speak to his manager and would get back to me. I again expressed concerns regarding retaliation and asked that they not speak to John. |
| 1/21/05 | I sent an email to Ed Emmi expressing my concerns that he spoke to John regarding our conversation. I new this because Ed sent a meeting notice for Ed, John and myself to attend. |
| 1/21/05 | Ed Emmi responded and said "though, unorthodox ..." he and his manager went to John to get answers to my questions. This shows that Ed was fully aware of my wishes not to discuss the matter with John because of my fear of retaliation. |
| xx/xx/xx | Meeting with HR and John. I was told that I was being paid less then Jim because I did not travel in my position. When Jim was hired, he did not travel and it was never written or mandated in anyone's job description. |
| 01/05 | I was told by John that if I did not agree to travel in my current position that I would be demoted. I was never asked or told that I must travel or be demoted until after I went to HR. |
| 01/05 | Linda Russell said to Mary Devine "I can't save her now". |
| 1/31/05 | HR reorganized which HR reps were responsible for which departments and Ed Emmi was removed from my case and Andrea Johnson was assigned. |
| 2/1/05 | Meeting with Ed Emmi, Andrea Johnson, John Evans and myself. I was never given a reason why both John and Jim consistently received higher salaries then me for the same job duties and was only told that was the past and we are concentrated on going forward. I was given the excuse that both Jim and I were qualified for the promotion and it was given to Jim because I did not complete my IREM (Institute for Real Estate Mangement) degree. Jim does not have this degree nor has he taken any of the courses. If you review both of our personnel files you will see that I had 20 years of superior performance and he has had many job related issues. His company car was taken away for abusing the privileges, |

he was almost terminated from the department he previously worked in and was given
warnings for abusing computer policies.

03/05     I was called into John's office and told that my work schedule must be changed. For the
previous 5 years, I worked a flex schedule so I could get my daughter on the bus in the
morning. I told John that he could not do this that it was a retaliation move. He said he
would check with HR and get back to me. The subject was never brought back up.

3/31/05     I sent an email request for tools I will need to fulfill the responsibilities of my new
description that now requires travel. My request was for a Treo phone so I could communicate
both by phone and email while on the road, a new pc (my pc was 5+ yrs old and constantly
out of service), transportation (every person (all males) that is responsible for jobs on the
road has a company vehicle), and to be relocated closer to my supervisor to better
communications while in the office. My pc was ultimately replaced with an extra that was
in the Division and eventually I did receive the treo phone. I was told Dave Gibson
denied the request for the vehicle and John denied the request for being relocated closer to Jim.

6/29/2005     I sent John Evans email that I felt Jim was searching for things that I was doing wrong and
I also stated that Jim's email was defensive and acousational. John said it wasn't accusational
to him and that it was a non-issue.

7/15/2005     I had a meeting with John behind closed doors to discuss my concerns that Jim's communication
is still defensive and accousational. A week later John later sent an email discussing how I can
improve and again did not address my concerns with the tone of Jim's emails. None
of the issues in the email were brought up or discussed in the original meeting with John.

7/22/2005     John again questioned my work schedule in an email this time. John stated that it did not
conform with General Services guidelines. Apparantly John recently created a new guideline for
the Division since his attempts at retaliation in March did not succeed.

9/20/05     I received a level 2 warning.

10/05     I met with Andrea in HR and discussed that I felt an extreme amount of work related
stress and that I felt as though the warning was another effort of retaliation. I was
not feeling well mentally or physically and she suggested I contact my physician.

10/24?/05     Went out on disability and returned December 19th.

11/8/05     Email from John Evans selecting the winning bidder for Furniture for Villanova.
Customer relationships were the reason behind the decisions for awarding bids.

12/9/05     Email from WT President of PA telling us what vendors must get the bid award. The
commercial lending department always chose the winning bidders and we as project
managers had are hands tied when trying to push a contractor to perform because they
were customers.

5/23/06     Received an email regarding missing a meeting. I was working at Villanova all weekend
to get the building ready for opening and did not get my voicemails or emails. I did try
and contact

5/30/06     I received a level 3 warning. At the meeting I asked for weekly meetings with HR and
my supervisor to discuss the "alleged" outstanding issues. We had only one weekly
meeting with HR and then HR dismissed their selves from the meetings. I met
weekly with my supervisor to review my performance and at each meeting I was not
told of any problems or concerns with my performance. I sent notes from the meetings
to HR on a weekly basis.

5/31/06     Met with Andrea in HR to discuss my concerns with being retaliated against. Andrea
told me that there were bigger issues going on in our Division and they were being
looked into. Andrea confirmed that many people from our Division has came to HR
over the last 2 years complaining about how they were being treated. I discussed my fear
of being terminated and she told me to just keep following the rules and they could not
terminate me. I asked for her opinion whether I should find employment elsewhere, or
file charges for retaliation and she said to do what I felt I needed to do. I also expressed

my concerns that I was targeted to be terminated in July because all of my major projects were coming due in July. I also showed her where the future projects were being reassigned from me to others without discussing this with me.

| | |
|---|---|
| 6/6/06 | Sent email to Jim and HR listing the workload on my plate and asked for priorities. My workload was heavier then any other individuals in the past or present. I was opening 4 new offices in one month time frame (1 in CT, 1 in NJ, 1 in PA and 1 in Germany), completing a 2 million dollar project (construction the PA Headquarters building), expanding the MD headquarters and working on the completion of the company stacking plans for budget. Each of these projects was scheduled to be completed in one month. The project load was unrealistic. NOTE: I accomplished all the projects on time and on budget by working an unreasonable amount of hours. I worked for 2 weeks straight until 11:00 pm at night. |
| 6/14/06 | I contacted Andrea because an email was deleted from my inbox and I did not ever see the email. I asked what IT could do to show when and from what computer the email was deleted. She asked if I wanted her to pursue the investigation and I denied the request because management did not pursue discipline on the subject. I also told Andrea again that the work place stress is affecting my family and that I felt management was working against me and not for me. |
| 6/15/06 | I sent an email to Andrea showing where I was being treated different at staff meetings. My projects status were being updated in highlighted and bold print. |
| 6/15/06 | I sent another email to Andrea with a status report on the weekly progress meeting with my supervisor. I also brought up the concern that I was being placed under a microscope and they were looking for me to make one false move to terminate me. Andrea later confirmed in a meeting that she was getting called almost everyday with issues they were trying to raise against me. |
| 6/20/06 | I emailed Andrea concerns regarding my supervisor looking for something to find wrong with my performance. The issue I brought to her attention was Jim reprimanding me that I did not add delegates to my calendar. He never tried to view my calendar, if he did he would have known he was added as a delegate. SIDE NOTE: We were the only area in our Division that was requested to have people view our calendars. |
| 6/20/06 | John called a meeting with HR regarding several items he thought were issues regarding my performance. I was being interrogated in this meeting regarding non-issues and was later apologized to by John at the request of Andrea for his behavior. |
| 6/21/06 | I emailed Andrea information regarding Jim telling me about a staff member (Tom Yborra) in Security was going to get a bad review. It was none of my business. I think Jim told me this information because he mentioned that someone (Tom Yborra) complaining about me in my review. I disagreed with Jim on the subject matter and Jim then told me I was right and that Tom Yborra is getting a bad review and he would remove the information from my review |
| 6/23/06 | Meeting for Department to review survey performed by an outside contractor that measured how Wilmington Trust treated their staff. Our department measured 14% below the rest of the company on the diversity issue and 10% below the industry. |
| 7/5/06 | I sent Andrea an email stating point black that I was being retaliated against and wanted HR to help. We set up a meeting to discuss this issue for 7/17 when I returned from vacation. I also asked that at the meeting if Andrea would review my response to my level 3 warning before I submitted it in writing formally. I told her I had written proof that the allegations made in the warning were 100% untrue. |
| 7/16/06 | I was called at home by Jim O'Neil and asked to take some time off with pay while they investigate my issues. I asked if Jim or John was being asked to take time off also and he said he could not discuss that. Neither were asked to take any time off. |
| 7/20/06 | Andrea Johnson called my cell phone and wanted to set up meeting for responding to the level 3 warning received. The meeting was set up for Monday @ 10:00 am. Discussed with Andrea that I was extremely upset about how I could be written up for untrue events and that I |

had written proof that the allegations in the level 3 were untrue. Also discussed that there were many things going on in our Division that were Bizarre and that I would like to further discuss these issues with her. I would not be surprised if another person was on listening on the line or the phone call was recorded.

| | |
|---|---|
| 7/21/06 | Jim O'Neil l/m on cell phone to schedule meeting for 7/24 @ 8:00 am. |
| 7/24/2006 | Meeting with Jim Riley and Andrea Johnson. Was terminated from WT for Performance reasons. Never given specifics. When requested if they would like my response for the level 3 warning, they said it was not necessary. |
| 7/25/2006 | Cancelled annual summer family vacation |
| 8/2/2006 | Letter from Barclay's turning me down for the position |
| 8/3/2006 | Met with Nancy Abrams and discussed case. She took copies of my correspondence with HR and the warnings and will draft a letter for me to review. |
| 8/11/06 | Nancy called back and said there was a conflict with her firm and recommended 4 other attorneys. I will not be billed for her time. Reviewed draft letter with Nancy Abrams and she faxed to WT |
| 8/16/06 | Spoke to Andy Erba regarding case - recommended filing administrative charges to EEOC, not sure standard of law in DE |
| 8/18/2006 | L/M with Tom Neuberger (302 655-0582). Talked to Nancy Abrahms. WT acknowledged receipt of letter said Gail Howard was on vacation this week and Gail would get back to her when she returns from vacation. I will contact Nancy Monday if possible with final selection of new attorney. |
| 10/19/2006 | 8 staff members from General Services were promoted |

Note: I have also enclosed the Company Policy regarding EEO. In the policy, it states that an Affirmative Action Officer has been assigned to assist in the remedying the problem areas. I never once spoke to an Affirmative Action Officer or was told that there was such a person.

# EXHIBIT  J

09/20/2007  09:05   3028318249                    FPA                                      PAGE  05

exhibit S

## CORPORATE REAL ESTATE STATISTICS

|  | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 |  |
|---|---|---|---|---|---|---|---|---|
| # of Projects | 12 | 11 |  | 28 | 42 | 32 |  |  |
| # of Project Managers | 4 | 4 | -3 | 3 | 2 | 2 | 2 |  |
| # of Locations in DE | 85 | 85 | 87 | 88 | 88 | 90 | 95 |  |
| # of Locations Outside DE | 10 | 11 | 13 | 16 | 17 | 21 | 22 |  |
| # moves | not needed per John |  |  |  |  |  |  |  |
| # furniture work orders | not needed per John |  |  |  |  |  |  |  |



WTC REAL ESTATE GROWTH (OUTSIDE DELAWARE)

6/13/2006

w9573



WTC REAL ESTATE GROWTH (DELAWARE)

# OF LOCATIONS

# of Locations in DE

# EXHIBIT K

*exhibit K*

## Coleman, Rhonda A.

| | |
|---|---|
| **From:** | Russell, Linda M. |
| **Sent:** | Friday, January 21, 2005 10:50 AM |
| **To:** | Coleman, Rhonda A. |
| **Subject:** | FW: Movement on 13 - Furniture |

-----Original Message-----
| | |
|---|---|
| **From:** | Tancredi, James D. |
| **Sent:** | Friday, January 21, 2005 9:25 AM |
| **To:** | Russell, Linda M. |
| **Subject:** | RE: Movement on 13 - Furniture |

Linda,

That would be me. With all those question marks, I though Tommy wrote this note. :o) I unfortunately had no access to e-mail in Cayman. It cost about $8 per minute for telephone/data transmissions. As such, I apologize for lack of communication. It could not be avoided.

Jim

*Proper Planning & $ for a push run*
*Would have been minimal.*

-----Original Message-----
| | |
|---|---|
| **From:** | Russell, Linda M. |
| **Sent:** | Thursday, January 20, 2005 9:29 AM |
| **To:** | Tancredi, James D.; 'Michael Peters'; Coleman, Rhonda A. |
| **Cc:** | Evans, John; Jackson, Maureen |
| **Subject:** | FW: Movement on 13 - Furniture |

Who is in charge of the PEI Building Project?????

-----Original Message-----
| | |
|---|---|
| **From:** | Dubb, Susan T. |
| **Sent:** | Thursday, January 20, 2005 9:23 AM |
| **To:** | Russell, Linda M. |
| **Cc:** | Watson, Christopher A.; Bevan, Sonja A.; Jackson, Maureen |
| **Subject:** | Movement on 13 - Furniture |

Linda,

I was under the impression that the furniture from the outside office - next to the conference room on 13 was to be moved out before the construction happened. The furniture is still in this office in the middle of a construction mess.

The client who files is suppose to come in today and file, and he could not even get to the cabinet. I thought Sonja had asked for the desk and the chair to be moved across the hall to another Shell office for safe keeping. The furniture is dirty, dusty and has been sitting in there during the renovations. The phone never moved either.

Can you send someone over to move the furniture and clean it before the client see it? Please let me know.

I have already e-mailed Maureen about the phones, and also put her on the e-mail.

Thank you in advance for all your help and assistance.

Susan Dubb

1

# EXHIBIT  L

09/20/2007  09:09    3028318249              FPA                    PAGE  01/03

Survey response
of staff

**Coleman, Rhonda A.**

| | |
|---|---|
| **From:** | Bennett, Caryn Y. |
| **Sent:** | Tuesday, August 02, 2005 3:41 PM |
| **To:** | Coleman, Rhonda A.; Andress, Mark G. |
| **Subject:** | RE: Vending Machines |

Exhibit L

I put a work order in for the guys to move the one from the 5th flr.  They should be able,
depending on their schedule, to get it to the 11th flr. within a day or so.

-----Original Message-----
From: Coleman, Rhonda A.
Sent: Tuesday, August 02, 2005 3:28 PM
To: Andress, Mark G.
Cc: Bennett, Caryn Y.
Subject: RE: Vending Machines


Any news?

  -----Original Message-----
From:       Coleman, Rhonda A.
Sent: Wed Jul 27 08:57:17 2005
To:   Andress, Mark G.
Subject:    RE: Vending Machines

When can I let the folks know to expect a machine?

-----Original Message-----
From: Andress, Mark G.
Sent: Tuesday, July 05, 2005 11:21 PM
To: Coleman, Rhonda A.
Subject: RE: Vending Machines


No

  -----Original Message-----
From:       Coleman, Rhonda A.
Sent: Tue Jul 05 23:19:19 2005
To:   Andress, Mark G.
Subject:    RE: Vending Machines

Is this done?

  -----Original Message-----
From:       Coleman, Rhonda A.
Sent: Thu Jun 30 13:09:54 2005
To:   Andress, Mark G.
Subject:    Vending Machines

  Can you please have vending machines ordered for the 11th floor.

Thanks!

# EXHIBIT M

09/20/2007  09:09    3028316249                FPA                                PAGE  02/03

exhibit M

## Coleman, Rhonda A.

| | |
|---|---|
| **From:** | Coleman, Rhonda A. |
| **ent:** | Friday, May 12, 2006 9:25 AM |
| **To:** | Bennett, Caryn Y. |
| **Cc:** | Andress, Mark G. |
| **Subject:** | RE: Door Buzzer and Conference Room Table in Doylestown |

Did work orders get placed for these?  This has been two months and we are starting to look bad!!!!

-----Original Message-----
**From:** Hoff, Linda M.
**Sent:** Friday, May 12, 2006 9:22 AM
**To:** Bennett, Caryn Y.
**Cc:** Coleman, Rhonda A.
**Subject:** RE: Door Buzzer and Conference Room Table in Doylestown

Good morning.  Touching bases again to see if you had a chance to talk to Randy and Chuck.

Thanks,
Linda

*Linda Hoff*
*Wilmington Trust of Pennsylvania*
*Commercial Banking*
*2003 South Easton Road, Suite 204*
*Doylestown, PA 18901-7100*
*267-880-7000*
*lhoff@wilmingtontrust.com*

-----Original Message-----
**From:** Bennett, Caryn Y.
**Sent:** Wednesday, April 26, 2006 5:01 PM
**To:** Hoff, Linda M.
**Cc:** Coleman, Rhonda A.
**Subject:** RE: Door Buzzer and Conference Room Table in Doylestown

Hi Linda,

Randy is out of town this week, but I will check with him when he gets back about the buzzer and Chuck is out the rest of the week also, so I will check with him next week as well about the table.

Caryn

-----Original Message-----
**From:** Hoff, Linda M.
**Sent:** Wednesday, April 26, 2006 9:55 AM
**To:** Bennett, Caryn Y.
**Cc:** Coleman, Rhonda A.
**Subject:** RE: Door Buzzer and Conference Room Table in Doylestown

Caryn,

Greetings from Doylestown

I'm following-up on two work orders for Doylestown.  Can you please do me a favor and check on each one?
thanks

1) the front door buzzer
2) the table in our conference room

1

*Linda Hoff*
*Wilmington Trust of Pennsylvania*
*Commercial Banking*
*2003 South Easton Road, Suite 204*
*Doylestown, PA  18901-7100*
*267-880-7000*
*lhoff@wilmingtontrust.com*

-----Original Message-----
**From:**        Bennett, Caryn Y.
**Sent:**        Friday, March 31, 2006 10:01 AM
**To:**          Coleman, Rhonda A.; Hoff, Linda M.
**Subject:**     RE: Buzzer in Doylestown

A work order has been issued - per your request.

-----Original Message-----
**From:**        Coleman, Rhonda A.
**Sent:**        Tuesday, March 28, 2006 8:51 AM
**To:**          Hoff, Linda M.
**Cc:**          Bennett, Caryn Y.
**Subject:**     RE: Buzzer in Doylestown

I will place a work order to have it fixed!!

-----Original Message-----
**From:**        Hoff, Linda M.
**Sent:**        Monday, March 27, 2006 2:47 PM
**To:**          Coleman, Rhonda A.
**Subject:**     Buzzer in Doylestown

Rhonda,

Greetings

I hope you can point me in the right direction .. Our buzzer at the front entrance is acting strange .. There is a delay between the time the buzzer is pushed and it is heard in the office.

Who could help us with this?

Thanks,
Linda

*Linda Hoff*
*Wilmington Trust of Pennsylvania*
*Commercial Banking*
*2003 South Easton Road, Suite 204*
*Doylestown, PA  18901-7100*
*267-880-7000*
*lhoff@wilmingtontrust.com*

2

⊌JS 44  (Rev. 12/07)

**CIVIL COVER SHEET**

— 0 8 - 5 0 — ⸱

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.  (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| Rhonda A. Coleman | Wilmington Trust Co |
| **(b)** County of Residence of First Listed Plaintiff  SAlem<br>(EXCEPT IN U.S. PLAINTIFF CASES) | County of Residence of First Listed Defendant  NewCastle<br>(IN U.S. PLAINTIFF CASES ONLY)<br>NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE<br>LAND INVOLVED. |
| **(c)** Attorney's (Firm Name, Address, and Telephone Number) | Attorneys (If Known) |

**II. BASIS OF JURISDICTION** (Place an "X" in One Box Only)

| | |
|---|---|
| ❐ 1  U.S. Government<br>Plaintiff | ☒ 3  Federal Question<br>(U.S. Government Not a Party) |
| ❐ 2  U.S. Government<br>Defendant | ❐ 4  Diversity<br>(Indicate Citizenship of Parties in Item III) |

**III. CITIZENSHIP OF PRINCIPAL PARTIES** (Place an "X" in One Box for Plaintiff
(For Diversity Cases Only)                                and One Box for Defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ❐ 1 | ☒ 1 | Incorporated or Principal Place<br>of Business In This State | ❐ 4 | ☒ 4 |
| Citizen of Another State | ☒ 2 | ❐ 2 | Incorporated and Principal Place<br>of Business In Another State | ❐ 5 | ❐ 5 |
| Citizen or Subject of a<br>Foreign Country | ❐ 3 | ❐ 3 | Foreign Nation | ❐ 6 | ❐ 6 |

**IV.  NATURE OF SUIT** (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ❐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ❐ 610 Agriculture | ❐ 422 Appeal 28 USC 158 | ❐ 400 State Reapportionment |
| ❐ 120 Marine | ❐ 310 Airplane | ❐ 362 Personal Injury - | ❐ 620 Other Food & Drug | ❐ 423 Withdrawal | ❐ 410 Antitrust |
| ❐ 130 Miller Act | ❐ 315 Airplane Product | Med. Malpractice | ❐ 625 Drug Related Seizure | 28 USC 157 | ❐ 430 Banks and Banking |
| ❐ 140 Negotiable Instrument | Liability | ❐ 365 Personal Injury - | of Property 21 USC 881 | | ❐ 450 Commerce |
| ❐ 150 Recovery of Overpayment | ❐ 320 Assault, Libel & | Product Liability | ❐ 630 Liquor Laws | **PROPERTY RIGHTS** | ❐ 460 Deportation |
| & Enforcement of Judgment | Slander | ❐ 368 Asbestos Personal | ❐ 640 R.R. & Truck | ❐ 820 Copyrights | ❐ 470 Racketeer Influenced and |
| ❐ 151 Medicare Act | ❐ 330 Federal Employers' | Injury Product | ❐ 650 Airline Regs. | ❐ 830 Patent | Corrupt Organizations |
| ❐ 152 Recovery of Defaulted | Liability | Liability | ❐ 660 Occupational | ❐ 840 Trademark | ❐ 480 Consumer Credit |
| Student Loans | ❐ 340 Marine | **PERSONAL PROPERTY** | Safety/Health | | ❐ 490 Cable/Sat TV |
| (Excl. Veterans) | ❐ 345 Marine Product | ❐ 370 Other Fraud | ❐ 690 Other | | ❐ 810 Selective Service |
| ❐ 153 Recovery of Overpayment | Liability | ❐ 371 Truth in Lending | **LABOR** | **SOCIAL SECURITY** | ❐ 850 Securities/Commodities/ |
| of Veteran's Benefits | ❐ 350 Motor Vehicle | ❐ 380 Other Personal | ❐ 710 Fair Labor Standards | ❐ 861 HIA (1395ff) | Exchange |
| ❐ 160 Stockholders' Suits | ❐ 355 Motor Vehicle | Property Damage | Act | ❐ 862 Black Lung (923) | ❐ 875 Customer Challenge |
| ❐ 190 Other Contract | Product Liability | ❐ 385 Property Damage | ❐ 720 Labor/Mgmt. Relations | ❐ 863 DIWC/DIWW (405(g)) | 12 USC 3410 |
| ❐ 195 Contract Product Liability | ❐ 360 Other Personal | Product Liability | ❐ 730 Labor/Mgmt.Reporting | ❐ 864 SSID Title XVI | ❐ 890 Other Statutory Actions |
| ❐ 196 Franchise | Injury | | & Disclosure Act | ❐ 865 RSI (405(g)) | ❐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ❐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ❐ 892 Economic Stabilization Act |
| ❐ 210 Land Condemnation | ❐ 441 Voting | ❐ 510 Motions to Vacate | ❐ 790 Other Labor Litigation | ❐ 870 Taxes (U.S. Plaintiff | ❐ 893 Environmental Matters |
| ❐ 220 Foreclosure | ☒ 442 Employment | Sentence | ❐ 791 Empl. Ret. Inc. | or Defendant) | ❐ 894 Energy Allocation Act |
| ❐ 230 Rent Lease & Ejectment | ❐ 443 Housing/ | **Habeas Corpus:** | Security Act | ❐ 871 IRS—Third Party | ❐ 895 Freedom of Information |
| ❐ 240 Torts to Land | Accommodations | ❐ 530 General | | 26 USC 7609 | Act |
| ❐ 245 Tort Product Liability | ❐ 444 Welfare | ❐ 535 Death Penalty | **IMMIGRATION** | | ❐ 900 Appeal of Fee Determination |
| ❐ 290 All Other Real Property | ❐ 445 Amer. w/Disabilities - | ❐ 540 Mandamus & Other | ❐ 462 Naturalization Application | | Under Equal Access |
| | Employment | ❐ 550 Civil Rights | ❐ 463 Habeas Corpus - | | to Justice |
| | ❐ 446 Amer. w/Disabilities - | ❐ 555 Prison Condition | Alien Detainee | | ❐ 950 Constitutionality of |
| | Other | | ❐ 465 Other Immigration | | State Statutes |
| | ☒ 440 Other Civil Rights | | Actions | | |

**V.  ORIGIN** (Place an "X" in One Box Only)

| | | | | | |
|---|---|---|---|---|---|
| ❐ 1 Original<br>Proceeding | ❐ 2 Removed from<br>State Court | ❐ 3 Remanded from<br>Appellate Court | ❐ 4 Reinstated or<br>Reopened | ❐ 5 Transferred from<br>another district<br>(specify) | ❐ 6 Multidistrict<br>Litigation | ❐ 7 Appeal to District<br>Judge from<br>Magistrate<br>Judgment |

**VI. CAUSE OF ACTION**
Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
Title VII of 1964 civil Rights Act
Brief description of cause:

**VII. REQUESTED IN**
**COMPLAINT:**
❐ CHECK IF THIS IS A CLASS ACTION
UNDER F.R.C.P. 23
**DEMAND $**
CHECK YES only if demanded in complaint:
**JURY DEMAND:**  ❐ Yes  ❐ No

**VIII. RELATED CASE(S)**
**IF ANY**
(See instructions):
JUDGE _____ DOCKET NUMBER _____

DATE  1-23-08
SIGNATURE OF ATTORNEY OF RECORD  Rhonda A. Coleman

**FOR OFFICE USE ONLY**

RECEIPT # _____  AMOUNT _____  APPLYING IFP _____  JUDGE _____  MAG. JUDGE _____

Rule 4 issued
Rec # 150478          MA

AO FORM 85 RECEIPT (REV. 9/04)

United States District Court for the District of Delaware

Civil Action No. _____ 0 8 - 5 0 _____

# ACKNOWLEDGMENT
# OF RECEIPT FOR AO FORM 85

## *NOTICE OF AVAILABILITY OF A*
## *UNITED STATES MAGISTRATE JUDGE*
## *TO EXERCISE JURISDICTION*

I HEREBY ACKNOWLEDGE RECEIPT OF _____ 2 _____ COPIES OF AO FORM 85.

_____1/24/08_____
(Date forms issued)

x _____
(Signature of Party or their Representative)

x. Rhonda A. Coleman
(Printed name of Party or their Representative)

Note: Completed receipt will be filed in the Civil Action

OFFÌCE OF THE CLERK
**UNITED STATES DISTRICT COURT**
DISTRICT OF DELAWARE

Peter T. Dalleo
**CLERK**

**LOCKBOX 18**
**844 KING STREET**
**U.S. COURTHOUSE**
**WILMINGTON, DELAWARE 19801**
**(302) 573-6170**

**RE:  C.A.#** ___0 8 - 5 0_____

**CASE CAPTION:** _____ **v.** _____

## ACKNOWLEDGMENT OF RECEIPT FOR F.R.Civ.P. 4

       I hereby acknowledge receipt of a copy of Rule 4 (Summons) of the Federal Rules of Civil Procedure, and understand that it is my responsibility to make service of process on defendants in accordance with this rule.

Date Received ___1/24/07___
by Plaintiff:

Signed: _X_____
           Pro Se Plaintiff

Date Received ___1/24/08___
by Clerk's office:

Signed: _____
           Deputy Clerk

Note:  If you received Federal Rule 4 by mail, please sign this receipt and return it to:

    Clerk
    U.S. District Court
    844 N. King Street
    Lockbox 18
    Wilmington, DE 19801

If applicable,  Rule 4 mailed to plaintiff:

_____
       Date mailed

_____
       By  Deputy Clerk

cc:  Docketing Clerk

wp\forms\rule4receipt 2-04